IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JOHNATHAN B. GERALD,

        Plaintiff,

vs.                                                          No. CIV 10-0721 JB/LFG

MIKE LOCKSLEY, BOARD OF REGENTS OF
THE UNIVERSITY OF NEW MEXICO, and
PAUL KREBS,

        Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendants' Motion to Dismiss Plaintiff's

First Amended Complaint, filed December 6, 2010 (Doc. 23)("Motion").  The Court held a hearing

on January 27, 2011.  The primary issues are: (i) whether Plaintiff Johnathan Gerald has adequately

set forth allegations to support his claims in his First Amended Complaint for Personal Injury, Race

Discrimination and Deprivation of First Amendment Rights under Color of State Law, filed

November 2, 2011 (Doc. 19)("FAC"); (ii) and whether that Court should allow Gerald to amend his

FAC to attempt to plead a hostile work environment claim.  The Court dismisses with prejudice

Gerald's FAC.  The Court grants Gerald leave to amend his FAC to attempt to plead a hostile work

environment claim, based on the allegations in his EEOC Charge, filed December 6, 2010 (Doc. 23-

1).

## FACTUAL BACKGROUND

Locksley is the head football coach at the University of New Mexico ("UNM").  Defendant

Paul Krebs is the Athletic Director at UNM.  At all times relevant to FAC, UNM employed Gerald

as an assistant coach responsible for working the team's wide receivers.  Gerald's claims arise from

an alleged alteration with Locksley, and UNM's and Krebs' subsequent response to this incident.

Gerald alleges that, after a team practice session in August of 2009, before the physical altercation between Gerald and Locksley on which Gerald bases his tort claims, Locksley physically threatened him. Gerald further alleges that, on or about September 20, 2009, during a coach's meeting at the UNM athletic facility, Locksley choked Gerald and punched him in the face. Gerald asserts that the "attack was under the guise of a disciplinary action against the Plaintiff, who had incurred the Defendant's displeasure for the team's performance during a game," and that "Locksley expressed his displeasure at what he perceived to [be Gerald's] disobedience or insubordination." FAC ¶¶ 15, 16, at 3.

On September 20, 2009, Gerald reported the incident to UNM management and police, including Krebs. Gerald asserts that "Krebs and other UNM officials did not take appropriate measures to handle the situation." FAC ¶ 18, at 3. Krebs encouraged Gerald "to minimize and trivialize what had occurred," and "suggested to Plaintiff that his career would not benefit if he persisted in complaining of Locksely's behavior and that he should desist from any further action in the matter and from making any statements in regard to the assault." FAC ¶¶ 20-21, at 3. Gerald alleges that Krebs' "motive and intent . . . was to protect the University athletic program from criticism because of the incident, and to protect his position as Athletic Director, and the statements were discriminatory and retaliatory in nature." FAC ¶ 22, at 3-4. Gerald asserts that Krebs publically denied and minimized the altercation between Locksley and Gerald, initially issuing a letter of reprimand to Locksley, without imposing further discipline. Gerald further asserts that, after a public outcry over the light response, the UNM administration suspended Locksley for ten days.

Gerald was placed on administrative leave for the remainder of the 2010 football season. Although UNM invited Gerald to return to his employment with the UNM football team the following year, he refused to do.  Gerald alleges that UNM and Krebs' discipline of Locksley was insufficient to deter further acts of violence.

On December 6, 2010, Gerald filed a charge of discrimination with the EEOC.  His EEOC Charge named only UNM as the respondent.  <u>See</u> EEOC Charge at 2.  Moreover, in his EEOC Charge, Gerald did not check the box for retaliation; he checked only "race" as the basis for his claims of discrimination.  EEOC Charge at 2.  The narrative portion of the charge lists a number of grievances and states:

> Statement of Discrimination: I was hired by the Respondent on December 19, 2008, as a Full time Football Coach.  During the time of my employment my supervisor (Head Coach) has subjected me to different working term and conditions than the other White coaches, including, but not limited to, threats and intimidation of physical abuse, demeaning my decisions, and cursing me in front of my peers and students. On September 20, 2009, my supervisor physically assaulted me by choking and punching me about the face.  I reported this to management and nothing was done.  These conditions have made my working atmosphere hostile to which it has affected my performance of duties.

> I believe that I have been discriminated against because of my Race (Black) in violation of Title VII of the Civil Rights Act of 1964 as amended.

EEOC Charge at 2.

## PROCEDURAL BACKGROUND

On July 30, 2010, Gerald filed suit against Locksley and UNM, raising claims for assault and battery, race discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17, and the New Mexico Human Rights Act, NMSA 1978, §§ 28-1-1 to -15 ("NMHRA"), and First-Amendment retaliation.  Locksley and UNM filed a motion to dismiss Locksley's original Complaint, <u>see</u> Defendants' Motion to Dismiss, filed August 25, 2010 (Doc. 6), and in response,

Locksley filed his FAC, which added Krebs as a Defendant and raised several additional claims -- i.e., retaliation under Title VII and the NMHRA, a denial of equal protection, and breach of contract. Locksley also pursues a claim for punitive damages in Count VI of his Amended Complaint.

As to adverse employment action, Gerald asserts in the FAC that Krebs and UNM "failed to take appropriate remedial action and dissuaded and discouraged Plaintiff from persisting in his complaining and requiring remedial action . . . ." FAC ¶ 42, at 7.  Gerald states that "[t]he motive and intent behind Defendant Krebs' statements to Plaintiffs [sic] was to protect the University athletic program from criticism because of the incident, and protect his position as Athletic Director."  FAC ¶ 22, at 3-4.

The Defendants withdrew their original motion to dismiss, based on Gerald's decision to amend.  See Notice of Withdrawal of Defendants' Motion to Dismiss, filed October 28, 2010 (Doc. 17).  Before the Defendants filed their second motion to dismiss, Mark Baker, the Defendants' counsel, conferred, pursuant to D.N.M.LR-Civ. 7.1, with Gerald's counsel, Dennis Montoya, regarding the relief requested through this Motion.  Gerald opposes this motion.

The Defendants now move the Court, pursuant to rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss Gerald's FAC in its entirety.  The Defendants assert that the allegations in Gerald's FAC fail to establish his claims.  On December 20, 2010, Gerald filed his Response to Defendants' Motion to Dismiss Plaintiff's First Amended Complaint.  See Doc. 24. Gerald opposes the Motion, asserting that he was adequately set forth his claims.  On January 25, 2011, the Defendants filed their Reply in Support of Defendants' Motion to Dismiss Plaintiff's First Amended Complaint.  See Doc. 31.

At the hearing, Gerald conceded that his constitutional claims against UNM must be

dismissed under the Eleventh Amendment.  See Transcript of Hearing at 76:19-77:13 (taken January 27, 2011)(Court, Montoya)("Tr.")[1]

## LEGAL STANDARD FOR MOTIONS TO DISMISS UNDER RULE 12(b)(1)

"Federal courts are courts of limited jurisdiction; they are empowered to hear only those cases authorized and defined in the Constitution which have been entrusted to them under a jurisdictional grant by Congress."  Henry v. Office of Thrift Supervision, 43 F.3d 507, 511 (10th Cir. 1994)(citations omitted).  A plaintiff generally bears the burden of demonstrating the court's jurisdiction to hear his or her claims.  See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 104 (1998)("[T]he party invoking federal jurisdiction bears the burden of establishing its existence.").  Rule 12(b)(1) allows a party to raise the defense of the court's "lack of jurisdiction over the subject matter" by motion.  Fed. R. Civ. P. 12(b)(1).  The United States Court of Appeals for the Tenth Circuit has held that motions to dismiss for lack of subject-matter jurisdiction "generally take one of two forms: (1) a facial attack on the sufficiency of the complaint's allegations as to subject-matter jurisdiction; or (2) a challenge to the actual facts upon which subject-matter jurisdiction is based."  Ruiz v. McDonnell, 299 F.3d 1173, 1180 (10th Cir. 2002).

> On a facial attack, a plaintiff is afforded safeguards similar to those provided in opposing a rule 12(b)(6) motion: the court must consider the complaint's allegations to be true.  See Ruiz v. McDonnell, 299 F.3d at 1180; Williamson v. Tucker, 645 F.2d 404, 412 (5th Cir. 1981).  But when the attack is aimed at the jurisdictional facts themselves, a district court may not presume the truthfulness of those allegations. A court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1).  In such instances, a court's reference to evidence outside the pleadings does not convert the motion to a Rule 56 [summary-judgment] motion.

---

[1] The Court's citations to the transcript refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

Alto Eldorado Partners v. City of Santa Fe, No. CIV 08-0175 JB/ACT, 2009 WL 1312856, at *8-9

(D.N.M. Mar.11, 2009)(Browning, J.)(citations omitted).  As the United States Court of Appeals for

the Fifth Circuit has stated:

> [T]he trial court may proceed as it never could under 12(b)(6) or Fed. R. Civ. P. 56.
> Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction -- its very
> power to hear the case -- there is substantial authority that the trial court is free to
> weigh the evidence and satisfy itself as to the existence of its power to hear the case.
> In short, no presumptive truthfulness attaches to plaintiff's allegations, and the
> existence of disputed material facts will not preclude the trial court from evaluating
> for itself the merits of jurisdictional claims.

Williamson v. Tucker, 645 F.2d 404, 412-13 (5th Cir. 1981)(quoting Mortenson v. First Fed. Sav.

& Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977)).

When making a rule 12(b)(1) motion, a party may go beyond the allegations in the complaint

to challenge the facts upon which jurisdiction depends, and may do so by relying on affidavits or

other evidence properly before the court.  See New Mexicans for Bill Richardson v. Gonzales, 64

F.3d 1495, 1499 (10th Cir. 1995); Holt v. United States, 46 F.3d 1000, 1003 (10th Cir. 1995).  In

those instances, a court's reference to evidence outside the pleadings does not necessarily convert

the motion to a rule 56 motion for summary judgment.  See Holt v. United States, 46 F.3d at 1003

(citing Wheeler v. Hurdman, 825 F.2d 257, 259 n.5 (10th Cir. 1987)).  Where, however, the court

determines that jurisdictional issues raised in rule 12(b)(1) motion are intertwined with the case's

merits, the court should resolve the motion under either rule 12(b)(6) or rule 56.  See Franklin Sav.

Corp. v. United States, 180 F.3d 1124, 1129 (10th Cir. 1999); Tippet v. United States, 108 F.3d

1194, 1196 (10th Cir. 1997).  "When deciding whether jurisdiction is intertwined with the merits

of a particular dispute, 'the underlying issue is whether resolution of the jurisdictional question

requires resolution of an aspect of the substantive claim.'"  Davis ex rel. Davis v. United States, 343

F.3d 1282, 1296 (10th Cir. 2003)(quoting Sizova v. Nat'l Inst. of Standards & Tech., 282 F.3d 1320, 1324 (10th Cir. 2002)).

## LAW REGARDING RULE 12(b)(6)

Under rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994)(citation omitted). The sufficiency of a complaint is a question of law, and when considering and addressing a rule 12(b)(6) motion, a court must accept as true all well-pleaded factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor. See Smith v. United States, 561 F.3d 1090, 1097 (10th Cir. 2009); Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006); Hous. Auth. of Kaw Tribe v. City of Ponca City, 952 F.2d 1183, 1187 (10th Cir. 1991). A complaint challenged by a rule 12(b)(6) motion to dismiss does not need to set forth detailed factual allegations, but a plaintiff's burden to set forth the grounds of his or her entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). See Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009)(stating that a plaintiff's complaint must set forth more than a threadbare recital "of the elements of a cause of action, supported by mere conclusory statements"). To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face. See Bell Atl. Corp v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995 (10th Cir. 2010). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal,

129 S. Ct. at 1940.

## LAW REGARDING EXHAUSTION OF ADMINISTRATIVE REMEDIES

Both Title VII and NMHRA claims must be administratively exhausted before being brought in federal court.  Title VII creates a work-sharing deferral system between the EEOC and the states that have their own employment discrimination legislation.  See 42 U.S.C. § 2000e-5(c), (d).  In the states that possess their own employment discrimination legislation, the EEOC must generally "defer" to state or local remedies.  EEOC v. Superior Temp. Servs., Inc., 56 F.3d 441, 447 (2d Cir. 1995)(quoting 42 U.S.C. § 2000e-5(c), (d)).  The NMHRA places New Mexico among those states that have their own employment discrimination legislation and contact agencies.  See 29 C.F.R. § 1601.74 (2005).  In New Mexico, a complainant can, upon meeting filing requirements, proceed with his or her grievance either through the EEOC or through the New Mexico Human Rights Division ("NMHRD").  See Mitchell-Carr v. McLendon, 127 N.M. 282, 286-87, 980 P.2d 65, 69-70 (1999).  "In a State that has an entity with the authority to grant or seek relief with respect to the alleged unlawful practice, an employee who initially files a grievance with that agency must file the charge with the EEOC within 300 days of the employment practice."  Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 109 (2002).  Once a person elects to proceed with his or her complaint under state law, the NMHRA controls the grievance procedures for resolving the complaint.  See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. at 109.

Whether complainants decide to pursue their grievances with the EEOC or with the NMHRD, they must exhaust their respective regimes' administrative remedies before seeking judicial review.  See Jones v. Runyon, 91 F.3d 1398, 1399 (10th Cir. 1996)("Exhaustion of administrative remedies is a jurisdictional prerequisite to suit under Title VII."); Mitchell-Carr v.

-8-

McLendon, 127 N.M. at 288, 980 P.2d at 71 ("[E]xhaustion of administrative remedies is a

prerequisite to suit under the NMHRA, and a failure to exhaust administrative remedies may mean

that the court lacks subject-matter jurisdiction.")(citing Luboyeski v. Hill, 117 N.M. 380, 382, 872

P.2d 353, 355 (1994)).   Exhaustion of administrative remedies is central to Title VII's statutory

scheme, because it provides the EEOC and state deferral agencies with the first opportunity to

investigate discriminatory practices, and enables them to perform their roles of obtaining voluntary

compliance and of promoting conciliatory efforts.   See Patterson v. McLean Credit Union, 491 U.S.

164, 180-81 (1989); Williams v. Little Rock Mun. Water Works, 21 F.3d 218, 222 (8th Cir. 1994).

### 1.      The Exhaustion of Administrative Remedies Under the NMHRA.

The NMHRA makes it an unlawful discriminatory practice for

> an employer, unless based on a bona fide occupational qualification or other
> statutory prohibition, to refuse to hire, to discharge, to promote or demote or to
> discriminate in matters of compensation, terms, conditions or privileges of
> employment against any person otherwise qualified because of race, age, religion,
> color, national origin, ancestry, sex, physical or mental handicap or serious medical
> condition, or, if the employer has fifty or more employees, spousal affiliation;
> provided, however, that 29 U.S.C. Section 631(c)(1) and (2) shall apply to
> discrimination based on age; or, if the employer has fifteen or more employees, to
> discriminate against an employee based upon the employee's sexual orientation or
> gender identity. . . .

NMSA 1978, § 28-1-7.  The NMHRA also allows individuals to bring a lawsuit in the appropriate

district court after exhausting their administrative remedies.  See Luboyeski v. Hill, 117 N.M. at 382,

872 P.2d at 355. The NMHRA provides:

> A person aggrieved by an order of the commission may obtain a trial de novo in the
> district court of the county where the discriminatory practice occurred or where the
> respondent does business by filing a notice of appeal within ninety days from the
> date of service of the commission's order.

NMSA 1978, § 28-1-13A.

To bring an NMHRA suit in district court, a plaintiff is required to exhaust the administrative grievance process with respect to all defendants named in the district-court lawsuit.  See Luboyeski v. Hill, 117 N.M. at 383, 872 P.2d at 356 ("Since [the plaintiff] has not gone through the administrative process that is prerequisite to suing the individual defendants under the Human Rights Act, we affirm the trial court's order dismissing those defendants.").  Accordingly, in Luboyeski v. Hill, the Supreme Court of New Mexico affirmed a trial court's dismissal of respondents who were not named in the administrative proceeding, but who were added to the appeal to the district court.  See 117 N.M. at 383, 872 P.2d at 356.

As this Court has previously acknowledged, the Supreme Court of New Mexico allows for personal liability under the NMHRA.  See Duprey v. Twelfth Judicial Dist. Court, No. CIV 08-0756 JB, 2009 WL 2482170, at *7 (D.N.M. July 28, 2009)(Browning, J.).  The NMHRA defines "employer" as "any person employing four or more persons and any person acting for an employer." NMSA 1978, § 28-1-2B.  While acknowledging that there is generally no personal liability under Title VII, the Supreme Court of New Mexico has "reject[ed] the proposition that there can exist no individual liability under the NMHRA."  Sonntag v. Shaw, 130 N.M. 238, 243, 22 P.3d 1188, 1193 (2001).  In Sonntag v. Shaw, a defendant relied on Title VII case law to argue that the owner of a corporation could not be sued as an individual under the NMHRA.  See  Sonntag v. Shaw, 130 N.M. at 243, 22 P.3d at 1193.  Although it held that the defendant could not be held personally liable, given that the plaintiff had failed to exhaust administrative remedies, the Supreme Court of New Mexico declined to close the door on individual liability under the NMHRA.  See Sonntag v. Shaw, 130 N.M. at 243, 22 P.3d at 1193.  The Supreme Court of New Mexico noted:

> [T]his Court has acknowledged the possibility of individual liability for
> discrimination claims.  Cf. Luboyeski v. Hill, 117 N.M. 380, 382, 872 P.2d 353, 355

(1994) (affirming the dismissal of individual defendants because the plaintiff failed to exhaust administrative remedies against them); Mitchell-Carr v. McLendon, 1999-NMSC-025, ¶ 10, 127 N.M. 282, 980 P.2d 65 (citing Luboyeski). As Plaintiff suggests, the potential for individual liability for discrimination claims is rooted in the language of the NMHRA itself, which forbids "any person" from supporting a discriminatory practice. Section 28-1-7(I); see NMSA 1978, § 28-1-2(A) (1993) (including within its definition of "person" for purposes of the NMHRA, "one or more individuals").

Sonntag v. Shaw, 130 N.M. at 243, 22 P.3d at 1193.

### 2.    The Exhaustion of Administrative Remedies under Title VII.

Title VII prohibits an employer from "fail[ing] or refus[ing] to hire or . . . discharg[ing] any individual, or otherwise . . . discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "Under long-standing [Tenth] [C]ircuit precedent, supervisors and other employees may not be held personally liable under Title VII." Williams v. W.D. Sports, N.M., Inc., 497 F.3d 1079, 1083 n.9 (10th Cir. 2007). See Haynes v. Williams, 88 F.3d 898, 899 (10th Cir. 1996)("The relief granted under Title VII is against the employer, not individual employees whose actions would constitute a violation of the Act."). Before commencing a Title VII action in federal court in a state with an agency empowered to investigate employment discrimination, like the New Mexico Department of Labor, Human Rights Division, "a plaintiff first must exhaust administrative remedies by filing a charge of discrimination with the EEOC within 300 days of the allegedly unlawful employment practice." Castaldo v. Denver Public Sch., 276 F. App'x 839, 841 (10th Cir. 2008)(citing 42 U.S.C. § 2000e-5(e)(1); 42 U.S.C. § 12117(a); Proctor v. United Parcel Serv., 502 F.3d 1200, 1206 & n.3 (10th Cir. 2007)(explaining filing times in deferral states, which are those states that have "an agency empowered to investigate employment discrimination"). To exhaust administrative remedies, an individual claimant must: (i)

timely file a charge of discrimination with the EEOC setting forth the facts and nature of the charge; and (ii) receive notice of the right to sue.  See 42 U.S.C. §§ 2000e-5(b), (c), (e), (f)(1); Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1326 (10th Cir. 1999).  "[A] plaintiff normally may not bring a[n] . . . action based upon claims that were not part of a timely-filed EEOC charge for which the plaintiff has received a right-to-sue letter."  Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs., 165 F.3d at 1321.

To be timely, a plaintiff must file the charge with the EEOC within 180 days or with a state agency within 300 days of the complained-of conduct.  See 42 U.S.C. § 2000e-5(e)(1); 29 C.F.R. § 1601.13 (1998); Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs., 165 F.3d at 1327; Gunnell v. Utah Valley St. Coll., 152 F.3d 1253, 1260 n.3 (10th Cir. 1998).  Once an individual receives notice of the right to sue, he or she has ninety days in which to file suit.  See 42 U.S.C. § 2000e-5(f)(1).

**3.      The Exhaustion of Administrative Remedies Is a Jurisdictional Requirement.**

In the Tenth Circuit, exhaustion of administrative remedies is a jurisdictional prerequisite to filing a Title VII action.  See Jones v. United Parcel Serv., Inc., 502 F.3d at 1183; Alcivar v. Wynne, 268 F. App'x 749, 753 (10th Cir. 2008)("The Tenth Circuit has consistently held that 'exhaustion . . . is a jurisdictional prerequisite to suit under Title VII -- not merely a condition precedent to suit.'")(quoting Shikles v. Sprint/United Mgmt. Co., 426 F.3d 1304, 1317 (10th Cir. 2005)); Ransom v. U.S. Postal Service, 170 F. App'x 525, 527 & n.2 (10th Cir. 2006)("[A] claimant under the Rehabilitation Act . . . is required to present her claims to the appropriate EEO agency before filing suit.")(citing 5 U.S.C. § 7702(a)(2)); Wells v. Shalala, 228 F.3d 1137, 1142-43 (10th Cir. 2000)); Jones v. Runyon, 91 F.3d 1398, 1399 (10th Cir. 1996)("Exhaustion of administrative

remedies is a jurisdictional prerequisite to suit under Title VII."); Romero v. Union Pac. R.R., 615 F.2d 1303, 1303 (10th Cir. 1980).

Without such a filing, federal courts lack subject-matter jurisdiction to entertain discrimination claims under that statutes, and a rule 12(b)(1) motion to dismiss is procedurally proper.  See Seymore v. Shawyer & Sons, Inc., 111 F.3d 794, 799 (10th Cir. 1997); Carmody v. SCI Colo. Funeral Servs., Inc., 76 F. Supp. 2d 1101, 1103-04 (D. Colo. 1999).[2]  When a defendant brings a motion to dismiss for lack of subject-matter jurisdiction under rule 12(b)(1) based on a plaintiff's failure to exhaust administrative remedies in a timely manner, a court "analyze[s] th[e] case under 12(b)(6) of the Federal Rules of Civil Procedure," unless a court considers materials outside the complaint, in which case "it should . . . treat[] [the] motion as a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure."  Douglas v. Norton, 167 F. App'x 698, 704-05 (10th Cir. 2006).

a.      **The Scope of the EEOC Charge.**

"A plaintiff's claim in federal court is generally limited by the scope of the administrative

---

[2] The Tenth Circuit has mentioned some concern whether failure to exhaust administrative remedies is still a jurisdictional prerequisite to suit after the Supreme Court's decision in Jones v. Bock, 549 U.S. 199 (2007).  See, e.g., Alcivar v. Wynne, 268 F. App'x at 753 (noting that "Jones v. Bock held that under the PLRA [Prison Litigation Reform Act] exhaustion is an affirmative defense to be raised by the defendant and not a jurisdictional pleading requirement," but finding it was "not . . . necessary to decide whether exhaustion is jurisdictional under Title VII after Jones."); McQueen v. Colo. Springs Sch. Dist. No. 11, 488 F.3d 868, 874 (10th Cir. 2007)("Although courts have repeatedly referred to the exhaustion requirement as jurisdictional, . . . recent Supreme Court jurisprudence in other contexts casts doubt on that characterization . . . .")(citations omitted, emphasis in original).  A recent unpublished Tenth Circuit decision indicates that Jones v. Bock did not demote the exhaustion requirement from a jurisdictional prerequisite to an affirmative defense, at least in the Title VII context.  See Martinez v. Target Corp., No. 09-2112, 2010 WL 2616651, at *3 n.2 (10th Cir. July 1, 2010)(Kelly, Porfilio, O'Brien, JJ.)("Martinez is not proceeding under the PLRA; Bock is inapposite.  She does not point us to a single decision -- of this or any other court -- applying Bock in the context of a Title VII or ADEA case.").

investigation that can reasonably be expected to follow the charge of discrimination submitted to the EEOC." MacKenzie v. City & County of Denver, 414 F.3d 1266, 1274 (10th Cir. 2005). "We liberally construe charges filed with the EEOC in determining whether administrative remedies have been exhausted as to a particular claim." Jones v. United Parcel Serv., Inc., 502 F.3d at 1186. "This more lenient pleading standard contemplates the fact that administrative charges of unlawful employment practices are regularly filled out by employees who do not have the benefit of counsel." Mitchell v. City of Wichita, 112 F. App'x 662, 667 (10th Cir. 2005). "[T]he charge must contain facts concerning the discriminatory and retaliatory actions underlying each claim." Jones v. United Parcel Serv., Inc., 502 F.3d at 1186. "The failure to mark a particular box creates a presumption that the charging party is not asserting claims represented by that box." Jones v. United Parcel Serv., Inc., 502 F.3d at 1186 (citing Gunnell v. Utah Valley State College, 152 F.3d 1253, 1260 (10th Cir. 1998)). "The presumption may be rebutted, however, if the text of the charge clearly sets forth the basis of the claim." Jones v. United Parcel Service, Inc., 502 F.3d at 1186.

Liberally construing EEOC complaints requires courts to look beyond the formalities of the complaint form. The Tenth Circuit held in Jones v. United Parcel Service, Inc. that, while Jones checked "no" to the questions, "[d]o you believe that the employer regarded you as disabled?" and "did you advise you employer that you required an accommodation?", Jones' allegations that UPS interfered with a medical evaluation to ensure Jones was not released to return to work, that UPS did not permit Jones to return to work despite releases from two doctors, and that Jones checked a box for retaliation, should have triggered an administrative investigation into whether UPS discriminated against Jones because he was disabled and whether UPS retaliated against him. 502 F.3d at 1182, 1186-87. Because Jones checked "no" in response to the question whether he advised

his employer he needed accommodation and because the text of the charge did not contain facts that would prompt an investigation of such a claim, the Tenth Circuit held that Jones did not exhaust his administrative remedies with respect to his failure-to-accommodate claim.  502 F.3d at 1187.

In Duncan v. Manager Department of Safety, 397 F.3d 1300 (10th Cir. 2005), a former police officer filed an EEOC charge against the city on April 14, 1998, and checked the box for retaliation. See 397 F.3d at 1314.  The officer alleged a series of acts before the date the EEOC charge was filed that were supposedly in retaliation for her use of the complaint process.  See 397 F.3d at 1314.  The Tenth Circuit held that none of the actions the officer alleged in her EEOC charge were sufficient to support a retaliation claim.  See 397 F.3d at 1314.  The Tenth Circuit noted that her allegation in her complaint that in August of 1998 -- months after filing her EEOC complaint -- she was transferred to the police academy in retaliation for filing her original EEOC charge was severe enough to support a retaliation claim. See 397 F.3d at 1314.  The Tenth Circuit noted, however, that, because the officer did not file an additional EEOC charge alleging that specific retaliatory act, she did not exhaust her administrative remedies and thus the district court correctly dismissed her claim for retaliation.  See 397 F.3d at 1314.

In Annett v. University of Kansas, 371 F.3d 1233 (10th Cir. 2003), the Tenth Circuit declined to consider Annett's contention that receiving the position of adjunct lecturer versus adjunct professor constituted a retaliation action, because she failed to exhaust her administrative remedies.  See id. at 1238.  The Tenth Circuit considered Annett's charge of discrimination filed September 6, 2000, and her "complaint narrative" submitted on May 31, 2000, and found no reference to a distinction between "lecturer" and "professor" as probative of discrimination or retaliation.  371 F.3d at 1238.  Annett's complaint stated: "I was given an Adjunct faculty position,

but no Principal Investigator status, which prevents me from obtaining grants."  371 F.3d at 1238.

Annett's complaint narrative stated: "My own position as an Adjunct Faculty member at KU was

downgraded to prevent me from submitting grants that could act as an alternative source of income."

371 F.3d at 1238.  The Tenth Circuit held that it could not conclude "that this sentence represents

the distinction between being appointed an adjunct lecturer versus an adjunct professor in 1999 or

2000."  371 F.3d at 1238.  Furthermore, the Tenth Circuit noted that it "lack[ed] jurisdiction to

review Title VII claims that are not part of a timely-filed EEOC charge," including actions that

occurred after the charge was filed.  371 F.3d at 1238 (citing Seymore v. Shawver & Sons, Inc., 111

F.3d  at 799).

> Previously, we would proceed to examine whether the alleged employment action,
> provided it occurred after the filing of the EEOC charge, was "like or reasonably
> related to the allegations of the EEOC charge."  However, our recent holding in
> Martinez v. Potter, has foreclosed this line of inquiry.  In Martinez, we abrogated the
> continuing violation exception to our jurisdictional requirements to allege a claim of
> retaliation and held that "unexhausted claims involving discrete employment actions
> are no longer viable."  In so doing, we relied on National R.R. Passenger Corp. v.
> Morgan, which concluded that each discrete retaliatory action constitutes its own
> unlawful employment practice for which administrative remedies must be exhausted,
> and we applied Morgan to incidents occurring after an employee's filing of an EEO
> complaint, and we applied Morgan to incidents occurring after an employee's filing
> of an EEO complaint..

Annett v. Univ. of Kansas, 371 F.3d at 1238 (internal quotations and citations omitted). Thus, the

Tenth Circuit dismissed Annett's claim for failure to exhaust administrative remedies.

### b.   **Each Discrete Incident Must be Exhausted.**

Before 2002, under the "continuing violation" theory, the Tenth Circuit recognized a limited

exception to the exhaustion requirement "when the unexhausted claim is for discrimination like or

reasonably related to the allegations of the EEOC charge."  Simms v. Okla. ex. rel. Dep't of Mental

Health and Substance Abuse Servs., 165 F.3d at 1327 (internal citations and quotations omitted).

The Tenth Circuit "construed the 'reasonably related' exception to include most retaliatory acts subsequent to an EEOC filing." 165 F.3d at 1327 (citing Seymore v. Shawyer & Sons, Inc., 111 F.3d at 799). In Martinez v. Potter, 347 F.3d 1208 (2003), however, the Tenth Circuit noted that the "Supreme Court's recent pronouncement in National Railroad Passenger Corp. v. Morgan, 536 U.S. 101 (2002), has effected fundamental changes to the doctrine allowing administratively unexhausted claims in Title VII actions." 347 F.3d at 1210. The Tenth Circuit's "decisions have unambiguously recognized Morgan as rejecting application of the 'continuing violation' theory." Martinez v. Potter, 347 F.3d at 1211 (citing Davidson v. America Online, Inc., 337 F.3d 1179 (10th Cir. 2003)). The Tenth Circuit in Martinez v. Potter stated:

> We agree with the government that such unexhausted claims involving discrete employment actions are no longer viable. Morgan abrogates the continuing violation doctrine as previously applied to claims of discriminatory or retaliatory actions by employers, and replaces it with the teaching that each discrete incident of such treatment constitutes its own unlawful employment practice for which administrative remedies must be exhausted.

347 F.3d at 1210 (internal citations and quotations omitted).

Thus, under National Railroad Passenger Corp. v. Morgan, each discrete act of discrimination must be administratively exhausted. "Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable unlawful employment practice." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. at 114 (internal citations and quotations omitted). In National Railroad Passenger Corp. v. Morgan, this rule applied to bar a plaintiff from suing on claims for which no administrative remedy had been sought when those incidents of which the plaintiff complained occurred more than 300 days before the filing of the plaintiff's EEO complaint. See Martinez v. Potter, 347 F.3d at 1210. "The rule is equally

-17-

applicable, however, to discrete claims based on incidents occurring after the filing of Plaintiff's

EEO complaint." Martinez v. Potter, 347 F.3d at 1210-11.  The Tenth Circuit has stated: "Our

decisions have unambiguously recognized Morgan as rejecting application of the continuing

violation theory." Martinez v. Potter, 347 F.3d at 1211 (internal quotations omitted).

In Jones v. United Parcel Service, the Tenth Circuit explained how the requirement that

plaintiffs must exhaust each discrete claims works in conjunction with courts liberally construing

EEOC charges.  See 502 F.3d at 1186.

> The next step in determining whether a plaintiff has exhausted her administrative
> remedies is to determine the scope of the allegations raised in the EEOC charge
> because "[a] plaintiff's claim in federal court is generally limited by the scope of the
> administrative investigation that can reasonably be expected to follow the charge of
> discrimination submitted to the EEOC. . . . We emphasize, however, that our inquiry
> is limited to the scope of the administrative investigation that can reasonably be
> expected to follow from the discriminatory acts alleged in the administrative charge.
> In other words, the charge must contain facts concerning the discriminatory and
> retaliatory actions underlying each claim; this follows from the rule that "each
> discrete incident" of alleged discrimination of retaliation "constitutes its own
> 'unlawful employment practice' for which administrative remedies must be
> exhausted."

Jones v. United Parcel Service, 502 F.3d at 1186 (citations omitted).

This Court has previously held that these principles demand that an act which occurs

subsequent to the filing of the formal EEOC charge would not be included in the scope of the

administrative investigation and would constitute its own "unlawful employment practice for which

administrative remedies must be exhausted." Farley v. Leavitt, No. CIV 05-1219 JB/LFC, 2007 WL

6364329, at *14 (D.N.M. Dec. 31, 2007)(Browning, J.)(quoting Jones v. United Parcel Serv., Inc.,

502 F.3d at 1186)(internal quotation marks omitted).  Tenth Circuit holdings support this conclusion.

See Duncan v. Manager Department of Safety, 397 F.3d at 1314 (affirming dismissal of retaliation

claim postdating plaintiff's EEO complaint, and stating: "Ms. Duncan did not file an additional

-18-

EEOC charge alleging the retaliatory act however, and this failure to exhaust her administrative remedies is fatal to her claim"); Annett v. Univ. of Kan., 371 F.3d at 1238 ("Previously, we would proceed to examine whether the alleged employment action, provided it occurred after the filing of the EEOC charge, was 'like or reasonably related to the allegations of the EEOC charge'[;] [h]owever, our recent holding in Martinez v. Potter, has foreclosed this line of inquiry.").

   **c.**  **A Plaintiff Must Exhaust at Least One Related Act that Is the Basis of a Hostile Work Environment Claim.**

   A different rule applies to hostile environment claims, for which "the continuing violation doctrine remains viable." Semsroth v. City of Wichita, 304 F. App'x 707, 722 (10th Cir. 2008). An employer creates a hostile work environment when "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Davis v. U.S. Postal Serv., 142 F.3d 1334, 1341 (10th Cir. 1998)(quotations omitted). Under National Railroad Passenger Corp. v. Morgan, a series of events that constitute a hostile environment claim are considered one unlawful action. See West v. Norton, 376 F. Supp. 2d 1105, 1129 (D.N.M. 2004)(Browning, J.). "Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. at 115 (internal citations and quotations omitted). An "unlawful employment practice" that constitutes a hostile work environment thus cannot be said to occur on any particular day, but rather occurs over a series of days or years. Id. (citing Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993)). Accordingly, so long as one of the incidents included within the claim of hostile environment occurred within the prescribed time limit, other conduct that occurred outside of the proscribed time period, but contributing to the hostile work environment, is not time barred. See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. at 105

(holding "that consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as any act contributing to that hostile environment takes place within the statutory time period"); West v. Norton, 376 F. Supp. 2d at 1129.

In National Railroad Passenger Corp. v. Morgan, the Supreme Court of the United States provided three factors courts may consider to determine if "a series of separate acts . . . collectively constitute one 'unlawful employment practice.'"   536 U.S. at 117 (quoting 42 U.S.C. § 2000e-5(e)(1)).   "[A] series of alleged events comprises the same hostile environment where 'the pre- and post-limitations period incidents involved the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers.'" Duncan v. Manager, Dep't of Safety, City & Co. of Denver, 397 F.3d at 1309 (quoting Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. at 120)("Morgan advises looking at the type of these acts, the frequency of the acts, and the perpetrator of the acts.").

In National Railroad Passenger Corp. v. Morgan, the Supreme Court addressed whether an EEOC charge alleging the plaintiff was "consistently harassed and disciplined more harshly than other employees on account of his race" was part of the same hostile work environment claim as "evidence from a number of other employees that managers made racial jokes, performed racially derogatory acts, made negative comments regarding the capacity of blacks to be supervisors, and used various racial epithets."  536 U.S. at 105, 120.  While expressly declining to make a judgment on the merits of the plaintiff's claims, the Supreme Court found it could not say that these were "not part of the same actionable hostile environment claim."  536 U.S. at 121.

In Duncan v. Manager, Dep't of Safety, City & Co. of Denver, the Tenth Circuit addressed

a plaintiff's hostile environment claim alleging "three groups of acts that plausibly took place during the filing period: (1) the harassing statements by Sgt. Andrews; (2) the spreading of rumors by Lt. Leone; and (3) the anonymous magazine article placed in her box and the theft of a notebook by an unknown perpetrator."  397 F.3d at 1309.  The Tenth Circuit "examin[ed] the acts in the filing period and determin[ed] what acts outside of the filing period [we]re related by type, frequency, and perpetrator.  The entire range of related acts constitute[d] the hostile work environment underlying Ms. Duncan's claim."  397 F.3d at 1309.  The Tenth Circuit found:

> The alleged actions of Sgt. Andrews and Lt. Leone began after Ms. Duncan returned to District Four in late 1996 and continued into the filing period.  These acts are related by type, frequency, and perpetrator, thus all these acts, including those before the beginning of the filing period, are within the scope of Ms. Duncan's hostile work environment claim.  The alleged hostile actions that occurred before Ms. Duncan returned to District Four, however, are not part of the same hostile work environment as those alleged during the filing period. The acts she alleges immediately prior to her return are an anonymous letter threatening physical violence and Chief Michaud's adjustment of her score on the sergeant's exam. While these acts may have a temporal relation to the behavior of Sgt. Andrews and Lt. Leone, they are of a different character, they took place while Ms. Duncan was on a different assignment, and they were not perpetrated by the same people. Even if we draw all inferences in Ms. Duncan's favor, we do not think a rational jury could conclude that any of the allegations before her return to District Four are part of the same hostile work environment as those acts alleged during the filing period.

Duncan v. Manager, Dep't of Safety, City & Co. of Denver,  397 F.3d at 1309.

### 4.    Time Requirements for Exhausting Administrative Remedies Are Not Jurisdictional.

While failure to exhaust administrative remedies is a jurisdictional bar to suit, in Zipes v. Trans World Airlines, Inc., 455 U.S. 385 (1982), the Supreme Court held that "filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling." 455 U.S. at 393.  See DeWalt v. Meredith Corp., 288 F. App'x 484, 490 (10th Cir. 2008)(citing

Zipes v. Trans World Airlines, Inc., 455 U.S. at 393; Beaird v. Seagate Tech., Inc., 145 F.3d 1159,

1174-75 (10th Cir. 1998)).   The Tenth Circuit treats a plaintiff's failure to timely exhaust

administrative remedies not "as a jurisdictional issue, [but] rather . . . as an affirmative defense to

be raised by [defendants]."  DeWalt v. Meredith Corp., 288 F. App'x at 490.

Though not jurisdictional, the time limit is not an arbitrary barrier.  It is designed to give an

agency timely notice of potentially illegal conduct, to discover and correct its own errors, and

possibly to conciliate the claim.  See Sampson v. Civiletti, 632 F.2d at 863.  An employee who fails

to comply with the limitation period is barred from seeking judicial relief in federal court, absent

a defense of equitable tolling.  See Davis v. United States Postal Serv., 142 F.3d at 1339; Wilson

v. West, 962 F. Supp. 939, 944 (S.D. Miss. 1997).

### a.       Exceptions of Equitable Tolling Are Narrowly Construed.

"Equitable exceptions, however, have been narrowly construed."  Harms v. I.R.S., 321 F.3d

1001, 1006 (10th Cir. 2003).  See Montoya v. Chao, 296 F.3d 952, 957 (10th Cir. 2002)(stating that

"federal courts have typically extended equitable relief only sparingly").  The Tenth Circuit "has

generally recognized equitable tolling of Title VII periods of limitation only if circumstances rise

to the level of active deception which might invoke the powers of equity to toll the limitations

period."  Montoya v. Chao, 296 F.3d at 957.  See Godwin v. Sw. Research Inst., 237 F. App'x 306,

307 (10th Cir. 2007)("Our precedent requires that an ADEA plaintiff demonstrate 'active deception'

on the part of an employer, the EEOC, or the court."); Biester v. Midwest Health Servs., Inc., 77

F.3d 1264, 1269 n.2 (10th Cir. 1996)(noting in a Title VII case that "extraordinary circumstances"

are "necessary to justify equitable tolling under established Tenth Circuit precedent.").  "Equitable

tolling may be appropriate where a plaintiff has been lulled into inaction by an employer's

'deliberate design . . . or actions that the employer should unmistakably have understood would cause the employee to delay filing his charge.'" Al-Ali v. Salt Lake Cmty. Coll., 269 F. App'x 842, 847 (10th Cir. 2008)(quoting Hulsey v. Kmart, Inc., 43 F.3d 555, 557 (10th Cir. 1994)).  Equitable tolling "is not warranted where an employee is aware of all of the facts constituting discriminatory treatment but lacks direct knowledge of the employer's subjective discriminatory purpose." Bennett v. Coors Brewing Co., 189 F.3d 1221, 1235 (10th Cir. 1999)(citation omitted).

### b.    Equitable Tolling Is Within the District Court's Discretion.

The decision whether to equitably toll the limitations period rests within the district court's sound discretion.  See Purrington v. Univ. of Utah, 996 F.2d 1025, 1030 (10th Cir. 1993).  In Castaldo v. Denver Public Schools, 276 F. App'x 839 (10th Cir. 2008), the Tenth Circuit found that the district court did not abuse its discretion when it chose not to apply equitable tolling to the plaintiff's EEOC charge when the plaintiff alleged: (i) that his employer did not post notices regarding the filing of EEOC charges; (ii) that he was too incapacitated by his shoulder injuries to file an EEOC charge; and (iii) that he was proceeding pro se.  See 276 F. App'x at 841.  The Tenth Circuit found no error in the district court's conclusion that the failure to post EEOC notices was not a sufficient justification for equitable tolling.  See 276 F. App'x at 841.  See also Wilkerson v. Siegfried Ins. Agency, Inc., 683 F.2d 344, 347 (10th Cir. 1982)(holding that "the simple failure to post . . . notices, without intent to actively mislead the plaintiff respecting the cause of action, does not extend the time within which a claimant must file his or her discrimination charge").  The district court noted that the plaintiff did not allege that his employer intended to actively deceive him by failing to post notices about filing EEOC charges.  See Castaldo v. Denver Pub. Schs., 276 F. App'x at 841.  The Tenth Circuit also concluded that the statements in the plaintiff's EEOC charge revealed

that it was not his alleged incapacity that prevented him from filing a timely charge, but rather the

fact that he was unaware of his obligation to do so until he consulted an attorney.  See 276 F. App'x

at 841.  The Tenth Circuit found that "his ignorance of the filing requirement does not entitle him

to equitable tolling."  276 F. App'x at 842.  Finally, the Tenth Circuit upheld the district court's

finding that the plaintiff's pro-se status did not justify equitable tolling, because the plaintiff had the

ability to contact an attorney but elected not to do so until well after the expiration of the filing

period.  See 276 F. App'x at 842.

In Godwin v. Southwest Research Institute, the Tenth Circuit held that the district court did

not abuse its discretion in refusing to employ equitable tolling when the plaintiff misaddressed his

EEOC submission, which arrived forty-four days after the time limit had expired.  See 237 F. App'x.

at 307-08.  In Baker v. Perfection Hy-Test, No. 95-6091, 1996 WL 1162 (10th Cir. Jan. 2, 1996),

the Tenth Circuit held that there was no active deception sufficient to toll the 300-day deadline

where the plant manager of the plaintiff's employer told the plaintiff, after his demotion, that

"restructuring was happening 'all over the country,' that plaintiff 'couldn't sue,' [and] that he might

try but he 'wouldn't get to first base.'" 1996 WL 1162, at * 2.  The Tenth Circuit found that the

statements "at most expressed an opinion concerning plaintiff's likelihood of success."  1996 WL

1162, at *7.

## LAW REGARDING TITLE VII EMPLOYMENT DISCRIMINATION CASES

"Title VII of the Civil Rights Act of 1964 forbids employment discrimination based on race,

color, religion, sex, or national origin."   Brown v. Gen. Servs. Admin., 425 U.S. 820, 825

(1976)(citing 42 U.S.C. §§ 2000e-2, 2000e-3).  "Title VII of the Civil Rights Act of 1964 prohibits

an employer from failing or refusing to hire or discharging any individual, or otherwise

discriminating against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." Farley v. Leavitt, No. CIV 05-1219 JB/LFC, 2007 WL 6364329, at *6 (D.N.M. Dec. 31, 2007)(Browning, J.)(quoting 42 U.S.C. § 2000e-2(a)(1))(internal quotes and alterations omitted). With the 1972 amendments to the statute, Title VII's protections apply to federal employees as well as to employees of private concerns.  See Brown v. Gen. Servs. Admin., 425 U.S. at 825-26 (citing 42 U.S.C. § 2000e(b)).

> [A]lthough the plaintiff need not plead facts that constitute a prima facie case under the framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 . . . (1973), in order to survive a motion to dismiss, Swierkiewicz v. Sorema N.A., 534 U.S. 506, 510-15 . . . (2002), a civil rights plaintiff retains the burden of alleging facts sufficient to state a claim entitling her to relief.

Harman v. Unisys Corp., 356 F. App'x 638, 640 (D.C. Cir. 2009)(citing Jordan v. Alternative Res. Corp., 458 F.3d 332, 346-47 (4th Cir. 2006).  See Prince-Garrison v. Maryland Dep't of Health and Mental Hygiene, 317 F. App'x 351, 353 (4th Cir. 2009)("A civil rights plaintiff need not plead facts that constitute a prima facie case under the framework of McDonnell Douglas Corp. v. Green . . . in order to survive a motion to dismiss.  Nevertheless, the plaintiff retains the burden to allege facts sufficient to state all the elements of her claim."  (citations omitted)).  See also Messina v. Kroblin Transp. Sys., Inc., 903 F.2d 1306, 1308 (10th Cir. 1990)("McDonnell Douglas inferences provide assistance to a judge as he addresses motions to dismiss, for summary judgment, and for directed verdict").

**1.      Law on Claims for Hostile Work Environment.**

"To establish a prima facie case of hostile work environment harassment, a plaintiff must show that 'under the totality of circumstances [(i)] the harassment was pervasive or severe enough

to alter the terms, conditions, or privilege of employment, and [(ii)] the harassment was racial or stemmed from racial animus.'" Bloomer v. United Parcel Serv., Inc., 94 F. App'x 820, 825 (10th Cir. 2004)(quoting Witt v. Roadway Express, 136 F.3d 1424, 1432 (10th Cir. 1998)). See Carter v. Mineta, 125 F. App'x 231, 238 (10th Cir. 2005); Mitchell v. City and County of Denver, 112 F. App'x 662, 671 (10th Cir. 2004). To establish a hostile-work environment claim, "a plaintiff must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Davis v. U.S. Postal Serv., 142 F.3d at 1341 (internal citations and quotations omitted). "A discriminatory and abusive environment must affect the employee's work environment so substantially as to make it intolerable for her to continue." Creamer v. Laidlaw Transit, Inc., 86 F.3d 167, 170 (10th Cir. 1996)(holding that a work environment did not contain "pervasive" harassment when the plaintiff made general allegations of frequent "sexual slurs" and the only specific incident cited to involved a co-worker grabbing the plaintiff).

"The mere utterance of a statement which 'engenders offensive feelings in an employee' would not affect the conditions of employment to a sufficient[ly] significant degree to violate Title VII.'" Gross v. Burggraf Construction Co., 53 F.3d 1531, 1537 (10th Cir.1995)(quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986)(alteration in the original)). A plaintiff must allege more than "'a few isolated incidents of racial enmity' or 'sporadic racial slurs.'" Chavez v. New Mexico, 397 F.3d 826, 832 (10th Cir. 2005)(quoting Bolden v. PRC, Inc., 43 F.3d 545, 551 (10th Cir. 1994)(internal citation omitted)). "Instead, 'there must be a steady barrage of opprobrious racial comments.'" Chavez v. Mexico, 397 F.3d at 832 (quoting Bolden v. PRC, Inc., 43 F.3d

at 551).

The Tenth Circuit has stated that "[p]ervasiveness and severity are independent and equal grounds" upon which a plaintiff may establish this element of a hostile environment claim. Witt v. Roadway Express, 136 F.3d at 1432 (addressing a hostile environment claim under 42 U.S.C. § 1981). See also Aramburu v. Boeing Co., 112 F.3d 1398, 1410 (10th Cir. 1997) (citing Durham v. Xerox Corp., 18 F.3d 836, 838-39 (10th Cir. 1994), for the proposition that "standards and burdens under § 1981 are the same as those under Title VII "). Moreover, the plaintiff must demonstrate that the work environment was objectively and subjectively offensive, but need "not demonstrate psychological harm, nor is she required to show that her work suffered as a result of the harassment." Walker v. United Parcel Service of Am., 76 F. App'x 881, 885 (10th Cir. 2003). In addition to all the circumstances, relevant considerations to determine if an environment is objectively hostile include: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998)(quoting Harris v. Forklift Systems, Inc., 510 U.S. at 21)(internal citations and quotations omitted).

   2.   **Disparate-Treatment Race Discrimination.**

In Martinez v. United States Department of Energy, 170 F. App'x 517 (10th Cir. 2006), the Tenth Circuit explained: "To prevail on a disparate treatment claim under Title VII of the Civil Rights Act, the employee must show the employer intentionally discriminated against him for a reason prohibited by the statute." 170 F. App'x at 521 (internal citations and quotations omitted). To establish a prima-facie case of discrimination, a plaintiff must demonstrate that: (i) she is a

member of a protected class; (ii) she suffered an adverse-employment action, and (iii) similarly situated employees were treated differently.  See Orr v. City of Albuquerque, 417 F.3d 1144, 1149 (10th Cir. 2005); Velasquez v. Frontier Med. Inc., 375 F. Supp. 2d 1253, 1271 (D.N.M. 2005)(Browning, J.).

### 3.    Title VII Retaliation.

To establish a prima-facie case of retaliation, a plaintiff must show: "([i]) that he [or she] engaged in protected opposition to discrimination, ([ii]) that a reasonable employee would have found the challenged action materially adverse, and ([iii]) that a causal connection existed between the protected activity and the materially adverse action."  Proctor v. United Parcel Serv., 502 F.3d at 1208 (quoting Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d at 1202).

### 4.    Materially Adverse Employment Action.

The Tenth Circuit liberally defines what constitutes an adverse employment action.  See Sanchez v. Denver Pub. Schs., 164 F.3d 527, 532 (10th Cir. 1998).  As the Tenth Circuit has stated:

> Such actions are not simply limited to monetary losses in the form of wages or benefits.  Instead, we take a case-by-case approach; examining the unique factors relevant to the situation at hand.  Nevertheless, we will not consider a mere inconvenience or an alteration of job responsibilities to be an adverse employment action.

Sanchez v. Denver Pub. Schs., 164 F.3d at 532 (internal quotation marks and citations omitted).  See Proctor v. United Parcel Serv., 502 F.3d at 1208.  An adverse action "is not limited to discriminatory actions that affect the terms and conditions of employment."  Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 64 (2006).  "[A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  Reinhardt

v. Albuquerque Pub. Sch. Bd. of Educ., 595 F.3d 1126, 1133 (10th Cir. 2010)(quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. at 68)(internal quotation marks omitted). "The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. at 68 ("We speak of material adversity because we believe it is important to separate significant from trivial harms."). "We construe the phrase 'adverse employment action' liberally and do not limit it to 'monetary losses in the form of wages or benefits.'" Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ., 595 F.3d at 1133 (quoting Annett v. Univ. of Kan., 371 F.3d at 1239). Acts that carry "a significant risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects" may be considered adverse actions, although "a mere inconvenience or an alteration of job responsibilities will not suffice." Annett v. Univ. of Kan., 371 F.3d at 1239 (internal quotation marks and citation omitted).

In Anderson v. Clovis Municipal Schools, 265 F. App'x 699 (10th Cir. 2008), the Tenth Circuit, in an unpublished opinion, addressed the requirement of an adverse employment action in the context of a disparate-treatment claim where an employee, who had been placed on a growth plan, alleged other harsh treatment and a written reprimand in support of his claim that he suffered a hostile work environment. Relying on Schuler v. City of Boulder, 189 F.3d 1304 (10th Cir. 1999), Anderson argued that the growth plan and formal reprimand rose to the level of an adverse employment action under the law of the Tenth Circuit. In discussing Anderson v. Clovis Municipal Schools' reliance on Schuler v. City of Boulder, the Tenth Circuit stated: "While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action. Otherwise, minor and even trivial employment

-29-

actions . . . would form the basis of a discrimination suit." MacKenzie v. City and County of Domier, 414 F.3d 1266, 1279 (10th Cir. 2005). See Heno v. Sprint/United Mgnt. Co., 208 F.3d 847, 857 (10th Cir. 2007)(explaining that Title VII only prescribes discriminatory conduct that "alters the employee's compensation, terms, conditions, or privileges of employment, or adversely affects his [or her] status as an employee.")(quotations omitted).  "Only acts that constitute a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits will rise to the level of an adverse employment action." Robinson v. Cavalry Portfolio Serv., LLC, 365 F. App'x 104, 114 (10th Cir. 2010)(quoting Haynes v. Level 3 Commc'ns, 456 F.3d at 1218-19).

## LAW REGARDING 42 U.S.C. § 1983

Section 1983 of Title 42 of the United States Code provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, . . . .

42 U.S.C. § 1983.  Section 1983 creates only the right of action; it does not create any substantive rights; substantive rights must come from the Constitution or federal statute.  See Spielman v. Hildebrand, 873 F.2d 1377, 1386 (10th Cir. 1989)("Section 1983 does not provide a remedy if federal law does not create enforceable rights.").  Rather, 42 U.S.C. § 1983 authorizes an injured person to assert a claim for relief against a person who, acting under color of state law, violated the claimant's federally protected rights.  To state a claim upon which relief can be granted under § 1983, a plaintiff must allege: (i) a deprivation of a federal right; and (ii) that the person who deprived the plaintiff of that right acted under color of state law.  See West v. Aikins, 487 U.S. 42,

-30-

48 (1988).  Broken down differently, a plaintiff

> must establish (1) a violation of rights protected by the federal Constitution or
> created by federal statute or regulation, (2) proximately caused (3) by the conduct of
> a "person" (4) who acted under color of any statute, ordinance, regulation, custom[,]
> or usage, of any State or Territory or the District of Columbia.

Martinez v. Martinez, No. CIV 09-0281 JB/KBM, 2010 WL 1608884, at *11 (D.N.M. Mar. 30,

2010)(Browning, J.)(quoting Summum v. City of Ogden, 297 F.3d 995, 1000 (10th Cir. 2002)).

Neither the civil-rights statutes nor the Fourteenth Amendment, however, are a license to the federal

judiciary to displace state law through the creation of a body of general federal tort law.  See Paul

v. Davis, 424 U.S. 693, 701 (1976)(Fourteenth Amendment); Griffin v. Breckenridge, 403 U.S. 88,

101-102 (1971)(civil-rights statute).

        The Supreme Court has made clear that there is no respondeat superior liability under

§ 1983.  See Ashcroft v. Iqbal, 129 S. Ct. at 1948 ("Because vicarious liability is inapplicable to

Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the

official's own individual actions, has violated the Constitution."); Bd. of County Comm'rs v. Brown,

520 U.S. 397, 403 (1997).  An entity cannot be held liable solely on the basis of the existence of an

employer-employee relationship with an alleged tortfeasor.  See Monell v. New York City Dept. of

Soc. Servs., 436 U.S. 658, 689 (1978).  Further, the Tenth Circuit has held that supervisors are not

liable under § 1983 "unless there is an affirmative link between the constitutional deprivation and

the supervisor's exercise of control or direction, his personal participation, or his failure to

supervise."  Kiesling v. Troughton, 107 F.3d 880, at *2 (10th Cir. 1997)(citing Meade v. Grubbs,

841 F.2d 1512, 1527 (10th Cir. 1988)).  They can be held liable only for their own unconstitutional

or illegal policies, and not for the tortious acts of their employees.  Supervisory liability requires a

showing that such policies were a "deliberate or conscious choice."  Barney v. Pulsipher, 143 F.3d

1299, 1307-08 (10th Cir. 1998)(citations and internal quotations omitted).  See Bd. of County Comm'rs v. Brown, 502 U.S. at 404 ("[I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality.  The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged.")(emphasis in original).

These standards apply for allegations of liability based on failure to train and for "official de facto policies" that arise from "failing to adopt various policies to adequately protect" a class of persons.  Barney v. Pulsipher, 143 F.3d at 1367, 1309 n.8.  "[W]hen the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm," it is liable. Barney v. Pulsipher, 143 F.3d at 1307.

> In a "narrow range of circumstances," however, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a "highly predictable" or "plainly obvious" consequence of a municipality's action or inaction, such as when a municipality fails to train an employee in specific skills needed to handle recurring situations, thus presenting an obvious potential for constitutional violations.

Barney v. Pulsipher, 143 F.3d at 1307-08.  Most cases, however, will not fall within this "narrow range of circumstances" without "a pattern of violations."  Barney v. Pulsipher, 143 F.3d at 1308.

## LAW REGARDING FIRST-AMENDMENT RETALIATION CLAIMS

The Tenth Circuit applies "a five-prong analysis to determine whether action taken against an employee constitutes retaliation in violation of the employee's First Amendment rights."  Hook v. Regents of Univ. of Cal., No. 09-2102, 2010 WL 3529414, at *10 (10th Cir. Sept. 13, 2010).

> First, the court must determine whether the employee speaks pursuant to his official duties.  If the employee speaks pursuant to his official duties, then there is no constitutional protection because the restriction on speech simply reflects the

exercise of employer control over what the employer itself has commissioned or created.  Second, if an employee does not speak pursuant to his official duties, but instead speaks as a citizen, the court must determine whether the subject of the speech is a matter of public concern.  If the speech is not a matter of public concern, then the speech is unprotected and the inquiry ends.  Third, if the employee speaks as a citizen on a matter of public concern, the court must determine whether the employee's interest in commenting on the issue outweighs the interest of the state as employer.  Fourth, assuming the employee's interest outweighs that of the employer, the employee must show that his speech was a substantial factor or a motivating factor in a detrimental employment decision.  Finally, if the employee establishes that his speech was such a factor, the employer may demonstrate that it would have taken the same action against the employee even in the absence of the protected speech.

Couch v. Bd. of Trs. of Mem'l Hosp., 587 F.3d 1223, 1235 (10th Cir. 2009)(quotations and citation omitted).  "Implicit within this five-prong analysis 'is a requirement that the public employer have taken some adverse employment action against the employee.'"  Hook v. Regents of Univ. of Cal., 2010 WL 3529414, at *10 (quoting Couch v. Bd. of Trs. of Mem'l Hosp., 587 F.3d at 1235-36).  The standard for determining whether an employer subjected an employee to an adverse employment action is the same for retaliation claims under the First Amendment and Title VII, see Hook v. Regents of Univ. of Cal., 2010 WL 3529414, at *10,[3] which is the same standard that

_____

[3] The Tenth Circuit has recognized that, "[p]rior to November 2009, there was some confusion in our circuit as to what qualifies as an adverse employment action in the context of First Amendment retaliation."  Hook v. Regents of Univ. of Cal., 2010 WL 3529414, at *10 (citing Maestas v. Segura, 416 F.3d 1182, 1188 n.5 (10th Cir. 2005)).  In Maestas v. Segura, the majority noted, in dicta, that "some forms of retaliation may be actionable under the First Amendment while insufficient to support a discrimination claim under Title VII."  416 F.3d at 1188 n.5.  See Baca v. Sklar, 398 F.3d 1210, 1220-21 (10th Cir. 2005)("Although we have never delineated what actions constitute 'adverse employment actions' in the First Amendment context, we have repeatedly concluded that a public employer can violate an employee's First Amendment rights by subjecting an employee to repercussions that would not be actionable under Title VII." (citing Morfin v. Albuquerque Pub. Sch., 906 F.2d 1434, 1437 n.3 (10th Cir. 1990)(rejecting proposition that "only adverse employment decisions, such as termination, suspension, or transfer, in retaliation for constitutionally protected conduct are illegal.  Actions short of an actual or constructive employment decision can in certain circumstances violate the First Amendment."); Schuler v. City of Boulder, 189 F.3d at 1310 (reprimanding employee, transferring her to another location, and removing job

applies to Title VII claims, see Proctor v. United Parcel Serv., 502 F.3d at 1208 n.4 (citing

Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006)); Haynes v. Level 3 Communs, 456

F.3d 1215, 1228 (10th Cir. 2006).

### 1.      Speech Pursuant to Official Duties.

Under Garcetti v. Ceballos, 547 U.S. 410 (2006), and its progeny, a plaintiff must show that

---

duties from her constitute adverse employment actions in First Amendment context)).  In Couch v. Board of Trustees of Memorial Hospital, the Tenth Circuit, however, "clarified the parameters of First Amendment retaliation protection, explaining that [the Tenth Circuit] consider[s] an employment action to be adverse in the First Amendment retaliation setting if it 'would deter a reasonable person from exercising his First Amendment rights.'"  Hook v. Regents of Univ. of Cal., 2010 WL 3529414, at *10 (quoting Couch v. Bd. of Trs. of Mem'l Hosp., 587 F.3d at 1238).  The Tenth Circuit explained in Hook v. Regents of University of California, that "[t]his test is identical to the test which is applied in Title VII retaliation claims."  Hook v. Regents of Univ. of Cal., 2010 WL 3529414, at *10 (citing Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006)).

The Tenth Circuit's former "confusion" may be reconciled with Hook v. Regents of University of California by recognizing that Burlington Northern and Santa Fe Ry. Co. v. White lowered the standard for establishing adverse employment actions in retaliation claims under Title VII from "activity that affects the terms and conditions of employment," Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. at 56, to actions "a reasonable employee would have found . . . materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination," Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ., 595 F.3d at 1133 (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. at 68)(internal quotation marks omitted).  Other United States Courts of Appeals apply the same standard for establishing adverse employment action under Title VII and the First Amendment.  See, e.g., Hellman v. Weisberg, 360 F. App'x 776, 779 (9th Cir. 2009)("[T]he test of adverse employment action in the First Amendment context is substantially similar to the test under Title VII."); Boyd v. Peet, 249 F. App'x 155, 158 (11th Cir. 2007)("[A] court may apply Title VII standards to First Amendment retaliation claims." (citing Stavropoulos v. Firestone, 361 F.3d 610, 620 (11th Cir. 2004)); Zelnik v. Fashion Inst. of Tech., 464 F.3d 217, 227 (2d Cir. 2006)("Our standard for First Amendment retaliation claims has always been the equivalent to the standard set forth in [Burlington Northern and Santa Fe Ry. Co. v. White]."); Okruhlik v. Univ. of Ark., 395 F.3d 872, 878 (8th Cir. 2005)(noting the same test applies to both First Amendment and Title VII retaliation cases).  But see, e.g., Mosely v. Bd. of Educ. of City of Chicago, 434 F.3d 527, 533-34 (7th Cir. 2006)("[P]ublic employees who allege that their employers retaliated against them based on assertions of First Amendment rights . . . 'do[] not require an adverse employment action within the meaning of the antidiscrimination statutes, such as Title VII of the Civil Rights Act of 1964.'" (quoting Spiegla v. Hull, 371 F.3d 928, 941 (7th Cir. 2004)).

the substance of the speech which forms the basis for the First Amendment claim involves something that is not part of the plaintiff's official duties and is a matter of public concern, and not merely a complaint involving the plaintiff's own employment. See Brammer-Hoelter v. Twin Peaks Charter Acad., 492 F.3d 1192, 1202 (10th Cir. 2007). In Brammer-Hoelter v. Twin Peaks Charter Academy, the Tenth Circuit applied the analysis from Garcetti v. Ceballos to determine whether the employee's First-Amendment right had been violated. First, the court must determine whether the employee speaks, "pursuant to her official duties." 493 F.3d at 1202. "If the employee speaks pursuant to his official duties, then there is no constitutional protection because the restriction on speech 'simply reflects the exercise of employer control over what the employer itself has commissioned or created.'" 492 F.3d at 1202 (quoting Garcetti v. Ceballos, 547 U.S. at 422).

Cases interpreting Garcetti v. Ceballos have indicated that speech relating to tasks within an employee's uncontested employment responsibilities is not protected from regulation. This principle may be true even though the speech concerns an unusual aspect of an employee's job that is not part of his everyday functions. See Battle v. Bd. Of Regents, 468 F.3d 755, 761 n.6 (11th Cir. 2006)(per curium). In some circumstances, filing a complaint with "an agency outside [a plaintiff's] direct chain of command . . . [i]s not pursuant to official duties, but rather [i]s the speech of a private citizen." Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ., 595 F.3d at 1137. The ultimate question is whether the employee speaks as a citizen or as a government employee -- an individual acting "in his or her professional capacity."

## 2.    Speech about Matters of Public Concern.

Second, if the employee does not speak pursuant to his or her official duties, but instead speaks as a citizen, the court must determine whether the subject of her speech is a matter of public

concern.  See Brammer-Hoelter v. Twin Peaks Charter Acad., 492 F.3d at 1202-1203.  "Whether

an employee's speech addresses a matter of public concern must be determined by the content, form,

and context of a given statement, as revealed by the whole record."  Connick v. Myers, 461 U.S.

138, 147 (1983)(finding that a terminated assistant district attorney's expressive activity did not

involve a matter of public concern where she disseminated a questionnaire to her co-workers

soliciting their views on office morale and dynamics, including whether they felt pressure to work

in political campaigns).

> [W]hen a public employee speaks not as a citizen upon matters of public concern, but
> instead as an employee upon matters only of personal interest, absent the most
> unusual circumstances, a federal court is not the appropriate forum in which to
> review the wisdom of a personnel decision taken by a public agency allegedly in
> reaction to the employee's behavior.

Connick v. Myers, 461 U.S. at 147.  "Statements revealing official impropriety usually involve

matters of public concern."  Brammer-Hoelter v. Twin Peaks Charter Acad., 492 F.3d at 1205 (citing

Lighton v. Univ. of Utah, 209 F.3d 1213, 1224 (10th Cir. 2000)).  Conversely, speech that simply

airs "grievances of a purely personal nature" does not involve matters of a public concern.

Brammer-Hoelter v. Twin Peaks Charter Acad., 492 F.3d at 1205 ("In determining whether speech

pertains to a matter of public concern, the court may consider 'the motive of the speaker and whether

the speech is calculated to disclose misconduct or merely deals with personal disputes and

grievances unrelated to the public's interest.'" (quoting Lighton v. Univ. of Utah, 209 F.3d at 1224)).

> The Tenth Circuit in Brammer-Hoelter v. Twin Peaks Charter Academy explained:

> [W]e have held that the following are not matters of public concern: speech
> regarding grievances about internal departmental affairs, Hom v. Squire, 81 F.3d
> 969, 974 (10th Cir. 1996), disputes over the term of employment, Lancaster v. Indep.
> Sch. Dist. No. 5, 149 F.3d 1228, 1233-34 (10th Cir. 1998), and workplace
> frustration, McEvoy v. Shoemaker, 882 F.2d 463, 466 (10th Cir.1989).

-36-

492 F.3d at 1205.

## LAW REGARDING EQUAL-PROTECTION CLAIMS

The Equal Protection Clause of the Fourteenth Amendment guarantees that "no states shall . . . deny to any person within the jurisdiction to the equal protection of the laws." U.S. Const. amend. XIV, § 1. "The Equal Protection Clause 'keeps governmental decision makers from treating differently persons who are in all relevant respects alike.'" Soskin v. Reinertson, 353 F.3d 1242, 1247 (10th Cir. 2004)(quoting Nordlinger v. Hahn, 505 U.S. 1, 10 (1992)). See Corder v. Lewis Palmer School Dist. No. 38, 566 F.3d 1219, 1233 (10th Cir. 2009)("Equal protection 'is essentially a direction that all persons similarly situated should be treated alike.'")(quoting City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985)). "In disparate-treatment discrimination suits, the elements of a plaintiff's case are the same whether that case is brought under §§ 1981 or 1983 or Title VII." Etsitty v. Utah Transit Auth., 502 F.3d 1215, 1227 (10th Cir. 2007)(quoting Maldonado v. City of Altus, 433 F.3d 1294, 1307 (10th Cir.2006), overruled on other grounds, Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006)).

Generally, to state a claim under § 1983 for violation of the equal-protection clause, the plaintiff must show the defendant acted under color of law and discriminated against him or her:

> To succeed on an equal employment action, [a plaintiff] must show that (1) she was deprived of a right arising under the United States Constitution or federal law, and (2) the offending party acted under the color of state law. Neither the City nor anyone else disputes that the Department was acting under color of state law at all relevant times. Instead, the City contends that Lewallen has failed to prove that the Department violated her Equal Protection rights. To succeed on this claim, Lewallen had to show that (1) she suffered an adverse employment action, (2) it was based on sex discrimination, and (3) a policy or custom of the City was the motivating force behind that sex-based adverse action.

Lewallen v. City of Beaumont, Nos. 09-40337, 09-40826, 2010 WL 3303756, at *3 & n.13 (5th Cir.

Aug. 23, 2010).

A state actor can generally be subject to liability only for its own conduct under 42 U.S.C. § 1983.  See Robbins v. Oklahoma, 519 F.3d at 1251 (citing DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. at 197).  At least in the Tenth Circuit, however, under some circumstances, harassment by a third-party can subject a supervisor or municipality to liability for violation of the equal-protection clause -- not for the harasser's conduct, per se, but for failure to take adequate steps to stop it.  See Murrell v. Sch. Dist. No. 1, 186 F.3d at 1249-51 (discussing one student's sexual harassment of another and stating: "[S]exual harassment by a state actor can constitute a violation of the equal protection clause.").  To state such a claim, the plaintiff

> must demonstrate that a state employee's discriminatory actions are representative of an official policy or custom of the municipal institution, or are taken by an official with final policy making authority.  To subject a governmental entity to liability, "a municipal policy must be a 'policy statement, ordinance, regulation, or decision officially adopted and promulgated by [a municipality's] officers.'"  Absent such an official policy, a municipality may also be held liable if the discriminatory practice is "so permanent and well settled as to constitute a 'custom or usage' with the force of law."

Murrell v. Sch. Dist. No. 1, 186 F.3d at 1249 (internal citations omitted).  Nevertheless, the Tenth Circuit has stated that "a failure to prevent sexual harassment by a student *before it occurs* does not violate . . . the Fourteenth Amendment absent a showing of an institutional policy of indifference. However, a refusal to remedy known sexual harassment is actionable."  Murrell v. Sch. Dist. No. 1, 186 F.3d at 1250 n.9 (emphasis in original).  Finally,

> [t]he party alleging discrimination has the burden of proving that the state's conduct was motivated by a discriminatory purpose.  See Witus v. Georgia, 385 U.S. 545, 550 (1967)(explaining that "[t]he burden is, of course, on the petitioners to prove the existence of purposeful discrimination"); Sauers v. Salt Lake County, 1 F.3d 1122, 1130 (10th Cir.1993)(stating that "[a] plaintiff in an equal protection action has the burden of demonstrating discriminatory intent.").  It is "hornbook constitutional law that mere negligence or mistake resulting in uneven application of the law is not an equal protection violation."  Roe v. Keady, 329 F.3d 1188, 1191-92 (10th Cir. 2003).

Bell v. Bd. of Educ. of the Albuquerque Pub. Schs., No. CIV 06-1137 JB/ACT, 2008 WL 4104118, at *15 (D.N.M. May 6, 2008)(Browning, J.).

On the other hand, to hold a supervisory employee liable in his or her individual capacity for sexual harassment conducted by a third party, the plaintiff must show "deliberate indifference to known . . . harassment." Murrell v. Sch. Dist. No. 1, 186 F.3d at 1250. "Liability under § 1983 must be predicated upon a 'deliberate' deprivation of constitutional rights by the defendant and not upon mere negligence." Murrell v. Sch. Dist. No. 1, 186 F.3d at 1250 (quoting Woodward v. City of Worland, 977 F.2d 1392, 1399 (10th Cir. 1992))(alterations omitted). To show that the supervisory employee's conduct was "deliberate" the plaintiff must "state facts sufficient to allege 'defendants actually knew of and acquiesced in' [the third-party's] behavior." Murrell v. Sch. Dist. No. 1, 186 F.3d at 1250.

To prevail on an Equal Protection claim, a plaintiff must show that he or she was subjected to an adverse employment action. Courts use the same standard for adverse employment actions under Equal Protection claims and Title VII claims. In McCrary v. Aurora Public Schools, 57 F. App'x. 362 (10th Cir. 2003), after holding that the plaintiff's ADEA and ADA claims failed because the she failed to show she was subject to an adverse employment action, the Tenth Circuit summarily dismissed her Equal Protection claim:

> As to Ms. McCrary's claim that her right to equal protection was violated when she was not considered for a fourth-grade classroom position and instead was transferred to a CST position, we have already concluded that neither of those actions constituted an adverse employment action [under the ADA or the ADEA], and Ms. McCrary has not otherwise shown that they gave rise to an injury for purposes of § 1983.

57 F. App'x. 362, 373. See, e.g., Lewallen v. City of Beaumont, Nos. 09-40337, 09-40826, 2010 WL 3303756, at *3 & n.13 (5th Cir. Aug. 23, 2010)(stating, in the Equal-Protection context:

"Standing alone, the denial of a lateral transfer cannot constitute an adverse employment action."
(citing Burger v. Cent. Apartment Mgmt., Inc., 168 F.3d 875, 879 (5th Cir. 1999)(Title VII case);
Williams v. New York City Housing Authority, 335 F. App'x. 108, 110 (2d Cir. 2009)(affirming
dismissal of plaintiff's Equal-Protection claim, stating: "Neither NYCHA's denial of Williams's
request for a leave of absence, nor its deduction of a small amount from her salary, nor its issuance
of two counseling memoranda constituted an adverse employment action."  (citing Weeks v. N.Y.
State (Div. of Parole), 273 F.3d 76, 86 (2d Cir. 2001)(addressing adverse employment actions in the
Title VII context), abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S.
101, 108-14 (2002); Galabya v. N.Y. City Bd. of Educ., 202 F.3d 636, 641 (2d Cir. 2000)(noting that
the alleged adverse action in ADEA case must result in a "change in responsibilities so significant
as to constitute a setback to plaintiff's career"); Crawford v. Carroll, 529 F.3d 961, 970 (11th Cir.
2008)("These elements also apply to a [Equal Protection] claim of race discrimination under § 1983
because the analysis of disparate treatment claims under § 1983 is identical to the analysis under
Title VII where the facts on which the claims rely are the same."); Watson v. City of Cleveland, 202
F. App'x 844, 856 (6th Cir. 2006)(employing the same adverse-employment-action standard for
Title VII and Equal Protection claims, stating: "Proving intentional discrimination for an equal
protection claim brought under § 1983 requires the plaintiff to make the same showing required to
prove a violation of Title VII."  (citing Gutzwiller v. Fenik, 860 F.2d 1317, 1325 (6th Cir. 1988)));
Patterson v. County of Oneida, 375 F.3d 206, 225 (2d Cir. 2004)(noting that substantive standards
for claims under Title VII also apply to discrimination claims under the Equal Protection Clause);
Herts v. Smith, 345 F.3d 581, 588 (8th Cir. 2003)("To make out a prima facie case of discrimination
under the Equal Protection Clause of the Fourteenth Amendment, or under Title VII, a plaintiff need

show only that she is a member of a protected class, was qualified for her position, and suffered an adverse employment action."). See also McPhaul v. Board of Com'rs of Madison County, 226 F.3d 558, 566 n.6 (7th Cir. 2000)("Because section 1983 claims generally follow 'the contours of Title VII claims,' we will apply the same 'hostile environment' standard that is applied in Title VII cases."  (citing King v. Bd of Regents of Univ. of Wis. Sys., 898 F.2d 533, 537 (7th Cir. 1990))).

## RELEVANT NEW MEXICO LAW REGARDING IMPLIED EMPLOYMENT CONTRACTS

In New Mexico, "an employment contract is for an indefinite period and is terminable at the will of either party unless the contract is supported by consideration beyond the performance of duties and payment of wages or there is an express contractual provision stating otherwise." Hartbarger v. Frank Paxton Co., 115 N.M. 665, 668, 857 P.2d 776, 779 (1993)(citation omitted). At-will employment relationships "can be terminated by either party at any time for any reason or no reason, without liability."  Hartbarger v. Frank Paxton Co., 115 N.M. at 668, 857 P.2d at 779. "New Mexico courts have recognized two additional exceptions to the general rule of at-will employment: wrongful discharge in violation of public policy (retaliatory discharge), and an implied contract term that restricts the employer's power to discharge." Hartbarger v. Frank Paxton Co., 115 N.M. at 668, 857 P.2d at 779.

A promise, or offer, that supports an implied contract might be found in written representations such as an employee handbook, in oral representations, in the conduct of the parties, or in a combination of representations and conduct.  See Newberry v. Allied Stores, Inc., 108 N.M. 424, 426, 773 P.2d 1231, 1233 (1989)(citation omitted).  "Under New Mexico law, a personnel manual gives rise to an implied contract if it controlled the employer-employee relationship and an employee could reasonably expect his employer to conform to the procedures it outlined."

See Newberry v. Allied Stores, Inc., 108 N.M. at 427, 773 P.2d at 1234.  The question whether an employment relationship has been modified is a question of fact.  See Lukoski v. Sandia Indian Mgmt. Co., 106 N.M. 664, 666, 748 P.2d 507, 509 (1988).  "An implied contract is created only where an employer creates a reasonable expectation.  The reasonableness of expectations is measured by just how definite, specific, or explicit has been the representation or conduct relied upon."  Hartbarger v. Frank Paxton Co., 115 N.M. at 672, 857 P.2d at 783.  If the alleged employer's promise is not sufficiently explicit, the courts will not find an implied contract.  See Hartbarger v. Frank Paxton Co., 115 N.M. at 669, 857 P.2d at 780.

> Evidence relevant to this factual decision includes the language used in the personnel manual as well as the employer's course of conduct and oral representations regarding it.  We do not mean to imply that all personnel manual[s] will become part of employment contracts.  Employers are certainly free to issue no personnel manual at all or to issue a personnel manual that clearly and conspicuously tells their employees that the manual is not part of the employment contract and that their jobs are terminable at the will of the employer with or without reason.  Such actions instill no reasonable expectations of job security and do not give employees any reason to rely on representations in the manual.  However, if an employer does choose to issue a policy statement, in a manual or otherwise, and, by its language or by the employer's actions, encourages reliance thereon, the employer cannot be free to only selectively abide by it.  Having announced a policy, the employer may not treat it as illusory.

Lukoski v. Sandia Indian Mgmt. Co., 106 N.M. at 666-67, 748 P.2d at 509-10 (citation omitted).

"Whether an employer's words and conduct support a reasonable expectation on the part of employees that they will be dismissed only in accordance with specified procedures or for specified reasons generally is a question of fact for the jury."  Meland v. E. N.M. Med. Ctr., 131 N.M. 65, 69, 33 P.3d 285, 289 (2001).  "[B]ecause an employee's expectation based on an employer's words or conduct must meet a certain threshold of objectivity, an employer may be entitled to judgment as a matter of law if the employee's expectations are not objectively reasonable."  West v. Wash. Tru

Solutions, LLC, 147 N.M. 424, 426, 224 P.3d 651, 653 (Ct. App. 2009).  In deciding whether to grant summary judgment, the question is whether a reasonable jury could find that the words and conduct support an objectively reasonable expectation that the employees would be dismissed only in accordance with specified procedures and for specified reasons.  See Meland v. E. N.M. Med. Ctr., 131 N.M. at 69, 33 P.3d at 289.

"[E]ven where a personnel manual purports to disclaim any intentions of forming contractual obligations enforceable against an employer, a fact finder may still look to the totality of the parties' statements and actions, including the contents of a personnel manual, to determine whether contractual obligations were created."  Beggs v. City of Portales, 146 N.M. 372, 377, 210 P.2d 798, 803 (2009).

**ANALYSIS**

The Court dismisses the FAC.  The Court grants Gerald leave to amend his Complaint to attempt to plead a hostile work environment claim, because Gerald's allegations in his EEOC Charge may adequately state a hostile work environment claim.  If, subject to rule 11, Gerald amends his Complaint to advance the facts alleged in his EEOC Charge in support of his hostile work environment claim, then he may be able to survive a motion to dismiss.  Because Gerald's other claims fail as a matter of law, the Court dismisses the claims in his Complaint with prejudice.

**I.   THE COURT WILL DISMISS ALL OF GERALD'S TITLE VII AND NMHRA CLAIMS AGAINST KREBS AND LOCKSLEY.**

The Court will dismiss Gerald's Title VII and NMHRA claims.  First, Gerald has not exhausted his administrative remedies against Locksley or Krebs for his discrimination claims.[4]

---

[4] While the Court lacks jurisdiction over the Title VII and NMHRA claim against Locksley and Krebs because Gerald did not exhaust his administrative remedies against them, and the Court

Accordingly, the Court will dismiss Gerald's Title VII and NMHRA claims -- both the retaliation and the discrimination claims -- against the individual defendants for lack of subject-matter jurisdiction.  See Luboyeski v. Hill, 117 N.M. at 382, 872 P.2d at 355.  Gerald also failed to exhaust his administrative remedies for his retaliation claim, and the Court therefore lacks subject-matter jurisdiction over that claim.  See Jones v. United Parcel Serv., Inc., 502 F.3d at 1183; Alcivar v. Wynne, 268 F. App'x at 753.  Finally, Gerald fails to adequately plead a discrimination claim.  The Court thus dismisses Count II of Gerald FAC.

Gerald has not exhausted his administrative remedies against any of the named individual defendants, because his EEOC Charge names only UNM as a respondent.  See EEOC Charge at 2. Because Gerald named no Defendant other than UNM as a respondent on his Charge, and because individuals are not subject to liability under Title VII, the Court will dismiss his Title VII and NMHRA claims against Locksley and Krebs.

Gerald seeks damages against the individual Defendants in their official and personal capacity under Title VII and the NMHRA.  See FAC ¶¶ 31-32, at 5.  Compliance with the administrative grievance procedure is a prerequisite to a suit under Title VII and the NMHRA.  For

---

should not, and will not, make any other rulings as to them on these claims, the Court notes that, even if he had exhausted administrative remedies against the individual Defendants, Gerald would have to explain how he can maintain a retaliation suit under Title VII against the Locksley and Krebs in their individual capacities.  The Tenth Circuit has held: "Under Title VII, suits against individuals must proceed in their official capacity; individual capacity suits are inappropriate.  The relief granted under Title VII is against the employer, not individual employees whose actions would constitute a violation of the Act."  Haynes v. Williams, 88 F.3d 898, 899 (10th Cir. 1996)(quoting Sauers v. Salt Lake County, 1 F.3d 1122, 1125 (10th Cir. 1993)).  See Busby v. City of Orlando, 931 F.2d 764, 772 (11th Cir. 1991)("The relief granted under Title VII is against the employer, not individual employees whose actions would constitute a violation of the Act.").  At the hearing, Gerald conceded that he cannot sue individuals under Title VII.  See Tr. at 6:4-6 (Court, Reimer)("[W]e did not assert, in fact we never intended to assert Title VII claims against individual defendants.").

a plaintiff to pursue a Title VII or NMHRA claim against a defendant in court, therefore, the plaintiff must have exhausted his or her administrative remedies with the NMHRD or EEOC.  See Kelley v. City of Albuquerque, 375 F. Supp. 2d 1183, 1214 (D.N.M. 2004)(Browning, J.)("Before a plaintiff can state a valid claim against an individual defendant under NMHRA, however, the plaintiff must first exhaust her administrative remedies.").  In Sonntag v. Shaw, the Supreme Court of New Mexico stated that, "[u]nder the NMHRA, a plaintiff must exhaust his or her administrative remedies against a party before bringing an action in district court against that party . . . ."  Sonntag v. Shaw, 130 N.M. at 243, 22 P.3d at 1193.  Based on this requirement, the Supreme Court of New Mexico held that, "[i]n neglecting to name [the corporation's owner] personally, [the plaintiff] failed to exhaust her administrative remedies against him.  The trial court [had] therefore erred in allowing Plaintiff's discrimination claim to be brought against [the owner] individually."  Id. at 243, 22 P.3d at 1193.  Similarly, in Luboyeski v. Hill, the Supreme Court of New Mexico addressed a case in which the plaintiff "filed a complaint with the Division, naming the School System as respondent and claiming that Kermit Hill, another teacher at the school where [the plaintiff] taught, had touched and made advances toward her in sexually inappropriate ways."  Luboyeski v. Hill, at 117 N.M. at 381, 872 P.2d at 354.  Hill was "not named as [a] respondent[] in the proceeding before the Division and w[as] only added as defendants on [the plaintiff's] appeal to the district court."  Id. at 382, 872 P.2d at 355.  The Supreme Court found that the plaintiff had not exhausted her administrative remedies against Hill, holding "that parties who have not been parties to an administrative proceeding should not be added on appellate review of that proceeding."  Id. at 382, 872 P.2d at 355 (internal citations and quotations omitted).  The Supreme Court of New Mexico has, therefore, established a bright line jurisdictional rule, which requires that a plaintiff name a defendant in his or her administrative

complaint.

Gerald's Charge named UNM, but not Locksley or Krebs.  As such, the EEOC never included the individual Defendants in its administrative assessments.  Gerald contends that the individual Defendants should have been on notice of his claims because of newspaper accounts of the dispute.  The law requires, however, that he administratively exhaust his claims against the Defendants.  See Sonntag v. Shaw, 130 N.M. at 243, 22 P.3d at 1193.  Moreover, it is not just notice to the Defendants that is at issue, but enabling the EEOC to investigate Gerald's complaint before he proceeds with a civil action.

Gerald also contends that Locksley should have known he was the subject of his EEOC Charge because it states: "During the time of my employment my supervisor (Head Coach) has subjected me to different working term and conditions than the other White coaches . . . ."  EEOC Charge at 2.  The relevant Supreme Court of New Mexico precedent defeats Gerald's argument.  See Sonntag v. Shaw, 130 N.M. at 243, 22 P.3d at 1193 (holding that despite complaining of discrimination based on Shaw's actions in her administrative complaint: "Plaintiff named only the Corporation as a defendant in her complaint to the Division.  In neglecting to name Mr. Shaw personally, she failed to exhaust her administrative remedies against him"); Luboyeski v. Hill, 117 N.M. at 381, 382-83, 872 P.2d at 354, 355-56 (holding that, although "Luboyeski filed a complaint with the Division, naming the School System as respondent and claiming that Kermit Hill, another teacher at the school where Luboyeski taught, had touched and made advances toward her in sexually inappropriate ways, . . . . [s]ince [the plaintiff] has not gone through the administrative process that is prerequisite to suing the individual defendants [including Hill] under the Human Rights Act," the plaintiff did not exhaust her administrative remedies against Hill).  Because Gerald

did not exhaust his administrative remedies with respect to the individual Defendants, the Court will dismiss the claims against them with prejudice.

## II.   GERALD DID NOT EXHAUST HIS ADMINISTRATIVE REMEDIES FOR HIS RETALIATION CLAIM IN COUNT II.

Gerald argues that his narrative in the EEOC Charge adequately sets forth a retaliation claim. At the hearing, Gerald asserted that the statement in his EEOC Charge that he reported the altercation to "management and nothing was done" establishes a retaliation claim, and overcomes the presumption his failure to check the "retaliation" box creates. EEOC Charge at 2. Because Gerald did not present a retaliation claim in his EEOC Charge, either in name or in substance, the Court concludes the Gerald did not exhaust his administrative remedies for his retaliation claim.

To bring a retaliation claim before this Court, Gerald must have first presented the claim to the EEOC. "A failure to file an administrative . . . claim before bringing suit is jurisdictionally fatal." Mitchell v. City and County of Denver, 112 F. App'x at 666. The Court must determine if a retaliation claim "can reasonably be expected to follow the charge of discrimination submitted to the EEOC." MacKenzie v. City & County of Denver, 414 F.3d at 1274. "We liberally construe charges filed with the EEOC in determining whether administrative remedies have been exhausted as to a particular claim." Jones v. United Parcel Serv., Inc., 502 F.3d at 1186. "This more lenient pleading standard contemplates the fact that administrative charges of unlawful employment practices are regularly filled out by employees who do not have the benefit of counsel." Mitchell v. City and County of Denver, 112 F. App'x at 667.[5] "[T]he charge must contain facts concerning

---

[5] At the hearing, Gerald represented that EEOC staff complete the EEOC Charge for the complaintants. While having professionals familiar with discrimination claims completing EEOC charges would appear to somewhat undermine the policy underlying courts' liberal construction of the charges, the Court will nonetheless liberally interpret the EEOC Charge.

the discriminatory and retaliatory actions underlying each claim." Jones v. United Parcel Serv., Inc., 502 F.3d at 1186.

First, Gerald did not check the box for "retaliation" on his EEOC Charge, nor did he set forth allegations in the narrative section that would lead the EEOC to investigate retaliation. See EEOC Charge at 2. "The failure to mark a particular box creates a presumption that the charging party is not asserting claims represented by that box." Jones v. United Parcel Serv., Inc., 502 F.3d at 1186 (citing Gunnell v. Utah Valley State College, 152 F.3d at 1260). "The presumption may be rebutted, however, if the text of the charge clearly sets forth the basis of the claim." Jones v. United Parcel Service, Inc., 502 F.3d at 1186.

In Annett v. University of Kansas, 371 F.3d 1233 (10th Cir. 2003), the Tenth Circuit declined to consider Annett's contention that receiving the position of adjunct lecturer versus adjunct professor constituted a retaliation action, because she failed to exhaust her administrative remedies. See 371 F.3d at 1238. The Tenth Circuit considered Annett's charge of discrimination filed September 6, 2000, and her "complaint narrative" submitted on May 31, 2000, and found no reference to a distinction between "lecturer" and "professor" as probative of discrimination or retaliation. 371 F.3d at 1238. Annett's complaint stated: "I was given an Adjunct faculty position, but no Principal Investigator status, which prevents me from obtaining grants." 371 F.3d at 1238. Annett's complaint narrative stated: "My own position as an Adjunct Faculty member at KU was downgraded to prevent me from submitting grants that could act as an alternative source of income." 371 F.3d at 1238. The Tenth Circuit held that it could not conclude "that this sentence represents the distinction between being appointed an adjunct lecturer versus an adjunct professor in 1999 or 2000." 371 F.3d at 1238. Furthermore, the Tenth Circuit noted that it "lack[ed] jurisdiction to

-48-

review Title VII claims that are not part of a timely-filed EEOC charge," including actions that

occurred after the charge was filed.  371 F.3d at 1238 (citing Seymore v. Shawver & Sons, Inc., 111

F.3d at 799).

> Previously, we would proceed to examine whether the alleged employment action,
> provided it occurred after the filing of the EEOC charge, was "like or reasonably
> related to the allegations of the EEOC charge."  However, our recent holding in
> Martinez v. Potter, has foreclosed this line of inquiry.  In Martinez, we abrogated the
> continuing violation exception to our jurisdictional requirements to allege a claim of
> retaliation and held that "unexhausted claims involving discrete employment actions
> are no longer viable."[6]  In so doing, we relied on National R.R. Passenger Corp. v.
> Morgan, which concluded that each discrete retaliatory action constitutes its own
> unlawful employment practice for which administrative remedies must be exhausted,
> and we applied Morgan to incidents occurring after an employee's filing of an EEO
> complaint, and we applied Morgan to incidents occurring after an employee's filing
> of an EEO complaint.

Annett v. Univ. of Kansas, 371 F.3d at 1238 (internal quotations and citations omitted).  The Tenth

Circuit therefore dismissed Annett's claim for failure to exhaust administrative remedies.

In Zinke v. Slater, 34 F. App'x 667 (10th Cir. 2002), the Tenth Circuit affirmed a district

court's dismissal of a plaintiffs' hostile-work-environment and discrimination claims, because she

failed to exhaust her administrative remedies.  The Tenth Circuit held that she did not overcome the

---

[6] Gerald relies on the abrogated standard in his Response, asserting that, "[w]hen an employee seeks judicial relief for incidents not listed in his original charge to the EEOC, the judicial complaint nevertheless may encompass any discrimination like or reasonably related to the allegations of the EEOC charge, including new acts occurring during the pendency of the charge before the EEOC."  Response at 13 (citing Brown v. Hartshorne Pub. Sch. Dist. No. 1, 864 F.2d 680, 682 (10th Cir. 1988)).  Under National Railroad Passenger Corp. v. Morgan, each claim and discrete act of discrimination must be administratively exhausted.  "Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify.  Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable unlawful employment practice."  Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. at 114 (internal citations and quotations omitted).  "The rule is equally applicable . . . to discrete claims based on incidents occurring after the filing of Plaintiff's EEO complaint."  Martinez v. Potter, 347 F.3d at 1210-11.

presumption her failure to check boxes in her EEO complaint created:

> In 1998, Zinke clearly indicated "reprisal" as the exclusive basis for her EEO complaint.   In Block 6, "Check Below Why You Believe You Were Discriminated Against," Zinke marked only "Reprisal," followed by the statement "Non-selection due to reprisal for reporting sexual harassment."   Although her failure to mark the box for sex discrimination is not dispositive, it "creates a presumption that she was not asserting claims represented by boxes not checked."   Gunnell v. Utah Valley State College, 152 F.3d 1253, 1260 (10th Cir. 1998); see also Williams v. Little Rock Mun. Water Works, 21 F.3d 218, 223 (8th Cir. 1994) (providing employee's EEOC charge, which mentioned filing previous racial discrimination charge, reasonably read as alleging only retaliation claim, particularly in light of employee's failure to check box for racial discrimination).   Zinke fails to rebut the presumption that she was not asserting additional claims because her factual description of the reprisal claim completely omits any reference to hostile work environment or gender discrimination issues.   In Block 7, "Explain How You Believe You Were Discriminated Against," Zinke described in detail what she believed was the FAA's failure to hire her in retaliation for filing the 1991 complaint of quid pro quo sexual harassment. See Gunnell, 152 F.3d at 1260 (concluding that plaintiff failed to rebut the presumption that she was not asserting sex discrimination claim, caused by her failure to mark appropriate box, because "reasonable reader would understand that her mention of sex discrimination" was merely an "explanation leading up to the gist of her complaint of retaliation").   There is nothing in the 1998 EEO complaint to put the Secretary on notice of any hostile work environment or gender discrimination claims.   In fact, the only reference to any kind of harassment in the 1998 complaint was to the 1991 charge of quid pro quo harassment as the "protected activity" element of Zinke's reprisal claim.   Thus, we conclude Zinke's hostile work environment and gender discrimination claims are not the same type of discrimination . . . .

34 F. App'x at 672-73.

Like the Plaintiffs in Zinke v. Slater, Gerald does not overcome the presumption his failure to check the box.   In the section titled "DISCRIMINATION BASED ON (Check appropriate box(es))," Gerald checked only the box for "race," and he did not check the box for "retaliation." In the section titled "DATE(S) DISCRIMINATION TOOK PLACE," Gerald indicated that the earliest date was August 13, 2009 and the latest date was September 20, 2009, the date of the altercation.   In the narrative portion of the EEOC Charge, Gerald wrote:

Statement of Discrimination: I was hired by the Respondent on December 19, 2008, as a Full time Football Coach.  During the time of my employment my supervisor (Head Coach) has subjected me to different working term and conditions than the other White coaches, including, but not limited to, threats and intimidation of physical abuse, demeaning my decisions, and cursing me in front of my peers and students.  On September 20, 2009, my supervisor physically assaulted me by choking and punching me about the face.  I reported this to management and nothing was done.  These conditions have made my working atmosphere hostile to which it has affected my performance of duties.

I believe that I have been discriminated against because of my Race (Black) in violation of Title VII of the Civil Rights Act of 1964 as amended.

EEOC Charge at 2.  Gerald's factual description of the discrimination claim omits any reference to retaliation against him for protected activity.  At the hearing, Gerald asserted that his statement that he "reported this to management and nothing was done" would reasonably lead the EEOC to investigate a retaliation claim.  His assertion that "nothing was done" does not sound in retaliation, because it does not suggest that Gerald suffered an adverse employment action in response to his protected activity.   A "reasonable reader would understand that [Gerald's] mention of" management's inaction as merely an "explanation leading up to the gist of h[is] complaint of" discrimination.  Gunnell v. Utah Valley State Coll., 152 F.3d at 1260.

The Court thus concludes that Gerald failed to exhaust his administrative remedies, because the Court's review of Gerald's EEOC Charge reveals that Gerald neither checked the retaliation box nor presented any information that could reasonably be expected to lead the EEOC to investigate a retaliation claim.  Because Gerald did not exhaust his administrative remedies for his retaliation claim, the Court has no subject-matter jurisdiction over it.  The Court therefore dismisses Gerald's retaliation claim in Count II.  See Echols v. Today's Staffing, 35 F. App'x 776, 777 (10th Cir. 2002)(affirming dismissal of race discrimination claim where EEOC charge provided no suggestion

of a racial discrimination theory).[7]

### III. GERALD DID NOT PLEAD A FIRST-AMENDMENT RETALIATION CLAIM, AN EQUAL PROTECTION CLAIM, OR A CASE OF EMPLOYMENT DISCRIMINATION, BECAUSE HE DID NOT ALLEGE THAT HE WAS SUBJECTED TO AN ADVERSE EMPLOYMENT ACTION.

Gerald fails to allege that he was subjected to an adverse employment action, which is necessary to establish his a discrimination claim under Title VII or the Equal Protection Clause, or his First-Amendment claim. See Wilkins v. Chevron, 370 F. App'x 919, 920 (10th Cir. 2010)(affirming a district court's grant of a motion to dismiss and noting "the proposed amended complaint does not allege any action that could amount to an adverse employment action"); Robbins v. Oklahoma, 519 F.3d 1247-48 (10th Cir. 2008)(holding that allegations in a complaint "must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief"). To state a discrimination claim under Title VII or the Equal Protection Clause, Gerald must allege that the Defendants subjected him to an adverse employment action. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 523-24 (1993)("Title VII does not award damages against employers who cannot prove a nondiscriminatory reason for adverse employment action, but only against employers who are proven to have taken adverse employment action by reason of (in the context of

---

[7] While the Court should not and will not decide issues where it lacks subject-matter jurisdiction, the Court notes, that even if Gerald had exhausted his administrative remedies as to his retaliation claim, his retaliation claim would have to overcome the Defendants' rule 12(b)(6) motion, which contends that the Court should dismiss Gerald's retaliation claim because it fails to state a claim. There is a question whether Gerald has alleged a protected activity. Gerald also does not identify an adverse employment action to which he was subjected; at best, the SAC insinuates that Gerald was constructively discharged. Thus, there is an issue whether the Amended Complaint lacks a factual basis for a viable retaliation. Accordingly, while the Court cannot, and should not, rule on the Defendants' alternative rule 12(b)(6) motion after it has found it lacks jurisdiction over the retaliation claim, the Court notes the serious issues raised in the motion to dismiss about the merits of the claim.

the present case) race."); Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981)(citing

McDonnell Douglas Corp. v. Green, 411 U.S. 792, 804-05 (1973)); Crawford v. Carroll, 529 F.3d

at 970 ("These elements also apply to a [Equal Protection] claim of race discrimination under § 1983

because the analysis of disparate treatment claims under § 1983 is identical to the analysis under

Title VII where the facts on which the claims rely are the same."); Etsitty v. Utah Transit Auth., 502

F.3d at 1227 ("In disparate-treatment discrimination suits, the elements of a plaintiff's case are the

same whether that case is brought under §§ 1981 or 1983 or Title VII."  (quoting Maldonado v. City

of Altus, 433 F.3d at 1307)); McCrary v. Aurora Public Schools, 57 F. App'x at 373 (summarily

dismissing plaintiff's Equal-Protection claim based on her failure to establish an adverse

employment action); Elmore v. Capstan, Inc., 58 F.3d 525, 529 (10th Cir. 1995).  See also Messina

v. Kroblin Transp. Sys., Inc., 903 F.2d at 1308 ("McDonnell Douglas inferences provide assistance

to a judge as he addresses motions to dismiss, for summary judgment, and for directed verdict.").

"Because the burden on [Gerald] to prove [his] NMHRA claims is identical to [his] burden under

Title VII, the analysis of [his] federal claims that follows applies equally to [his] state law claims."

Orr v. City of Albuquerque, 531 F.3d 1210, 1214 (10th Cir. 2008).  Similarly, Gerald must allege

an adverse employment action to establish his First-Amendment retaliation claim.  See Hook v.

Regents of Univ. of Cal., 2010 WL 3529414, at *10 ("Implicit within this five-prong analysis is a

requirement that the public employer have taken some adverse employment action against the

employee." (citation and internal quotation marks omitted)); Moya v. Schollenbarger, 465 F.3d 444,

465-57 (10th Cir. 2006)(affirming dismissal of First-Amendment retaliation claim for failing to

allege an adverse employment action taken against was taken against him).  The Tenth Circuit

recently announced that the standard for establishing adverse employment actions under Title VII

also applies to establishing an adverse employment action for First-Amendment retaliation claims. See Hook v. Regents of Univ. of Cal., 2010 WL 3529414, at *10 ("[The Tenth Circuit] consider[s] an employment action to be adverse in the First Amendment retaliation setting if it 'would deter a reasonable person from exercising his First Amendment rights'"; "[t]his test is identical to the test which is applied in Title VII retaliation claims." (citing Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53; Couch v. Bd. of Trs. of Mem'l Hosp., 587 F.3d at 1238)).  Gerald's allegations that Krebs told him to minimize the altercation and that pursuing his grievance would not be good for his career do not rise to the level of an adverse employment action.  Moreover, Gerald has not set forth allegations that establish a hostile work environment, or the meet the more demanding standard of establishing a constructive discharge claim and, thereby, an adverse employment action.  The Court therefore dismisses Count II, III, and IV of his FAC.

### A.   GERALD HAS NOT SET FORTH ALLEGATIONS ESTABLISHING AN ADVERSE EMPLOYMENT ACTION.

Gerald's allegations do not amount to an adverse employment action.  As an initial matter, the Court notes that the only factual basis on which Gerald founds his discrimination retaliation claim for which he also exhausted his administrative remedies is the Defendants' alleged inaction in response to his complaint.  See EEOC Charge at 2 ("I reported this to management and nothing was done.").  Unlike his claims under the Title VII, there is no administrative procedure Gerald must exhaust before bringing his First-Amendment retaliation claim.  As a result, the Court's analysis whether the Defendants' alleged inaction in response to Gerald's grievances amount to an adverse employment action applies to both his Title VII and his First Amendment claims, but the Court analyzes the actions not mentioned in the EEOC Charge for only the purposes of evaluating the viability of his First-Amendment retaliation claim.  Regardless, the Court concludes that none of the

Defendants' actions amount to a materially adverse employment action.

In his FAC, Gerald alleges that, on September 20, 2010, he reported his altercation with Locksley to UNM management and police, including Krebs.  Gerald asserts that "Krebs and other UNM officials did not take appropriate measures to handle the situation."   FAC ¶ 18, at 3.  According to the FAC, Krebs encouraged Gerald "to minimize and trivialize what had occurred," and "suggested to Plaintiff that his career would not benefit if he persisted in complaining of Locksely's behavior and that he should desist from any further action in the matter and from making any statements in regard to the assault."  FAC ¶¶ 20-21, at 3.  Gerald alleges that Krebs' "motive and intent . . . was to protect the University athletic program from criticism because of the incident, and to protect his position as Athletic Director, and the statements were discriminatory and retaliatory in nature." FAC ¶ 22, at 3-4.  Gerald asserts that Krebs publically denied and minimized the altercation between Locksley and Gerald, initially issuing a letter of reprimand to Locksley, without imposing further discipline.  Gerald further asserts that, after a public outcry over the light response, the UNM administration suspended Locksley for ten days.  Gerald was placed on paid administrative leave for the remainder of the 2010 football season.  Although UNM invited Gerald to return to his employment with the UNM football team the following year, he refused to do so, alleging that UNM and Krebs' discipline of Locksley was insufficient to deter further acts of violence.

"[W]hile adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action.  Otherwise, minor and even trivial employment actions . . . would form the basis of a discrimination suit."  Anderson v. Clovis Mun. Schs., 265 F. App'x at 704 (quoting MacKenzie v. City and County of Domier, 414

F.3d at 1279).  See Heno v. Sprint/United Mgmt. Co., 208 F.3d at 857)(explaining that Title VII proscribes only discriminatory conduct that "alters the employee's compensation, terms, conditions, or privileges of employment, or adversely affect his or her status as an employee")(quotations omitted).  "Only acts that constitute a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits will rise to the level of an adverse employment action."  Robinson v. Cavalry Portfolio Serv., LLC, 365 F. App'x at 114)(quoting Haynes v. Level 3 Communs, 456 F.3d at 1218-19).

The Amended Complaint does not allege that Gerald suffered, or was subject to, an adverse employment action.  Discouraging Gerald in unspecified ways from complaining about Locksley and failing to take unspecified "remedial actions" are not analogous to the concrete alterations in employment status that courts recognize as satisfying this standard.  The Defendants encouraging Gerald to minimize or not pursue a grievance because it would not be good for his career without any action does not amount to an adverse employment action.  See Barone v. United Airlines, Inc., 355 F. App'x 169 ,182 n.7 (10th Cir. 2009)(noting and distinguishing Seventh Circuit precedent that "[a]n unfulfilled threat, which results in no material harm, is not materially adverse" (citing Ajayi v. Aramark Bus. Servs., Inc., 336 F.3d 520, 531 (7th Cir. 2003))); Tapia v. City of Albuquerque, 170 F. App'x. 529, 535 (10th Cir. 2006)(relying on Tenth Circuit precedent "that unrealized threats do not rise to level of actionable retaliation" to hold that "[t]he fact that the letter indicates that Tapia could be disciplined for a future threat is not enough to make the letter itself disciplinary action" (citing Jeffries v. Kansas, 147 F.3d 1220, 1232-33 (10th Cir. 1998))); Dick v. Phone Directories Co., Inc., 397 F.3d 1256, 1268 (10th Cir. 2005)(affirming district court's holding "that an unrealized

threat of termination, without more, [does not] constitute[] an adverse employment action" (citing Jeffries v. State of Kan., 147 F.3d at 1232-33; Cole v. Ruidoso Mun. Schs., 43 F.3d 1373, 1381 (10th Cir.1994))).  The Defendants' alleged actions would not lead a reasonable employee to fail to file or prosecute a discrimination claim.  See Heno v. Sprint/United Mgnt. Co., 208 F.3d at 857 (holding that facts including "the Human Resources Department refus[ing] to further investigate [the plaintiff's] complaint once they found out she had filed an EEOC complaint" and her employer's "suggest[ion] [the plaintiff] might wish to transfer to a different Sprint department because the inside sales department was shifting to a commission format on which Ms. Heno had previously struggled" "do not rise to the level of an adverse employment action").

Nor was placing Gerald on paid administrative leave an adverse employment action.  See Swearnigen-El v. Cook County Sheriff's Dep't, 602 F.3d 852, 860 (7th Cir. 2010)(affirming summary judgment against plaintiff who was, among other things, placed on paid leave, because the plaintiff failed to establish an adverse employment); Alaniz v. Zamora-Quezada, 591 F.3d 761, 773 (5th Cir. 2009)("[P]lacing [the employee] on paid leave -- whether administrative or sick -- was not an adverse employment action." (quoting McCoy v. City of Shreveport, 492 F.3d 551, 559 (5th Cir. 2007)(internal quotation marks omitted));  Eggers v. Moore, 257 F. App'x 993, 995 (6th Cir. 2007)("[P]aid leave is not an adverse employment action." (citing Peltier v. United States, 388 F.3d 984, 988 (6th Cir. 2004))); Otero v. N.M. Cors. Dep't, 640 F. Supp. 2d 1346, 1355 (D.N.M. 2009)(Browning, J.)(holding that being placed on paid administrative leave was not an adverse employment action).  Gerald acknowledges that no threat ever was carried out and that he "was invited to return to employment with the UNM football team" after Locksley was suspended for ten days for his actions, FAC ¶ 29, at 4, during which Locksley was unable to coach a football game,

see Reply at 9.

The Tenth Circuit held in Samuels v. Potter, 372 F. App'x 906 (10th Cir. 2010), that a plaintiff who alleged his supervisor "put[ ] his hands on him and point[e]d a finger in his face" failed to establish an adverse employment action in the retaliation context. 372 F. App'x at 908. The Tenth Circuit stated: "We certainly do not discount the impropriety of any unwanted physical contact in the workplace, but propriety per se is not the inquiry here. Rather, we must ask whether the contact alleged might well have dissuaded a reasonable worker from complaining about discrimination." 372 F. App'x at 908 (footnotes omitted). The Tenth Circuit held that the plaintiff's allegations did not raise a triable issue:

> Three points lead us to that conclusion. First, this court has acknowledged on numerous occasions that the anti-discrimination laws do not license courts to police the workplace for each and every deviation from social standards of proper interpersonal conduct. In the context of alleged retaliation, we have repeatedly held that, unless pervasive, incidents of rudeness, ridicule, unruly behavior, and angry outbursts allegedly prompted by past complaints are not sufficient to satisfy the material-adversity standard. See Somoza v. Univ. of Denver, 513 F.3d 1206, 1214-15 (10th Cir. 2008) (discussing several of this circuit's cases). The incident Mr. Samuels alleged here, insofar as it involved offensively pointing a finger in his face, clearly falls within this line of precedent. The push to the back of his shoulder may have taken the incident a step further, but not enough to cross the line and raise a triable issue of material adversity.

372 F. App'x at 908.

Moreover, with respect to Gerald's discrimination claim, these are the "threadbare recitals" and conclusory allegation that are inadequate to overcome a rule 12(b)(6) challenge. See Iqbal v. Ashcroft, 129 S. Ct. at 1949-50. Gerald does not provide any factual allegations that would support the notion that anything the Defendants did or did not do was because of his race. He instead alleges that "[t]he motive and intent behind Defendant Krebs' statements to the Plaintiff was to protect the University athletic program from criticism because of the incident . . . ." FAC ¶ 22, at 3-4. He then

leaps to the conclusory allegation that that the statements nevertheless "were discriminatory and retaliatory in nature." FAC ¶ 22, at 4. "[T]he complaint never intimates in any way why [Gerald] believes that [his race] motivated [the Defendants'] actions." Guirguis v. Movers Specialty Servs., Inc., 346 F. App'x 774, 776 (3d Cir. 2009). In Guirguis v. Movers Specialty Servs., Inc., the United States Court of Appeals for the Third Circuit affirmed a district court's dismissal of a plaintiff's Complaint that, like Gerald's FAC, failed make a plausible allegation of discrimination:

> Guirguis's complaint fails to cross the threshold established by Twombly and Iqbal. It alleges that Guirguis is an Egyptian native of Arab descent, that Movers discharged him, and that his termination occurred in violation of his civil rights. The final allegation is precisely the type of factually unsupported legal conclusion that is inadequate to surmount a Rule 12(b)(6) challenge. The remaining averments contain no facts supporting an inference that Movers terminated Guirguis on the basis of his national origin. Indeed, the complaint never intimates in any way why Guirguis believes that national origin motivated Movers' actions. In the absence of factual averments supporting his discrimination claims, the District Court properly found that Guirguis failed to raise a plausible right to relief under the pleading standard established by Twombly.

346 F. App'x at 776. Gerald fails to include the race of any person involved in the alleged discrimination, or provide allegations of any comparable incident or behavior by other UNM employees of a different race that was handled in a different manner. See Guirguis v. Movers Specialty Servs., Inc., 346 F. App'x at 776. See also Hysten v. Burlington N. & Santa Fe Ry. Co., 296 F.3d 1177, 1187 (10th Cir. 2002)("A plaintiff wishing to prove discriminatory animus with evidence that his employer treated him differently from other employees bears the burden of showing that the comparison is legally relevant -- i.e., that the employees were similarly situated." (citing Watts v. City of Norman, 270 F.3d 1288, 1293 (10th Cir.2001))).

## B.   GERALD HAS NOT SET FORTH ALLEGATIONS OF CONSTRUCTIVE DISCHARGE.

Gerald intimates that his decision not to return to UNM was a result of inadequate

disciplinary action and this lack of discipline was constructive termination.  See FAC ¶ 29, at 4-5.

Because Gerald has failed to allege the requisite level of severe working conditions required to make

out a constructive termination claim, he cannot rely on such allegations to satisfy the adverse

employment action requirement.   "A hostile work environment can become so severe that it gives

rise to a constructive discharge, which is an adverse employment action."   Venezia v. Gottlieb

Mem'l Hosp., Inc.,  421 F.3d 468, 473 (7th Cir. 2005)(citing Pa. State Police v. Suders, 542 U.S.

129, 147 n.9 (2004); EEOC v. Univ. of Chicago Hosp., 276 F.3d 326, 331 (7th Cir. 2002); Herron

v. DaimlerChrysler Corp., 388 F.3d 293, 303 (7th Cir. 2004)). Strickland v. United Parcel Serv.,

Inc., 555 F.3d 1224, 1230 n.4 (10th Cir. 2009)("[C]onstructive discharge is an adverse employment

action."  (citing Fischer v. Forestwood Co., 525 F.3d 972, 980 (10th Cir. 2008))).  Cf. Turner v. Pub.

Serv. Co. of Colo., 563 F.3d 1136, 1145 (10th Cir. 2009)("[Hansel v. Pub. Serv. Co. of Colo., 778

F. Supp. 1126, 1133-34 (D. Colo. 1991)] involved a different form of discrimination -- the plaintiff

alleged a hostile work environment, not an adverse employment action -- from the discrimination

alleged in this case.").  "An employee is constructively discharged when the employer by his illegal

discriminatory acts makes 'working conditions so difficult that a reasonable person in the employee's

position would feel compelled to resign.'"   Hall v. U.S. Dep't of Labor, 476 F.3d at 851.  To prevail

on a discrimination claim based on a hostile work environment,

> a plaintiff must show "that a rational jury could find that the workplace is permeated
> with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or
> pervasive to alter the conditions of the victim's employment and create an abusive
> working environment." Sandoval v. City of Boulder, 388 F.3d 1312, 1327 (10th Cir.
> 2004) (quotation omitted).

>> In making this determination, we consider the work atmosphere both
>> objectively and subjectively, looking at all the circumstances from
>> the perspective of a reasonable person in the plaintiff's position.  We
>> may consider the conduct's frequency and severity; whether it is

> physically threatening or humiliating, or a mere offensive utterance;
> and whether it unreasonably interferes with the plaintiff employee's
> work performance.

Tademy v. Union Pac. Corp., 614 F.3d 1132, 1144 (10th Cir. 2008) (citation and
quotations omitted).  Additionally, the harassment must be based on the plaintiff's
protected class or stem from discriminatory animus toward her protected class.  See
id. at 1139 (addressing claim of racially hostile work environment and stating
"harassment must be racial or stem from racial animus" (quotation and brackets
omitted)); see also Bolden v. PRC Inc., 43 F.3d 545, 551 (10th Cir. 1994) ("General
harassment if not racial or sexual is not actionable.").

Faragalla v. Douglas County Sch. Dist. RE 1, Nos. 09-1393, 10-1433, 2011 WL 94540 (10th Cir.

Jan. 12, 2011).  Taken as true, Gerald's allegations in his FAC, however, fall short of establishing

a hostile work environment, or the more demanding standard of constructive discharge.

Gerald alleges that Locksley threatened him with physical violence in August of 2009, and

physically attacked him on or about September 20, 2009:

> After a team practice session in August of 2010, prior to the physical
> altercation between Defendant Locksley and the Plaintiff, Defendant Locksley
> physically threatened the Plaintiff.  On or about September 20, 2009, during a
> coach's meeting at the UNM athletic facility, Plaintiff was physically attacked by the
> UNM Head Football Coach, Mike Locksley.  The attack included Locksley choking
> Mr. Gerald and punching him in the face.  The attack was under the guise of a
> disciplinary action against the Plaintiff, who had incurred the Defendant's displeasure
> for the team's performance during a game.  At the time of the attack, Defendant
> Locksley expressed his displeasure at what he perceived to disobedience or
> insubordination by the Plaintiff.
>
> The acts of Defendant Locksley described herein were done while in the
> service of UNM and as an individual, and caused bodily harm, emotional distress and
> loss of income and future employment and employment opportunities to the Plaintiff.
> The acts of Defendant Locksley were unprovoked, malicious, intentional,
> outrageous, and were done while in the service of UNM and as an individual, and
> without any justification.

FAC ¶¶ 13-16, at 2-3 (paragraph numbers omitted).  Count II states in its entirety:

> Plaintiff incorporates by reference the allegations of all of the foregoing paragraphs
> as if fully stated herein.  When Plaintiff reported Defendant Locksley's behavior to

Defendant Krebs and UNM, the Defendants failed to take appropriate remedial action and dissuaded and discouraged Plaintiff from persisting in his activity of complaining and requiring remedial action, and were intended to threaten the Plaintiff with the loss of his employment at UNM. <u>Said statements and actions by Defendant Krebs and UNM</u> were motivated by reason of Plaintiff's race, African American, in violation of Title VII of the Civil Rights Act of 1964 and the New Mexico Human Rights Act. Plaintiff was harmed and damaged as a result of said acts of race discrimination, in an amount to be established at trial, for which he is entitled to just and fair compensation.

FAC ¶¶ 42-44, at 7 (paragraph numbers omitted)(emphasis added)). First -- regarding Gerald's discrimination claim -- the Court notes that Gerald's allegations against Locksley nowhere mention race or suggest racial animus. See <u>Tademy v. Union Pac. Corp.</u>, 614 F.3d at 1139 ("The harassment must be "racial or stem[ ] from racial animus." (quoting <u>Witt v. Roadway Express</u>, 136 F.3d 1424, 1432 (10th Cir. 1998))). Gerald contends that "Locksley is also an African-American, but that should not make him less liable for a discrimination claim if his actions against the Plaintiff were racially motivated." Response at 18 n.2. A review of Gerald's FAC, however, reveals no suggestion that the altercation was "racially motivated"; rather, Gerald alleges that Locksley's dissatisfaction with Gerald's performance motivated his actions. The closet Gerald comes to alleging racial animus is his assertion that Locksley's actions were "under the guise of a disciplinary action," but nowhere does Gerald indicate what the guise was meant to conceal.

Second, assuming for the sake of argument that Gerald's allegations in the FAC suggest some nexus between Locksley's actions and racial animus, Gerald's allegations do not establish a hostile work environment or meet the more demanding standard of establishing constructive discharge, and thereby an adverse employment action. See <u>Durham v. McDonald's Restaurants of Okla., Inc.</u>, 325 F. App'x 694, 695 (10th Cir. 2009)(affirming a district court's holding that a plaintiff "failed to demonstrate sufficiently severe conditions to constitute a hostile work

environment (or, implicitly, a constructive discharge)"); Hall v. U.S. Dep't of Labor, 476 F.3d at 851 ("Thus, a constructive discharge 'can be regarded as an aggravated case of hostile work environment.'" (quoting Pa. State Police v. Suders, 542 U.S. at 146)); Zisumbo v. McCleodUSA Telecomms. Servs., Inc., 154 F. App'x 715, 729 (7th Cir. 2005)("Working conditions for constructive discharge must be even more egregious than the high standard for hostile work environment because in the ordinary case, an employee is expected to remain employed while seeking redress." (quoting Tutman v. WBBM-TV, Inc/CBS, Inc., 209 F.3d 1044, 1050 (7th Cir. 2000)(internal quotation marks omitted))).

To plead a hostile work environment claim, Gerald must set forth allegations making plausible harassment that "was pervasive or severe enough to alter the terms, conditions, or privilege of employment." Bloomer v. United Parcel Serv., Inc., 94 F. App'x at 825 (quoting Witt v. Roadway Express, 136 F.3d at 1432). The Tenth Circuit has stated that "[p]ervasiveness and severity are independent and equal grounds" upon which a plaintiff may establish this element of a hostile environment claim. Witt v. Roadway Express, 136 F.3d at 1432. In addition to all the circumstances, relevant considerations to determine if an environment is objectively hostile include: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998)(quoting Harris v. Forklift Systems, Inc., 510 U.S. at 21)(internal citations and quotations omitted). Gerald alleges essentially three incidents in support of his constructive discharge claim; he contends that Locksley threatened him, that Locksley attacked him, and that the Defendants discouraged Gerald from pursuing his grievance against Locksley. The small number of incidents

on which Gerald bases his claims is not fatal if the incidents are adequately severe. "[T]he required

showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness

or frequency of the conduct." Ellison v. Brady, 924 F.2d 872, 878 (7th Cir. 1991)(citing King v. Bd.

of Regents, 898 F.2d 533, 537 (7th Cir. 1990)).

There is no minimum number of incidents or pattern of behavior that Gerald must allege.

In Rocha Vigil v. City of Las Cruces, 119 F.3d 871 (10th Cir. 1997), the Tenth Circuit stated:

> In line with Harris, other circuits have recognized that Title VII hostile work
> environment plaintiffs need not prove a pattern, "steady barrage," or other minimum
> quantum of discriminatory conduct in order to establish actionable harassment. See
> Torres v. Pisano, 116 F.3d 625, 631 (2d Cir. 1997) ("Of course, even a single episode
> of harassment, if severe enough, can establish a hostile work environment."); Davis
> v. Monsanto Chem. Co., 858 F.2d 345, 349 (6th Cir. 1988) ("[P]laintiff need not
> prove that the instances of alleged harassment were related in either time or type.
> Rather all that the victim of racial harassment need show is that the alleged conduct
> constituted an unreasonably abusive or offensive work-related environment or
> adversely affected the reasonable employee's ability to do his or her job."); Rodgers
> v. Western-Southern Life Ins. Co., 12 F.3d 668, 674 (7th Cir. 1993) ("Within the
> totality of circumstances, there is neither a threshold 'magic number' of harassing
> incidents that gives rise, without more, to liability as a matter of law *nor a number
> of incidents below which a plaintiff fails as a matter of law to state a claim*.")
> (emphasis added); Daniels v. Essex Group, Inc., 937 F.2d 1264, 1274 n.4 (7th Cir.
> 1991) (recognizing that single, isolated incident of harassment can give rise to
> employer liability for racial harassment under Title VII).

119 F.3d at 873. While there is no minimum number of incidents, where a plaintiff alleges few,

incidents, they must be severe to establish a hostile work environment, or constructive discharge.

See, e.g., Lowe v. Angelo's Italian Foods, Inc., 87 F.3d 1170, 1175 (10th Cir.1996)(holding that one

isolated comment and the use of the term "girlie," "although regrettable, do not demonstrate that the

work environment . . . was 'permeated with discriminatory intimidation, ridicule, and insult'");

Creamer v. Laidlaw Transit, Inc., 86 F.3d 167, 170 (10th Cir.)(holding single incident of sexual

harassment was neither sufficiently pervasive nor severe to constitute a hostile work environment),

cert. denied, 519 U.S. 983 (1996); Gross v. Burggraf Construction Co., 53 F.3d 1531, 1547 (10th

Cir. 1995)(holding one single statement that could be construed as gender-based and hostile was

insufficient to demonstrate hostile work environment under Meritor Sav. Bank, FSB v. Vinson);

Bolden v. PRC Inc., 43 F.3d 545, 551 (10th Cir. 1994)(holding that only two overtly racial

comments and one arguably racial remark over the course of the plaintiff's eight years of

employment did not constitute pervasive conduct), cert. denied, 516 U.S. 826 (1995).

In Brooks v. City of San Mateo, 229 F.3d 917 (9th Cir. 2000)(Kozinski J.), the United States

Court of Appeals for the Ninth Circuit held that a single incident in which fellow employee touched

plaintiff's stomach and then her breast under her sweater, while very offensive, did not create a

hostile work environment, particularly given that the city took prompt steps to remove the fellow

employee from the workplace.  The Ninth Circuit stated:

> If a single incident can ever suffice to support a hostile work environment
> claim, the incident must be extremely severe.  See [EEOC, Policy Guidance
> on Sexual Harassment, 8 BNA FEP Manual, page 6 at 405:6690-91 (Mar. 19, 1990)]
> ("[A] single unusually severe incident of harassment may be sufficient to constitute
> a Title VII violation; the more severe the harassment, the less need to show a
> repetitive series of incidents.  This is particularly true when the harassment is
> physical.").  In Al-Dabbagh [v. Greenpeace, Inc., 873 F. Supp. 1105, 1111 (N.D. Ill.
> 1994)], a single incident was held to be sufficient where the assailant "slapped
> [plaintiff], tore off her shirt, beat her, hit her on the head with a radio, choked her
> with a phone cord and ultimately forced her to have sex with him."  Al- Dabbagh,
> 873 F.Supp. at 1108.  The perpetrator held the victim captive overnight; when she
> finally managed to escape, she had to be hospitalized for her injuries.  See id.

229 F.3d at 926.  Rape and other form of sexual assault creating a sexually hostile work environment

are the archetypical examples of single incidents which can establish a hostile work environment.

See, e.g., Little v. Windermere Relocation, Inc., 301 F.3d 958, 967 (9th Cir. 2001)("A single

'incident' of harassment -- and we assume arguendo that three rapes in the course of one evening

constitutes a 'single' incident -- can support a claim of hostile work environment because the

'frequency of the discriminatory conduct' is only one factor in the analysis." (citations omitted));

Ferris v. Delta Air Lines, Inc., 277 F.3d 128, 136 (2d Cir. 2001)("Although a continuing pattern of hostile or abusive behavior is ordinarily required to establish a hostile environment, a single instance can suffice when it is sufficiently egregious. We have no doubt a single incident of rape can satisfy the first prong of employer liability under a hostile work environment theory." (citing Tomka v. Seiler Corp., 66 F.3d 1295, 1305 (2d Cir. 1995)("[E]ven a single incident of sexual assault sufficiently alters the conditions of the victim's employment and clearly creates an abusive work environment for purposes of Title VII liability."), abrogated on other grounds by Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998))); Turnbull v. Topeka State Hosp., 255 F.3d 1238, 1243-44 (10th Cir. 2001)("He knocked her to the ground, undressed her and digitally penetrated her, bit and choked her, and repeatedly threatened to kill her."); Lockard v. Pizza Hut, Inc., 162 F.3d 1062, 1072 (10th Cir.1998)(finding a "single incident of physically threatening conduct," in which a customer pulled his waitress by the hair, grabbed and placed his mouth on her breast, severe enough to create an actionable hostile work environment).

In Lockard v. Pizza Hut, Inc., the Tenth Circuit, the Tenth Circuit held that a single sexual assault could establish a hostile work environment. Customers sexually assaulted the plaintiff after her supervisor insisted she wait on them:

> Ms. Lockard's duties included closing the store after the restaurant stopped serving customers at 10 p.m. on weekdays and 11 p.m. on weekends. Upon occasion, she and Mr. Jack[, her supervisor,] were the only Pizza Hut employees at closing time and Mr. Jack would often play one of his favorite songs "Freak Me" on the jukebox. The song contains sexually explicit lyrics. Ms. Lockard testified that she informed both Mr. Jack and Ms. Selby that she found this song offensive and asked Mr. Jack to stop playing it, to no avail. Other than playing offensive music, Mr. Jack never directly acted improperly toward her.
>
> Ms. Lockard's more serious allegation of sexual harassment involved the

failure of Mr. Jack to respond properly to the inappropriate conduct of two crude and
rowdy male customers on November 6, 1993.  Ms. Lockard testified that these two
men had eaten at the restaurant several times previous to November 6 and had made
sexually offensive comments to her, such as "I would like to get into your pants."
After the two men made these remarks, Ms. Lockard informed Mr. Jack that she did
not like waiting on them; however, the record contains no evidence that she told Mr.
Jack why she did not like waiting on the men or that she ever relayed to him the
substance of their remarks.  On the evening of November 6, these customers again
entered the restaurant.  The wait staff, including younger male waiters, argued over
who would seat them because no one on the staff wanted to serve them.  Mr. Jack
then instructed Ms. Lockard to wait on them.  After being seated by Ms. Lockard,
one of the customers commented that she smelled good and asked what kind of
cologne she was wearing.  Ms. Lockard responded that it was none of his business,
and the customer grabbed her by the hair.  She informed Mr. Jack that one of the
customers had pulled her hair and that she did not want to continue waiting on them,
and asked Mr. Jack if he could find someone else to serve them.  Ms. Lockard
testified that Mr. Jack denied her request, stating "You wait on them.  You were
hired to be a waitress.  You waitress."  Ms. Lockard returned to their table with a
pitcher of beer.  As she reached to put the beer on the table, the customer pulled her
to him by the hair, grabbed her breast, and put his mouth on her breast.  At that point,
Ms. Lockard told Mr. Jack that she was quitting and wanted to go home.  She called
her husband who picked her up.

162 F.3d at 1067 (citations to the record omitted).  At trial, the district court denied the defendants'

motion for judgment as a matter of law, and the defendants appealed, arguing in part that the

plaintiff has not demonstrated "that she suffered harassment sufficiently severe or pervasive to create

an actionable hostile work environment."  162 F.3d at 1068.  The Tenth Circuit affirmed, stating:

> The conduct of these customers on November 6 was more than a mere offensive
> utterance.  Grabbing Ms. Lockard's hair and breast while she attempted to take their
> orders and serve their beer is physically threatening and humiliating behavior which
> unreasonably interfered with Ms. Lockard's ability to perform her duties as a
> waitress.  Defendants essentially argue that the physically threatening conduct of
> these two customers was simply a one-time incident and was therefore not pervasive
> enough to create an abusive environment, comparing the single incident here with
> the repeated incidents of sexual abuse suffered by the plaintiff in Meritor.  However,
> in Harris the Court made clear that the "appalling conduct alleged in Meritor
> . . . merely present[s] some especially egregious examples of harassment.  They do
> not mark the boundary of what is actionable."  Harris, 510 U.S. at 22 . . . .  The
> "frequency of the discriminatory conduct," id. at 23 . . . is simply one factor in the
> analysis, and "no single factor is required," id.  Conduct is actionable if it is

> "sufficiently severe or pervasive." <u>Meritor</u>, 477 U.S. at 67 . . . (emphasis added); <u>see also</u> <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742 . . . (1998); <u>Harris</u>, 510 U.S. at 21-22 . . . .  We therefore disagree with defendants' assertions that a single incident of physically threatening conduct can never be sufficient to create an abusive environment.  "[L]ooking at all the circumstances," as we must, <u>Harris</u>, 510 U.S. at 23 . . . , we are persuaded that the record contains sufficient evidence to support the jury's conclusion that the harassing conduct of the customers was severe enough to create an actionable hostile work environment.

162 F.3d at 1072.

The Tenth Circuit returned to the quest whether a single incident can establish a hostile work environment in <u>Turnbull v. Topeka State Hospital</u>.  In that case, the Tenth Circuit reversed a district court's judgment as a matter of law that the plaintiff had not presented evidence establishing a hostile work environment.  A psychologist employed at a state mental hospital sued the hospital and state under Title VII for sexual harassment after a patient sexually assaulted her.  The hospital had a history of patients "sexual acting out" and "staff were aware this posed potential dangers, dangers that were tragically highlighted when a female employee was murdered by a patient in 1992." 255 F.3d at 1241.  "Although psychologists could request extra staff to attend a group therapy session or other treatment, the shortage of staff meant those requests were rarely met."  255 F.3d at 1242.  The plaintiff and others had complained of safety concerns.  The plaintiff was on a walk with the patient on the grounds of the hospital.  "When they reached a slightly secluded area, [the patient] suddenly attacked.  He knocked her to the ground, undressed her and digitally penetrated her, bit and choked her, and repeatedly threatened to kill her."  255 F.3d at 1242-43.

After a jury found a hostile work environment, the trial court entered judgment as a matter of law.  The Tenth Circuit reversed, holding the verdict was reasonable.  The Tenth Circuit stated that, "[w]hile there was only one incident, it was objectively abusive, dangerous, and humiliating, and Dr. Turnbull was so traumatized she was unable to return to work thereafter."  255 F.3d at

1243-44.

Courts rarely find limited incidents of physical violence without a sexual element to establish a hostile work environment.  In <u>Cooper v. American Airlines, Inc.</u>, 213 F. App'x 714 (10th Cir. 2007), the Tenth Circuit held that a single union-related physical assault was insufficient to make out a prima facie case of hostile work environment under Title VII.  The case involved a physical attack on the plaintiff that included striking him, and "pressing and bumping and humping" his leg:

> While Mr. Cooper was handing out the [Aircraft Mechanics Fraternal Association] flyers, Robert Jackson, who at the time was American's Managing Director of Base Maintenance, informed Mr. Cooper that the TWU was not happy about the distribution of the literature.  Shortly thereafter, another American employee, Randy McDonald, who is a white male and at the time was the president of TWU, physically confronted Mr. Cooper and tried to wrestle away the flyers, shouting that Mr. Cooper was destroying TWU membership.  He also began "pressing and bumping and humping" Mr. Cooper's leg.  Mr. Jackson intervened in an effort to get Mr. McDonald to stop his conduct.  A scuffle then ensued during which Mr. McDonald swung at and hit Mr. Jackson.  Mr. Jackson backed away and Mr. McDonald resumed his confrontation of Mr. Cooper, which included making "African gibberish" noises along with another American employee.  According to Mr. Cooper, other American employees chanted derogatory racial slurs.

213 F. App'x at 715-16 (citations to the record omitted).  The Tenth Circuit "agree[d] and affirm[ed] the district court's disposition," which "first stated that whether the harassment was based on or motivated by race was 'thin at best,'" and held that "the harassment did not affect a term or condition of Mr. Cooper's employment and did not constitute the '"steady barrage of opprobrious racial comment" as would offend Title VII.'" 213 F. App'x at 716 (quoting <u>Johnson v. Bunny Bread Co.</u>, 646 F.2d 1250, 1257 (8th Cir. 1981)).  The Tenth Circuit also agreed that, "considering whether American "'knew or should have known about the conduct and failed to stop it,' the court determined that American had not been negligent but had acted reasonably in responding to the incident." 213 F. App'x at 716 (quoting <u>Hollins v. Delta Airlines</u>, 238 F.3d 1255, 1258 (10th Cir.

2001)).

Similarly, in <u>Mathirampuzha v. Potter</u>, 548 F.3d 70 (2d Cir. 2008), the United States Court

of Appeals for the Second Circuit affirmed the district court's grant of summary judgment, holding

that a physical assault that produced injuries requiring eye surgery was insufficient to establish an

adverse employment action, or support a race, color, and national-origin hostile work environment

claim, for Title VII purposes:

> On September 29, 2003, the plaintiff was physically assaulted by Ron Sacco,
> a supervisor at the Wallingford plant. . . .  Sacco grabbed the plaintiff's arm, punched
> him in the shoulder and the chest, spit in his face, and poked him in the eye.  Sacco
> also shouted, "Joe, I['ll] never let you go to [the] Hartford plant."
>
> The plaintiff's direct supervisor, Claudio Scirocco, quickly intervened -- or,
> as the plaintiff phrased it, "came to save my life."  A union representative promptly
> arrived on the scene and brought the plaintiff to the office of a higher-ranking Postal
> Service supervisor.  But the supervisor laughed when the plaintiff told her what had
> happened.  The plaintiff's union continued to advocate on his behalf, however, and
> Sacco was ultimately issued a "Letter of Warning" for "Conduct Unbecoming a
> Postal Supervisor" and was transferred to another work assignment for at least a
> year.
>
> The plaintiff asserts that his confrontation with Sacco caused him physical
> injury and severe emotional distress. He suffered chest pains and contusions to his
> shoulder blade, required eye surgery, and fell into a depression.

548 F.3d at 73.  The plaintiff also alleged other incidents in his complaint that he did not

administratively exhaust, including "that Sacco has 'verbally harassed' him since 1999, ha[d]

'subjected him to disparate treatment by denying him approved lunch breaks and assistance in

performing work duties,' and ha[d] retaliated against him for complaining about his treatment."  548

F.3d at 73.  The Second Circuit held that this incident was insufficient to establish an adverse

employment action in support of a discrimination claim:

> We agree with the district court that the plaintiff's "asserted treatment at the
> hands of Ron Sacco on September 29 -- while unprofessional and boorish -- and the

initially dismissive attitude of other supervisors when Sacco's behavior was brought to their attention, does not amount to an 'adverse employment action' . . . ." [Mathirampuzha v. U.S. Postal Serv., No. 3:04cv841, 2006 WL 2458669, at *7 (D. Conn. Aug.21, 2006)].

An adverse employment action is "a materially adverse change in the terms and conditions of employment." Sanders v. N.Y. City Human Res. Admin., 361 F.3d 749, 755 (2d Cir. 2004) (emphasis added; citation and internal quotation marks omitted).

> To be materially adverse, a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities. Examples of such a change include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation.

Id. (citation, internal quotation marks, and ellipsis omitted). Only in limited circumstances does a single, acute incident of abuse qualify as an adverse employment action. In the context of hostile work environment claims, we have stated that a single event, if "extraordinarily severe," could alter the conditions of a working environment. Howley v. Town of Stratford, 217 F.3d 141, 153 (2d Cir. 2000) (citation and internal quotation marks omitted). A "single incident of rape," for example, "'sufficiently alters the conditions of the victim's employment and clearly creates an abusive work environment for purposes of Title VII liability'" for sex-based discrimination. Ferris v. Delta Air Lines, Inc., 277 F.3d 128, 136 (2d Cir. 2001) (quoting Tomka v. Seiler Corp., 66 F.3d 1295, 1305 (2d Cir. 1995), abrogated on other grounds by Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 . . . (1998)), cert. denied, 537 U.S. 824 . . . (2002). But we require that the incident constitute an "intolerable alteration" of the plaintiff's working conditions, Howley, 217 F.3d at 154, so as to substantially interfere with or impair his ability to do his job, see Mormol v. Costco Wholesale Corp., 364 F.3d 54, 59 (2d Cir. 2004).

We conclude, in light of that authority, that Sacco's aggressive conduct toward the plaintiff on September 29, 2003, was not an adverse employment action. After the incident took place, the plaintiff continued to work at the Wallingford plant in the same position, at the same pay, and with the same responsibilities. Indeed, there is no evidence that the assault brought lasting harm to the plaintiff's ability to do his job. The physical encounter itself, while understandably upsetting, was not so severe as to alter materially the plaintiff's working conditions -- unlike, for example, a rape, see Ferris, 277 F.3d at 136, or an obscene and humiliating verbal tirade that undermines the victim's authority in the workplace, see Howley, 217 F.3d at 154. The Postal Service's response to the incident, moreover, while not

immediate, ultimately ameliorated the plaintiff's working conditions, as Sacco was eventually disciplined and transferred to another work assignment for at least one year. Although a more severe incident of harassment or abuse could constitute an adverse employment action, the brief incident in this case, however regrettable, does not meet the "extraordinarily severe" standard. The plaintiff has therefore failed to establish a prima facie case of employment discrimination based on that event.

548 F.3d at 78-79.

Like the physical attack in Cooper v. American Airlines, Inc., in which the plaintiff alleged that he was punched and his leg was "press[ed] and bump[ed] and hump[ed]," Gerald's allegations of a threat, being hit and choked, and the Defendants' response does not rise to the level of a hostile work environment because "the harassment did not affect a term or condition of [Gerald's] employment." 213 F. App'x at 716. Moreover, the Tenth Circuit agreed that, despite the plaintiff's allegations that the attacker and other employees made "African gibberish" noises and chanted derogatory racial slurs, "whether the harassment was based on or motivated by race was 'thin at best.'" 213 F. App'x at 716 (citations omitted). Again, Gerald presents no allegations that Locksley's actions were racially motivated. Because his allegations fall short of establishing a hostile work environment, they also fail to establish the more demanding standard for constructive-discharge claims. See, e.g., Porter v. Erie Foods, Int'l, Inc., 576 F.3d 629, 640 (7th Cir. 2009)(holding constructive discharge possible where "allegations include repeated use of a noose -- perhaps the ultimate symbol of racial hatred and hate crimes -- combined with implied threats of physical violence"); Taylor v. W. & S. Life Ins. Co., 966 F.2d 1188, 1198-99 (7th Cir. 1992)(holding constructive discharge possible where a manager held a gun to his subordinate's temple, took a picture and then circulated the picture at a company meeting, stating "this is what a nigger looks like with a gun to his head"); Brooms v. Regal Tube Co., 881 F.2d 412, 416-17, 423-24 (7th Cir.1989)(holding that constructive discharge was established after "repeated instances of

grossly offensive conduct and commentary" that culminated in an incident where a coworker showed the plaintiff a racist pornographic photograph, told her that she was hired to perform the task depicted in the photograph, grabbed the plaintiff and threatened to kill her).

Moreover, the Defendants' discipline of Locksley ameliorated whatever affect Locksley's alleged actions had on Gerald's working conditions. While Gerald alleges that Krebs initially publically denied and minimized the altercation between Locksley and Gerald, and issued a letter of reprimand to Locksley, he further alleges that, after a public outcry over the light response, the UNM administration suspended Locksley for ten days. Gerald provides no basis for his assertion that Locksley's punishment was insufficient to deter further acts of violence.

Furthermore, like the assaults in Samuels v. Potter and Mathirampuzha v. Potter, Gerald's allegations do not amount to an adverse employment action. "The physical encounter itself, while understandably upsetting, was not so severe as to alter materially the plaintiff's working conditions." Mathirampuzha v. Potter, 548 F.3d at 79. The Defendants' "response to the incident, moreover, while not immediate, ultimately ameliorated the plaintiff's working conditions, as [Locksley] was eventually disciplined." 548 F.3d at 79. Additionally, while it does not excuse punching and choking, the realm of football admits greater physical interaction. See Gross v. Burggraf Construction Co., 53 F.3d at 1538 (noting the rough and tumble surroundings of the construction industry can make vulgarity and sexual epithets common and reasonable conduct); Sauers v. Salt Lake County, 1 F.3d 1122, 1126 (10th Cir. 1993)(affirming district court finding that plaintiff "accepted" the "unusually rough, sexually explicit and raw atmosphere" of the Salt Lake County Attorney's Office).

In sum, Gerald has not alleged an adverse employment action. Neither Locksley's alleged

attack, nor the Defendants' alleged response to Gerald's grievance altered his "compensation, terms, conditions, or privileges of employment, or adversely affects his status as an employee." Heno v. Sprint/United Mgnt. Co., 208 F.3d at 857. "Only acts that constitute a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits will rise to the level of an adverse employment action." Robinson v. Cavalry Portfolio Serv., LLC, 365 F. App'x at 114(quoting Haynes v. Level 3 Commc'ns, 456 F.3d at 1218-19). Additionally, Gerald has not set forth allegations that would rise to the level of a hostile work environment or the more demanding standard for establishing constructive discharge, and thereby an adverse employment action. Because Gerald's discrimination claim, Equal-Protection claim, and First-Amendment retaliation claim require him to plausibly allege an adverse employment action, his FAC is fatally deficient. The Court therefore dismisses Count II, Count III, and Count IV of Gerald's FAC.

The Court grants Gerald leave to file a second amended complaint for a hostile work environment claim. While the allegations in his FAC do not raise to the level of a hostile work environment, the allegations in Gerald's EEOC Charge, combined with his allegations that Locksley threatened, hit, and choked him, may, under the totality of the circumstances, amount to a hostile work environment. For some reason, Gerald did not include allegation in his FAC that he set forth in his EEOC Charge. In the EEOC Charge, Gerald alleges that he was "subjected . . . to different working term and conditions than the other White coaches, including, but not limited to, threats and intimidation of physical abuse, demeaning [his] decisions, and cursing [him] in front of [his] peers and students." EEOC Charge at 2. The physical attack combined with other threats and abuse and public humiliation in front of his peers and students may push his hostile work environment claim

across the line from possible to plausible.  If he can, under rule 11, put what is in his EEOC Charge

into an amended complaint, he may be able to establish a hostile-work-environment claim that can

survive a rule 12(b)(6) challenge.  On the other hand, Gerald must exhaust each discrete event that

composes his discrimination claim under Title VII, Jones v. United Parcel Service, 502 F.3d at 1186,

and he has not exhausted allegations that amount to an adverse employment action.  The Court

therefore dismisses his discrimination claim with prejudice.

## IV.   THE COURT ALSO DISMISSES GERALD'S FIRST-AMENDMENT CLAIM ON THE GROUNDS THE HE DID NOT ENGAGE IN PUBLIC SPEECH ABOUT A MATTER OF PUBLIC CONCERN AND BECAUSE THE DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY.

The Defendants assert that they are entitled to qualified immunity, because Gerald has not

alleged a violation of his First-Amendment rights, and certainly not clearly established rights.  To

overcome an assertion of qualified immunity, a plaintiff must allege: (i) the defendants violated his

constitutional rights; and (ii) those rights were clearly established at the time of the conduct at issue.

See Robbins v. Okla. ex rel. Dep't of Human Servs., 519 F.3d at 1249.  To survive a post-Twombly

motion to dismiss in the context of qualified immunity, a plaintiff must "nudge [his] claims across

the line from conceivable to plausible" by alleging facts sufficient to meet his burden under both

prongs of the qualified immunity analysis.  Robbins v. Okla. ex rel. Dep't of Human Servs., 519

F.3d at 1247 (quoting Bell Atl. Corp v. Twombly, 550 U.S. at 570).  The protection that qualified

immunity provides applies "regardless of whether a government official's error is a mistake of law,

a mistake of fact, or a mistake based on mixed questions of law and fact."  Pearson v. Callahan, 129

S. Ct. 808, 815 (2009)(internal quotation marks omitted).  And, because it is an immunity from suit

rather than merely a defense to liability, issues of qualified immunity must be resolved at the earliest

possible stage in litigation.  See Pearson v. Callahan, 129 S. Ct. at 815; Robbins v. Okla. ex rel.

Dep't of Human Servs., 519 F.3d at 1249 (noting that the standard in Bell Atlantic Corp v. Twombly has "greater bite" in qualified immunity cases "reflecting the special interest in resolving the affirmative defense of qualified immunity at the earliest stage of a litigation" (internal quotation marks and citations omitted)). Gerald's claims fail to meet either prong of the qualified immunity analysis. Again, Gerald fails to allege an adverse employment action. Additionally, Gerald does not allege that he spoke about a matter of public concern. Because Gerald has not adequately alleged that his First-Amendment rights were violated, he cannot show that the Defendants were willfully indifferent to a clear violation of his rights.

**A. GERALD HAS NOT SHOWN THAT HIS SPEECH INVOLVED A MATTER OF PUBLIC CONCERN.**

Gerald's grieving to the Defendants about Locksley is not a matter of public concern. Gerald asserts that "[t]he true First Amendment violation occurred after he reported the attack to the police." Response at 21. See Gelfand v. Cherry Creek Sch. Dist., 2009 U.S. Dist. LEXIS 48931, at *15-17 (D. Colo. June 10, 2009)(holding that a report to the police was not protected by the First Amendment). He argues his speech regarding Locksley's behavior was a matter of public concern. He contends that

> [h]is purpose in reporting the attack was two-fold. On one hand he reported the conduct as an employee advising the Defendant of misconduct by another employee who happened to be his supervisor. On the other hand, he reported the attack as an individual concerned for his safety and dignity and future instances of such conduct. In that respect he was no different than an ordinary citizen who sees something wrong at a public institution and reports it to management.

Response at 20.

Under Garcetti v. Ceballos and its progeny, Gerald must show that the substance of the speech on which he bases his First-Amendment retaliation claim involves something that is not part

of his official duties and that is a matter of public concern, and is not merely a complaint involving his own personal concerns. See Brammer-Hoelter v. Twin Peaks Charter Acad., 492 F.3d 1192, 1205 (10th Cir. 2007)("In determining whether speech pertains to a matter of public concern, the court may consider 'the motive of the speaker and whether the speech is calculated to disclose misconduct or merely deals with personal disputes and grievances unrelated to the public's interest.'" (quoting Lighton v. Univ. of Utah, 209 F.3d at 1224)). The Court concludes that, even if Gerald's First-Amendment retaliation claim did not fail for want of an adverse employment action, he cannot show that he spoke other than as part of his official duties about his private concerns. Consequently, the Court finds that Gerald's First-Amendment retaliation claim is without a sound basis in the law and in the facts of the case.

"Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." Connick v. Myers, 461 U.S. 138, 147-48 (1983). "Statements revealing official impropriety usually involve matters of public concern." Brammer-Hoelter v. Twin Peaks Charter Acad., 492 F.3d at 1205. Conversely, speech that solely airs "grievances of a purely personal nature" does not involve matters of a public concern. Brammer-Hoelter v. Twin Peaks Charter Acad., 492 F.3d at 1205. The Tenth Circuit in Brammer-Hoelter v. Twin Peaks Charter Academy explained: "[W]e have held that the following are not matters of public concern: speech regarding grievances about internal departmental affairs, disputes over the term of employment, and workplace frustration." 492 F.3d at 1205. "In determining whether speech pertains to a matter of public concern, the court may consider 'the motive of the speaker and whether the speech is calculated to disclose misconduct or merely deals with personal disputes and grievances unrelated to the public's interest.'" Brammer-Hoelter v. Twin

Peaks Charter Acad., 492 F.3d at 1205 (quoting Lighton v. Univ. of Utah, 209 F.3d at 1224).

Grievances that are purely personal in nature generally do not involve a matter of public concern.  See Brammer-Hoelter v. Twin Peaks Charter Acad., 492 F.3d at 1205.  Similarly, speech aggrieving department affairs are not matters of public concern and are, therefore, not the subject of constitutional protection.  See Brammer-Hoelter v. Twin Peaks Charter Acad., 492 F.3d at 1205 (citing Hom v. Squire, 84 F .3d at 974).

Gerald "cannot establish a First Amendment claim for retaliation based on filing an EEOC charge."  Grabow v. Independent Sch. Dist. No. I-008, 86 F.3d 1166, at *4 (finding the plaintiffs' EEOC charge "did not relate to a matter of political, social, or other concern to the community, but rather involved only 'matters of internal departmental affairs and personal interest'" (quoting Hom v. Squire, 81 F.3d at 974)).  In David v. City and County of Denver, 101 F.3d 1344 (10th Cir. 1996), the Tenth Circuit affirmed the district court's grant of summary judgment against a police officer who was suspended for tardiness after initiating sexual harassment complaints, including EEOC complaints.  The Tenth Circuit found that the EEOC complaints did not address matters of public concern:

> Her allegations focus on the conditions of her own employment, and in neither the EEOC complaints nor the letter to the City Attorney does Officer David allege that other employees have been subjected to harassment or retaliation or that the harassment and retaliation has interfered with the Department's performance of its governmental responsibilities. Therefore, Officer David's statements do not involve matters of public concern under the Connick standard.

101 F.3d at 1356.

While the press has no doubt been interested in the alleged incident, Gerald's grievance about his altercation with Locksley is not matter of public concern for the purposes of the First Amendment, because his speech was not "calculated to disclose misconduct," but "merely deal[t]

with personal disputes and grievances unrelated to the public's interest.'" <u>Brammer-Hoelter v. Twin</u>

<u>Peaks Charter Acad.</u>, 492 F.3d at 1205 (quoting <u>Lighton v. Univ. of Utah</u>, 209 F.3d at 1224).  <u>See</u>

<u>Morris v. City of Colo. Springs</u>, 09-cv-01506, 2010 WL 728554, at *5 (D. Colo. Feb. 25,

2010)("Plaintiff's Notice is limited entirely to her personal experience during a single incident with

Dr. Mahan and her own claimed injuries. As such, it is not a matter of public concern."  (citing

<u>Worley v. Bd. of County Comm'rs of Park County</u>, 44 F. App'x 892, 895 (10th Cir. 2002))).  His

grievance "focus[ed] on the conditions of h[is] own employment."  <u>David v. City and County of</u>

<u>Denver</u>, 101 F.3d at 1356.  Gerald did not "allege that other employees have been subjected to

harassment or retaliation or that the harassment and retaliation has interfered with the [UNM's]

performance of its governmental responsibilities."  101 F.3d at 1356.  Gerald's speech did not relate

to a matter of political, social, or other concern to the community, but rather involved only "matters

of internal departmental affairs and personal interest."  <u>Hom v. Squire</u>, 81 F.3d at 974.

Consequently, Gerald's speech does not enjoy First-Amendment protections, and he has not set forth

allegations alleging a constitutional violation.

**B.      THE DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY FROM GERALD'S FIRST-AMENDMENT CLAIM UNDER 42 U.S.C. § 1983.[8]**

The Defendants are entitled to qualified immunity, because they were not indifferent to

violations of Gerald's clearly established rights.  The defense of qualified immunity "protects a

government official from personal liability and the burden of having to go to trial unless he violated

---

[8] Although Gerald did not mention 42 U.S.C. § 1983 in the FAC, he seeks money damages, <u>see</u> FAC Prayer for Relief, at 10, and "the means by which a private individual seeks money damages for violation of his or her constitutional rights is by the mechanism of 42 U.S.C. § 1983," <u>Schaefer v. Las Cruces Pub. Sch. Dist.</u>, 716 F. Supp. 2d 1052, 1072 (D.N.M. 2010) (Browning, J.)(reviewing plaintiffs' constitutional claims for money damages through § 1983 even though plaintiffs failed to mention 42 U.S.C. § 1983).

clearly established statutory or constitutional rights of which a reasonable person would have known." Brammer-Hoelter v. Twin Peaks Charter Acad., 602 F.3d at 1184.  To defeat the defense of qualified immunity, Gerald must show that the Defendants' actions (i) "violated a constitutional or statutory right" and (i) the right the defendants violated was "clearly established at the time of the conduct at issue."  602 F.3d at 1184 (citations and quotations omitted).  To overcome qualified immunity, a plaintiff must show that the "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  Anderson v. Creighton, 483 U.S. 635, 640 (1987).  See Walker v. City of Orem, 451 F.3d 1139, 1151 (10th Cir. 2006).  "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  Medina v. City & County of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992).  See Hannula v. Lakewood, 907 F.2d 129, 131 (10th Cir. 1990) ("We do not require government officials to predict future legal developments.").  Gerald has not shown that the Defendants violated his rights, and thus not his clearly established First-Amendment rights.  The Defendants are therefore immune from his First-Amendment retaliation claim.

## V.   QUALIFIED IMMUNITY BARS GERALD'S CLAIM FOR DENIAL OF EQUAL PROTECTION IN COUNT IV.

As discussed in Section III, Gerald fails to allege an adverse employment action, which is fatal to his Equal-Protection claim.  Even if he had alleged an adverse employment action, his Equal-Protection claim fails on a number of other accounts.  First, nowhere in his FAC does he allege that he was treated differently than others who were similarly situated.  Second, qualified immunity shields the Defendants, because Gerald has not alleged a violation of his clearly established Equal-Protection rights.

## A.    GERALD HAS NOT ALLEGED DISPARATE TREATMENT.

"The equal protection clause is triggered when the government treats someone differently than another who is similarly situated."  Marino v. Mayger, 118 F. App'x 393, 399 (10th Cir. 2004)(quoting Buckley Constr., Inc. v. Shawnee Civic & Cultural Dev. Auth., 933 F.2d 853, 859 (10th Cir. 1991))(internal quotation marks omitted).  "The party alleging discrimination has the burden of proving that the state's conduct was motivated by a discriminatory purpose."  Schaefer v. Las Cruces Pub. Sch. Dist., 716 F. Supp. 2d 1052, 1067 (D.N.M. 2010)(Browning, J.)(alteration omitted)(quoting Bell v. Bd. of Educ. of the Albuquerque Pub. Schs., No. CIV 06-1137 JB/ACT, 2008 WL 4104118, at *15 (D.N.M. May 6, 2008)(Browning, J.)).  See Witus v. Georgia, 385 U.S. 545, 550 (1967)(explaining that "[t]he burden is, of course, on the petitioners to prove the existence of purposeful discrimination").

"Ordinarily the Equal Protection Clause is applied to claims of class-based discrimination," but "courts have expanded the concept to include claims of selective discrimination against individuals," also known as a "class of one" claim.  118 F. App'x 393 at 399-400.  See Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000)(per curiam)(finding that "equal protection claims [may be] brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment" (citations omitted)).  The Supreme Court has held that "the class-of-one theory of equal protection has no application in the public employment context."  Engquist v. Or. Dep't of Agric., 553 U.S. 591, 607-08 (2008)(reasoning that "an allegation of arbitrary differential treatment could be made in nearly every instance" of a personnel decision by the government, and "government offices could not function if every employment decision became a constitutional

matter"); Kelley v. City of Albuquerque, 542 F.3d 802, 821 (10th Cir. 2008)("[T]he class-of-one theory is not legally cognizable where, as here, a public employee claims that she has been treated differently than other employees."); Duprey v. Twelfth Judicial Dist. Court, No. CIV 08-0756 JB, 2009 WL 2105955, at *5 (D.N.M. June 22, 2009)(Browning, J.)("In this case, Duprey, who is a public employee, is alleging that she was denied a promotion and was demoted. Because her lawsuit arises in the public-employee context, she cannot proceed on the class-of-one theory.").

To establish an Equal-Protection claim, a plaintiff must "claim that the government has intentionally treated the [him or her] differently from other similarly situated citizens." Marino v. Mayger, 118 F. App'x at 399. The FAC does not state a plausible Equal-Protection claim, because it makes no allegation that Gerald was treated differently than others, or, specifically, others who are similarly situated. "The allegation that a plaintiff was treated differently from those similarly situated is an essential element of an equal protection action . . . ." Hennigh v. City of Shawnee, 155 F.3d 1249, 1257 (10th Cir. 1998)(affirming dismissal of plaintiff's Equal-Protection claim where plaintiff failed to assert how he was treated differently from others similarly situated). See Jennings v. City of Stillwater, 383 F.3d 1199, 1213 (10th Cir. 2004)(dismissing plaintiff's Equal-Protection claim in part because "she failed to make an adequate showing that similarly situated persons were treated differently" (citing City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. at 439 (the Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike")). Gerald's failure to allege that he was treated differently than others similarly situated also defeats his Equal-Protection claim. See Marino v. Mayger, 118 F. App'x at 400 (concluding "that the absence of an allegation of disparate treatment is fatal to the [plaintiff's] claim"). See also Murphy v. Colo. Dep't of Corr., 381 F. App'x 828, 833 (10th Cir. 2010)("He does not, however,

point to any facts indicating he was treated differently from anyone else.  Conclusory allegations are not sufficient to state a claim for relief." (citing <u>Dunn v. White</u>, 880 F.2d 1188, 1198 (10th Cir. 1989))).

### B.   GERALD HAS NOT OVERCOME THE DEFENDANTS' ASSERTION OF QUALIFIED IMMUNITY.

Because Gerald's Equal-Protection claim fails for want of allegations of an adverse employment action or disparate treatment, he cannot establish that a violation of the Equal Protection Clause.  To defeat the defense of qualified immunity, Gerald must show that the Defendants' actions (i) "violated a constitutional or statutory right" and (i) the right the defendants violated was "clearly established at the time of the conduct at issue."  602 F.3d at 1184 (citations and quotations omitted).  Because Gerald has shown no constitutional violation, the Defendants are entitled to qualified immunity on his Equal-Protection claim.

In sum, Gerald has failed to allege an Equal-Protection claim.  He has not set forth allegations that make plausible an adverse employment action or disparate treatment.  Moreover, the Defendants are entitle to qualified immunity against his claim.  The Court therefore dismisses Count IV.

### VI.   THE NMTCA HAS NOT WAIVED IMMUNITY FOR GERALD'S TORT CLAIMS IN COUNT I.

Sovereign immunity precludes Gerald's assault and battery claim.  The Defendants assert that the New Mexico Tort Claims Act, NMSA 1978, §§ 41-4-1 to -29 ("NMTCA"), bars Count I of Gerald's FAC.  Gerald responds that "[t]he question of liability of Defendant Locksley depends on whether or not he was acting within the scope of his duty when he attacked the Plaintiff," and contends that whether Locksley's actions were "in the scope of duty of the employment is a fact

question for the jury."  Response at 9.

The Court agrees that the NMTCA has not waived immunity for assault and battery for the

Defendants.

> The TCA "delimits the scope of liability for government entities and their employees
> by: (1) retaining immunity for torts not waived by the TCA; and (2) waiving immunity and
> recognizing liability, subject to certain protections, for employees acting within their scope
> of duty."  Celaya v. Hall, 2004-NMSC-005, ¶ 8, 135 N.M. 115, 85 P.3d 239 (citations
> omitted).  Section 41-4-17(A) of the TCA provides

>> the exclusive remedy against a governmental entity or public
>> employee for any tort for which immunity has been waived under the
>> Tort Claims Act and no other claim, civil action or proceeding for
>> damages, by reason of the same occurrence, may be brought against
>> a governmental entity or against the public employee or his estate
>> whose act or omission gave rise to the suit or claim.

> The actions for which immunity is waived are set out in Sections 41-4-5 to -12 of the TCA
> and the Religious Freedom Restoration Act, NMSA 1978, § 28-22-4 (2000).

> In this case, [Gerald] does not argue that immunity is waived for his [tort] claims
> under the express waiver provisions in Sections 41-4-5 to -12 or under Section 28-22-4.  See
> Candelaria v. Robinson, 93 N.M. 786, 790, 606 P.2d 196, 200 (Ct. App. 1980) (stating that
> unless a plaintiff alleges defamation by a law enforcement officer, immunity is not waived
> under the TCA).

Vigil v. State Auditor's Office, 138 N.M. at 66, 116 P.2d at 857.

Gerald alleges that Locksley choked and punched him, and brings a claim for assault and

battery.  See FAC ¶ 14, at 3.  The NMTCA does not waive immunity for Gerald's tort claims against

Locksley.  First, Locksley is a "public employee" covered by the NMTCA.  A "public employee"

as "an officer, employee or servant of a governmental entity."  N.M.S.A. 1978, § 41-4-3F.  The

NMTCA defines "governmental entity" to include the State, all political subdivisions of the State

and their agencies, instrumentalities and institutions.  N.M.S.A. 1978, § 41-4-3B-C.  UNM is an

"arm of the state."  Nieto v. Univ. of N.M., No. CIV 08–0465 JB/WPL, 2010 WL 4929013, at *2

(D.N.M. Oct. 31, 2010)(Browning, J.).

> The NMTCA waives immunity for assault and battery against law enforcement officers.
>
> The immunity granted pursuant to Subsection A of Section 41-4-4 NMSA 1978 does not apply to liability for personal injury, bodily injury, wrongful death or property damage resulting from assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, defamation of character, violation of property rights or deprivation of any rights, privileges or immunities secured by the constitution and laws of the United States or New Mexico when caused by law enforcement officers while acting within the scope of their duties.

NMSA 1978, § 41-4-12.  That the New Mexico Legislature expressly allows assault and battery claims against law enforcement officers suggests that they are not otherwise allowed under § 41-4-4. "Thus, in order to state a tort claim under the waiver of immunity set out in Section 41-4-12, a plaintiff must demonstrate that the defendants were law enforcement officers acting within the scope of their duties . . . ." Weinstein v. City of Santa Fe, 121 N.M. 646, 649, 916 P.2d 1313, 1316 (1996). Gerald does not contend that the waiver for law enforcement officers applies, and the Court does not believe that it does.  None of the Defendants have as their "principal duties under law . . . to hold in custody any person accused of a criminal offense, to maintain public order or to make arrests for crimes."  NMSA 1978, § 41-4-3.  Therefore, the waiver of immunity for law enforcement officers does not apply in this case.

Gerald argues that the alleged assault and battery were outside the scope of the Locksley's duties because they were tortious or criminal.  "A governmental entity and any public employee while acting within the scope of duty are granted immunity from liability for any tort except as waived" by the NMTCA's provisions.  NMSA 1978, § 41-4-4A.  The New Mexico Legislature defined "scope of duty" to "mean[ ] performing any duties that a public employee is requested, required or authorized to perform by the governmental entity, regardless of the time and place of

performance."  NMSA 1978, § 41-4-3.  "Whether an employee is acting within the scope of duties is a question of fact, and summary judgment is not appropriate unless 'only one reasonable conclusion can be drawn' from the facts presented."  Celaya v. Hall, 135 N.M. 115, 122, 85 P.3d 239, 246 (2004).  "In the present case, [the Court] ask[s] whether, under any set of facts alleged in the complaint, Defendants' actions can be considered outside the scope of their duties and thus outside the coverage of the TCA."  Henning v. Rounds, 142 N.M. 803, 807, 171 P.3d 317, 321 (Ct. App. 2007).

The allegations in the FAC establish that Locksley was acting within the scope of his duties at the time of the alleged altercation.  Gerald acknowledges that "[a]t all times material to this action, Defendant[] Locksley . . . [was] acting in [his] capacity as [an] official[] of UNM," FAC ¶ 10, at 2, and that "[t]he acts of Defendant Locksley . . . were done while in the service of UNM," see id. ¶ 30, at 5.  Gerald further alleges that the altercation occurred "during a coach's meeting at the UNM athletic facility," FAC ¶ 14, at 3, and that "[t]he attack was under the guise of a disciplinary action against the Plaintiff, who had incurred the Defendant's displeasure for the team's performance during a game," id. 15, at 3.  Locksley thus was "performing . . . duties that [he was] requested, required or authorized to perform by [UNM] regardless of the time and place of performance."  NMSA 1978, § 41-4-3.

Gerald argues that "the assault and battery on the Plaintiff by his head coach during a staff meeting is not closely tied to the business of coaching a football team.  It is not something that a reasonable person would expect during a staff meeting."  Response at 11.  Gerald's contention appears to be that Locksley is not immune, because his alleged actions were tortious.  In Garcia-Montoya v. State Treasurer's Office, the Supreme Court of New Mexico rejected a plaintiff's

argument that unlawful acts necessarily fall outside of an employee's duties, because this interpretation would swallow the rule:

> With respect to Garcia-Montoya's claims of intentional infliction of emotional distress and defamation, the district court granted Defendants' motion for summary judgment on the basis that Garcia-Montoya's claims were barred by the Tort Claims Act. . . .   Garcia-Montoya claims that summary judgment was improper because Montoya and Andermann were not acting within the scope of duty.  Garcia-Montoya contends simply that intentional torts are outside the scope of duties for the positions of State Treasurer and Deputy State Treasurer.  Certainly, Garcia-Montoya's position oversimplifies the issue.  Public employees are not directed to commit torts as a part of their official duties; thus, Garcia-Montoya's formulation of the scope of duty test would completely nullify the Legislature's intent to provide governmental immunity against tort claims.  See NMSA 1978, § 41-4-2(A) (1976) ("[T]he area within which the government has the power to act for the public good is almost without limit, and therefore government should not have the duty to do everything that might be done.").
>
> The Legislature has specifically defined "scope of duties" to "mean [ ] performing any duties that a public employee is requested, required or authorized to perform by the governmental entity, regardless of the time and place of performance."  NMSA 1978, § 41-4-3(G) (1995).  Garcia-Montoya fails to specify any actions by Montoya and Andermann which they were not requested, required, or authorized to perform.  As a result, we do not believe that Garcia-Montoya has raised a genuine issue of material fact that Montoya's and Andermann's actions were outside the scope of their duties, and we affirm the summary judgment in Defendants' favor.

130 N.M. at 43, 16 P.3d at 1102.  By the same measure, Gerald's contention that the NMCTA's immunity does not cover Locksley's conduct is unavailing.  See Seeds v. Lucero, 137 N.M. 589, 592, 113 P.3d 859, 862 (Ct. App. 2005)("Our case law establishes that a public employee may be within the scope of authorized duty even if the employee's acts are fraudulent, intentionally malicious, or even criminal."  (citations omitted)); Vigil v. State Auditor's Office, 138 N.M. 63, 68, 116 P.3d 854, 859 (Ct. App. 2005)("[A]ssuming that [the defendant] violated state and federal law in conducting the audit, even to the extent of some tortious or criminal activity, if he was performing an act that he was requested, required or authorized to perform, he was acting within his scope of

duty . . . ." (citation internal quotation marks omitted)).  As the Court of Appeals of New Mexico

stated in Risk Mgmt. Div. v. McBrayer, 129 N.M. 778, 14 P.3d 43 (Ct. App. 2000):

> [T]he legislature likely foresaw the possibility that a public employee could . . . commit
> malicious, even criminal acts that were unauthorized, yet incidental to the performance of
> [his or her] duties.  And it is equally likely that the legislature intended that those
> unauthorized acts would fall within the scope of duties as defined in the TCA.

129 N.M. at 784, 14 P.3d at 49.  Consequently, Gerald's contention that Locksley's action were

outside of the scope of his employment because they were unlawful is unaviling.

Finally, Gerald asserts the the Court cannot resolve this issue through a motion to dismiss.

He grounds that argument on the Court's opinion in Chavez-Rodriguez v. City of Santa Fe, No. CIV

07-633 JB/DJS, 2008 WL 5992269 (D.N.M. April 20, 2009).  In Chavez-Rodriguez v. City of Santa

Fe, the Court declined to dismiss an assault claim against a public employee under rule 12(b)(6),

because the complaint did not contain sufficient information to determine whether the public

employee was acting within the scope of duty when the assault allegedly occurred.  The only

relevant allegations in the complaint indicated that the alleged assault occurred "during a meeting."

Id. at *3.  The Court concluded that it could not determine whether the defendant was acting within

the scope of duty as a matter of law based on this bare allegation and noted a number of questions

the complaint left unanswered:

> The Complaint states that a meeting was occurring, but it does not mention what kind
> of meeting, whether the meeting concerned City of Santa Fe issues, and in what
> context the alleged assault occurred.  Based solely on the pleadings -- all to which
> the Court can look for this particular issue -- the Court cannot conclude as a matter
> of law that the alleged assault occurred within the scope of Hiatt's duties.

Id. at *9 (footnotes omitted).  Unlike the complaint in Chavez-Rodriguez v. City of Santa Fe, the

FAC sets forth the type of meeting -- "a coach's meeting at the UNM athletic facility," FAC ¶ 14,

at 3 -- and the reason for the alleged attack -- "[t]he attack was under the guise of a disciplinary

action against the Plaintiff, who had incurred the Defendant's displeasure for the team's performance during a game," id. 15, at 3.  The FAC also states that Locksley was "acting in [his] capacity as [an] official[] of UNM," FAC ¶ 10, at 2, and that "[t]he acts of Defendant Locksley . . . were done while in the service of UNM," id. ¶ 30, at 5.  Consequently, the FAC does not present the issues the Court addressed in Chavez-Rodriguez v. City of Santa Fe.  The Court therefore concludes that the NMTCA bars Gerald's assault and battery claims.  The Court therefore dismissed Count I of the FAC.

> In his Response, Gerald asserts that,
>
> if the Court decides that the Defendant is immune from the tort action because he was in the scope of his employment, the Plaintiff should be allowed to amend his Complaint to include a claim under 42 U.S.C. § 1983 for the assault and battery where Defendant Locksley may have been operating under color of state law.

Response at 12.  In Williams v. Berney, 519 F.3d 1216 (10th Cir. 2008), the Tenth Circuit addressed the question: "[W]hat exactly are the contours of substantive due process claims premised on physical assault by ordinary government actors?"  519 F.3d at 1233.  In that case, a business license inspector assaulted two "doggie daycare" owners, who "sued [the inspector] and his employer, the City and County of Denver, alleging the assaults violated their . . . substantive due process rights under 42 U.S.C. § 1983."  519 F.3d at 1218.  The inspector "without provocation . . . pushed, shoved and repeatedly struck . . . Williams . . . both inside and outside the business premises.'  When Albin tried to help Williams, Berney, [the inspector,] also struck and pushed her.  Ten days later, Williams suffered a stroke, which he attributed to the fight."  519 F.3d at 1219 (citations to the record omitted)(alterations in original).  The Tenth Circuit affirmed the district court's grant of summary judgment against the plaintiffs' substantive due-process claim, because, while the inspector's "conduct was plainly objectionable, [the Tenth Circuit] agree[d] with the district court that he did

not violate Plaintiffs' constitutional rights."  519 F.3d at 1218.

The Tenth Circuit explained the standard for establishing a "constitutional tort":

> What differentiates a constitutional transgression from an ordinary common law tort is a "level of executive abuse of power . . . that . . . shocks the conscience." [County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998)].  In other words, the executive abuse represents "arbitrary action of government" and requires a showing of government officials "abusing their power, or employing it as an instrument of oppression." Id. at 845-46 . . . (quotations and brackets omitted).  While recognizing "no calibrated yard stick," id. at 847 . . . , the Supreme Court instructs that the "constitutional concept of conscience shocking duplicates no traditional category of common-law fault," id. at 848 . . . .

> The Supreme Court has also explained, "[r]ules of due process are not . . . subject to mechanical application in unfamiliar territory." Id. at 850 . . . .

> . . . .

> [D]istinctions in the application of force are not always facilely drawn. Given the latitude we ordinarily afford government actors operating in their official capacities, we recognize constitutional torts only "in the narrowest of circumstances," [Becker v. Kroll, 494 F.3d 904, 922 (10th Cir.2007)].  The tortious conduct alleged "must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power. . . .  [It] must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking."  Livsey v. Salt Lake County, 275 F.3d 952, 957-58 (10th Cir. 2001) (emphasis added) (quotation omitted). "Not surprisingly, little governmental action is held unconstitutional under th[is] formulation[ ]."  1 Martin A. Schwartz, Section 1983 Litigation § 3.05[D], at 3-116 (4th ed. 2006).

519 F.3d at 1220-21.

The "[p]laintiffs argue[d] [the Tenth Circuit] should resolve their substantive due process claim through the familiar prism of constitutional cases dealing with police encounters, prison confinement, and school discipline," contending that under any of these standard, the inspector's "unprovoked attack violated their substantive due process rights on two grounds common to all of the cases. First, the application of force was severe, given the injuries alleged in the complaint.

-90-

Second, the application of force was grossly disproportionate to any reasonable purpose." 519 F.3d at 1222. The Tenth Circuit stated that analogizing to these contexts was unenlightening, because "[p]olice officers, prison officials, and even school authorities are cloaked with the state's imprimatur to use *some level of force* when necessary," and "[i]n excessive force cases the government official's position is precisely what enables the official to harm the victim." 519 F.3d at 1222 (emphasis original).

The Tenth Circuit proceeded to consider the contours of the constitutional right "to be free from assault committed by state officials . . . outside of a custodial setting," United States v. Lanier, 520 U.S. 259, 272 n.7 (1997), stating: "The inquiry is thus in what circumstances will a physical assault transcend ordinary state tort law and rise to the level of a constitutional tort," Williams v. Berney, 519 F.3d at 1223. The Tenth Circuit found guidance in cases from the United States Court of Appeals for the Eleventh Circuit, including a case in which

> a college instructor physically attacked an adult student. Dacosta v. Nwachukwa, 304 F.3d 1045, 1047 (11th Cir. 2002). Several fellow students restrained the attacker until police arrived and arrested him for criminal battery. Relying on [Skinner v. City of Miami, 62 F.3d 344, 346 (11th Cir. 1995)], the court concluded the instructor's conduct, "malicious as it may have been," did not violate the student's substantive due process rights, only her state law right to be free from battery. Id. at 1048-49. And again, the court dismissed the excessive force cases as inapplicable. Id. ("The cases [plaintiff] cites as authority for her substantive due process claim involve excessive force used by law enforcement officers, and are not applicable to the instant case.").

519 F.3d at 1223. The Tenth Circuit contrasted Dacosta v. Nwachukwa with Wudtke v. Davel, 128 F.3d 1057 (7th Cir. 1997), in which the Seventh Circuit found a substantive due-process violation where a superintendent leveraged his authority to coerce a teacher to engage in sexual acts with him. The superintendent threatened not to alleviate the plaintiff's workload and to refuse to approve renewal of her provisional special education license; therefore, "the superintendent's authority over

the teacher enabled his ability to assault her."  519 F.3d at 1223 (citing <u>Wudtke v. Davel</u>, 128 F.3d

at 1059).  The Tenth Circuit concluded:

> An assault -- standing alone -- does not suffice to make out a constitutional substantive due process claim.  But an assault under a stated threat, a threat the victim knows an assaulting government official has the authority to carry out, can separate the ordinary common law tort from the substantive due process claim.  The combination of serious physical abuse and the assaulting official's use of official authority to force the victim to submit can shock the conscience.
>
> . . . .
>
> [T]o state a substantive due process claim against government officials not authorized to use force, litigants must show an abuse of governmental authority as an integral element of the attack.
>
> Several non-exhaustive factors flowing from these cases help illustrate the requisite abuse of power in claims of excessive force: (1) the harm results from misconduct by a government official; (2) the official has some authority over the victim but is not authorized to use force as a part of the official's position; (3) the official abuses that authority to further the attack; (4) the abuse exceeds run-of-the-mill negligent conduct, rising to the level of reckless or intentional conduct; and, finally, (5) the injury is "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." <u>Lewis</u>, 523 U.S. at 847 n.8 . . . .  We emphasize these factors do not exhaust all possible variations of governmental misconduct.  They merely provide a framework -- certainly not to the exclusion of other factors -- for how we can analyze a case like this one.

519 F.3d at 1223-24.

Applying the standard to the inspector's attack, the Tenth Circuit held that, "[w]hile

obviously the attack by [the inspector], a government official, was reckless and caused serious harm,

it is also evident that [the inspector] had no authority to use force and did not abuse his official

position to further his attack":

> According to Plaintiffs, the assault occurred without prior provocation or warning.  Although he was at The Golden Bone because of his official duties as an inspector, he visited the premises during normal business hours.  Berney was unarmed and had no authority to exercise any level of force against licensees.  His only responsibilities were to inspect and enforce dog kennel regulations.  Based on

the undisputed facts in this record, Berney's assault appeared to be an emotional overreaction made in anger.  But nothing about Berney's position with the City or his duties as an inspector authorized him to use force -- rather, he lost it on the job.

        While deplorable, this assault is not obviously distinguishable from an ordinary tort in myriad situations.  It was not a situation where Plaintiffs' injuries were caused by an abuse of Berney's authority as a license inspector.  And, as we have said, Berney's official position alone is not enough to create a substantive due process claim.  As a result, we cannot conclude Berney's conduct violated Plaintiffs' constitutional rights.

519 F.3d at 1225.

The same reasoning would defeat Gerald's proposed § 1983 claim.  Gerald does not allege that Locksley "leverage[d] his position to further the attack."  519 F.3d at 1225.  Like the inspector, Gerald's allegations suggest that Locksley "lost it on the job," and his actions are "not obviously distinguishable from an ordinary tort."  519 F.3d at 1225.  Moreover, unlike a city inspector at a "doggie daycare," the realm of football admits greater physical interaction, and what "shocks [the conscience] in one environment may not be so patently egregious in another."  County of Sacramento v. Lewis, 523 U.S. at 850.  The Court

do[es] not mean to suggest [Locksley's] uncivilized -- indeed, criminal -- actions, if true, are anything less than shameful.  But not every condemnable act by a public official represents a constitutional violation.  To say that § 1983 welcomes [Locksley's] unprovoked attack would be wrong.  Rather, § 1983 simply does not reach [Locksley's] conduct and leaves the matter to state civil remedies.

The Court cannot say that Locksley's conduct shocks the federal judiciary's conscience.  Accordingly, Locksley's alleged acts do not rise to the level of a constitutional tort, and the Court denies Gerald's request to bring them under § 1983.[9]

_____

[9] If Gerald thinks that the Court has not accurately conceptualized his proposal, he can move to amend, attaching a proposed amended complaint.  The Court will not, however, grant him leave to add a § 1983 without a motion to amend.  The Court's permission to amend in this order extends only to filing a hostile-work-environment claim.

## VII.   THE COURT WILL DISMISS GERALD'S BREACH-OF-CONTRACT CLAIM.

The Defendants contend that Gerald does not state a claim for breach of contract, or for a breach of the covenant of good faith and fair dealing, because none of the Defendants' alleged actions violated any of the terms of Gerald's contract or the addendum to his contract, which covers the parties' obligations to each other.  Gerald states that "[t]his is true as far as it goes," but asserts that his "contract is governed by the UNM Athletics Policies and Procedures ('Athletic Procedures') and the University Business Policies and Procedures Manual ('Manual')."  Response at 23.  Gerald also clarifies that he does not contend the Defendants breached the covenant of good faith and fair dealing.  See Response at 24-25 ("[T]here is no need to rely upon the covenant of good faith and fair dealing since the contract itself contains promissory language that was breached by the Defendants.").

The addendum to Gerald's employment contract states: "This appointment is governed by applicable policies as stated in the University's Intercollegiate Athletics Policies and Procedures Manual and the University Business Policies and Procedures Manual, as they are amended from time to time, published and distributed by the University, and by relevant federal and state laws and regulations."  Addendum to Employment Contract, filed December 6, 2010 (Doc. 23-1).  Gerald asserts that the "Manual has provisions that govern the conduct and responsibilities of all employees, and provide certain protection to employees."  Response at 23.  He points to section 2200 of the Manual, Whistleblower Protection and Reporting Suspected Misconduct and Retaliation, filed January 13, 2011 (Doc. 28-6, at 1)("Whistleblower Provision"), which provides:

> The University of New Mexico strongly encourages all University employees, acting in good faith, to report any suspected misconduct that may be taking place at the University.  An employee who interferes with or tries to interfere with the right of another employee reporting suspected misconduct is subject to disciplinary action,

up to and including dismissal.  The University is committed to protecting employees who report suspected misconduct in accordance with the Whistleblower Protection Act.  Misconduct is any on-the-job activity performed by a University employee that violates state and/or federal laws or regulations, local ordinances, or University policy.

Whistleblower Provision ¶ 1, at 1.  Gerald also points to section 2210 of the Manual, Campus Violence, filed January 13, 2011 (Doc. 28-6, at 7)("Campus Violence Provision"), which provides:

The University of New Mexico is committed to providing an environment that is free from violence.  Any acts or threatened acts of violence will not be tolerated.  Anyone engaging in such behavior will be subject to discipline, up to and including dismissal and may also be personally subject to other civil or criminal liabilities.  This policy is not intended to supersede federal, state, or local laws, rulings, and/or regulations.

Campus Violence § 1, at 1.

Gerald presents no allegations that indicate the Defendants violated any of these provisions.  Locksley was "subject[ed] to discipline" for his alleged violence.  He was suspended for ten days, during which he missed a football game.  Gerald argues in his Response that the basis of his breach-of-contract claim is that UNM and Krebs "failed to protect the Plaintiff or to take adequate measures to insure that the Plaintiff was not subjected to retaliation or adverse employment actions as promised, and breached the Contract."  Response at 24.  First, the Court has concluded that Gerald failed to allege that he was subjected to an adverse employment action or retaliation.  Moreover, the provisions do not obligate the Defendants to provide Gerald whatever unspecified discipline he thinks adequate.  See Ruegsegger v. W. N.M. Univ. Bd. of Regents, 141 N.M. 306, 313, 154 P.3d 681, 688 (Ct. App. 2006)("Even though the Student Handbook sets out a general framework of policies, we are not persuaded that the language contractually obligates WNMU to conduct any specific type of investigation, to provide support services, or to impose specific discipline.").  In Ruegsegger v. Western New Mexico University Board of Regents, the Court of Appeals of New

-95-

Mexico addressed whether a student handbook, in which one provision was a sexual harassment policy that set forth the University's commitment to a environment free of sexual discrimination, created an implied contract.  See 141 N.M. at 312-313, 154 P.3d at 687-88.  The Court of Appeals of New Mexico found that the handbook's provisions set forth guidelines and not a guarantee to specific rights.  See 141 N.M. at 313, 154 P.3d at 688.

> Review of these Handbook provisions indicates that, instead of contractually guaranteeing a right to specific types of investigation, support, and sanctions in the event of a sexual assault, they provide guidelines for the operation of WNMU. Therefore, they do not constitute the terms of an implied contract and do not contractually guarantee the rights asserted by Plaintiff.  See Sanchez v. The New Mexican, 106 N.M. 76, 79, 738 P.2d 1321, 1324 (1987) (affirming the dismissal of an implied contract claim on grounds that "the handbook lacked specific contractual terms which might evidence the intent to form a contract . . . [insofar as the] language is of a non-promissory nature and merely a declaration of defendant's general approach"); Stieber v. Journal Publ'g Co., 120 N.M. 270, 274, 901 P.2d 201, 205 (Ct. App. 1995) (holding that general policy statements in a handbook are "insufficient to create an implied contract" because they are merely declarations of a general approach to the subject matter); see also Goodman v. President & Trustees of Bowdoin Coll., 135 F. Supp. 2d 40, 56 (D. Me. 2001) (holding that handbook language that "'[d]iscrimination . . . has no place in an intellectual community . . . [and] [s]uch practices violate both the ideals of the College and its Social Code and are subject to appropriate disciplinary sanctions'" does not indicate a contractual obligation by the college to refrain from discrimination).  Even though the Student Handbook sets out a general framework of policies, we are not persuaded that the language contractually obligates WNMU to conduct any specific type of investigation, to provide support services, or to impose specific discipline.

141 N.M. at 313, 154 P.3d at 688.[10]  Similarly, UNM's Whistleblower and Campus Violence

---

[10] The Tenth Circuit has explained:

> In cases arising under diversity jurisdiction, the federal court's task is not to reach its own judgment regarding the substance of the common law, but simply to ascertain and apply the state law. . . .  The federal court must follow the most recent decisions of the state's highest court . . . .  Where no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do. . . .  In doing so, it may seek guidance from decisions rendered by lower courts in the relevant state, . . . appellate decisions in other states with similar legal

Provisions, which state that retaliation for reporting misconduct and campus violence will not be tolerated, are general guidelines, and the Provisions do not contain language specific enough to raise a reasonable expectation that UNM will provide a specific punishment or respond to Gerald's grievance in a particular manner.  In Ruegsegger v. Western New Mexico University Board of Regents, the Court of Appeals of New Mexico considered whether the language of the University's student handbook contractually obligated the University to conduct a specific form of investigation, to provide support services, or to impose a specific form of discipline.  See 141 N.M. at 313, 154 P.3d at 688.  The student handbook contained several portions that the plaintiff argued gave rise to an implied contract.

> The Student Handbook . . . contains a section on the Student Appeals Committee, which pertains to appeals from various committees including the disciplinary committee.  This section confers upon students the right to be present, bring witnesses, be accompanied by an attorney, and have no one but committee members present.  The section provides that "[t]he student" will be given verbal notification of the committee's decision and written notification will follow "in a timely manner."  This section does not clarify whether the phrase "[t]he student" refers to the student being disciplined, the complaining student, or both.
>
> The Handbook's "sexual harassment policy statement" consists of a general

---

principles, . . . district court decisions interpreting the law of the state in question, . . . and the general weight and trend of authority in the relevant area of law . . . .  Ultimately, however, the Court's task is to predict what the state supreme court would do.

Wade v. Emcasco Ins. Co., 483 F.3d 657, 665-66 (10th Cir. 2007)(citations and internal quotation marks omitted).  The Court believes that the Supreme Court of New Mexico would follow the Court of Appeal's decision in Ruegsegger v. Western New Mexico University Board of Regents, because it is an established principle in New Mexico law that the terms of the personnel manual must be "sufficiently explicit to create a reasonable expectation of an implied contract," Trujillo v. N. Rio Arriba Elec. Co-op, Inc., 131 N.M. 607, 615-616, 41 P.3d 333, 342-43 (2001), and because the Court of Appeals relied on the language in an opinion from the Supreme Court of New Mexico, Sanchez v. New Mexican, in reaching its holding.

statement of WNMU's commitment to maintaining an environment free of sexual discrimination and "objectionable and disrespectful conduct and communication of a sexual nature."  Students who feel they have been harassed are encouraged to contact the Director of Affirmative Action/EEO.  Students are also encouraged to report "[c]onduct of a sexual nature" to "their immediate supervisor, and/or appropriate vice president, and/or Affirmative Action."

The handbook also contains a section titled "RESPONSE TO AN ALLEGED SEXUAL ASSAULT" which states that "[t]he University has established the following Crisis Intervention Team to respond to any emergencies concerning sexual assaults."  It then states that the "Crisis Team is as follows" and lists (along with phone numbers) campus police, Vice President of Student Affairs, Vice President of Counseling, and Vice President of Housing.  This section recommends that at least two team members respond to any emergency and that the team should include male and female members when possible.

141 N.M. at 312, 154 P.3d at 687.  The Court of Appeals found that these provisions in the

handbook indicated that, "instead of contractually guaranteeing a right to specific types of

investigation, support, and sanctions in the event of a sexual assault, they provide guidelines for the

operation of [the University]."  141 N.M. at 313, 154 P.3d at 688.

The language in the UNM's Whistleblower and Campus Violence Provisions is similarly

broad, suggestive, and "of a non-promissory nature and merely a declaration of defendant's general

approach," 141 N.M. at 313, 154 P.3d at 688 (quoting Sanchez v. The New Mexican, 106 N.M. at

79, 738 P.2d at 1324,  providing guidance and not obligations.  The Whistleblower Provision states

that "[t]he University of New Mexico strongly encourages" reporting of suspected misconduct, and

that "[t]he University is committed to protecting employees who report suspected misconduct in

accordance with the Whistleblower Protection Act."  Whistleblower Provision ¶ 1, at 1.  It goes on

to state that "Retaliation will not be tolerated and will be promptly investigated by the University,"

id. ¶ 1.1, at 1, that "[a]n employee should report suspected misconduct as soon as reasonably

possible . . . [,] should select the reporting method . . . that they are most comfortable with and is

most appropriate to the situation," id. ¶ 4, at 2, that "[s]upervisors should not investigate reports, but instead must notify the Internal Audit Department," id. ¶ 4, at 4, and that "[r]eports of suspected misconduct should include" certain details, id. ¶ 4, at 4. The Whistleblower Provision further states:

> The Internal Audit Department will review and evaluate reports of suspected misconduct to determine if the report should be referred for further review and/or investigation. If such a determination is made, the Internal Audit Department will prepare a written report of the review. The University will act upon the Internal Audit Department's recommendations promptly. However, the timeliness of any investigation shall depend on the type and complexity of the report, the alleged act, and the type of investigation required.
>
> . . . .
>
> If the employee reports suspected misconduct which personally affects the reporting employee in the workplace, the Internal Audit Department *may* consult the University Dispute Resolution (DR) Coordinator to determine whether to proceed under this policy or to transfer the matter, in whole or in part, to the DR Coordinator for proceedings under "Dispute Resolution" Policy 3220. UBP.
>
> . . . .
>
> All disciplinary action taken as a result of investigations will be in accordance with the personnel policies contained in the University Business Policies and Procedures Manual, the collective bargaining agreements, and the Faculty Handbook as appropriate.

Whistleblower Provision ¶¶ 6, 6.1, 10, at 3, 4, 6 (emphasis in original).

Similarly, the Campus Violence Provision states that "[t]he University of New Mexico is committed to providing an environment that is free from violence," and that "[a]n environment that is free of fear will be possible only if all members of the University community accept their share in this responsibility." Campus Violence Provision ¶ 1, at 1. "All threats and violent behaviors should be taken seriously." Id. ¶ 1, at 1. Section 1 indicates that reporting of violence is required, see id. § 1, at 1 ("If the employee's supervisor is involved in the violent behavior, the employee shall report the behavior to the supervisor's immediate supervisor."), but the Campus Violence Provision

is unclear what becomes of the mandatory report:

**Incident Assessment Team**

In addition to the initial reporting required by Section 1., supervisors must report all incidents of violence or potential violence to Safety & Risk Services. Safety & Risk Services must report these incidents to the Chair of the Incident Assessment Team as soon as possible. These reports will be reviewed by the University's Incident Assessment Team which has representatives from Campus Police, CARS, Dispute Resolution, Human Resources, Safety & Risk Services, University Counsel, and the Health Sciences Center. This team will:

• review reports of violence, workers' compensation claims, and employee surveys to identify patterns of violence that could be prevented by security devices, procedural changes, and/or employe training;

• evaluate work sites to identify hazards, conditions, operations, and situations that could lead to violence and recommend measures to prevent or control hazards; and

• review post incident responses to ensure effectiveness of the supervisor's and University's responses and recommend corrective action and/or revised procedures if necessary.

Under the section titled "Discipline," the Campus Violence Provision states only: "Given the serious nature of violations to this policy, such violations can result in acceleration of the steps in progressive discipline," but provides no criteria by which to determine whether acceleration is warranted. Campus Violence Provision ¶ 4, at 3.

The language of these Provisions is similar to the language in <u>Ruegsegger v. Western New Mexico University Board of Regents</u>, which stated that students are encouraged to report sexual harassment and that the emergency response team should include male and female managers; the Court of Appeals of New Mexico found that the language in the student handbook was not specific enough to create a reasonable expectation that the University would be obligated to provide her a more comprehensive investigation and more support after her assault.  <u>See</u> 141 N.M. at 312, 154 P.3d at 387.  <u>See also</u> <u>Sanchez v. New Mexican</u>, 106 N.M. at 78, 738 P.2d at 1324 ("[T]he evidence

supports the Employer's contention that the handbook lacked specific contractual terms which might evidence the intent to form a contract.  The language is of a non-promissory nature and merely a declaration of defendant's general approach to the subject matter discussed."); Guest v. Allstate Ins. Co., 145 N.M. 797, 805, 205 P.3d 844, 852 (Ct. App. 2009)("Where a contract leaves it entirely optional for one of the parties to perform, the contract is not founded on mutual promises and is, [without performance], not binding or enforceable." (citation omitted)).  Neither Provision mandates a particular response.  Both Provisions are lacking in specificity, and merely declare UNM's approach to reports of misconduct and campus violence.  "[I]nstead of contractually guaranteeing a right to specific types of investigation, support, and sanctions in the event of a [violence or reporting misconduct], they provide guidelines for the operation of [the University]."  Ruegsegger v. W. N.M. Univ. Bd. of Regents, 141 N.M. at 313, 154 P.3d at 688.  The Court therefore does not believe that the language is sufficiently specific, explicit, or mandatory to create a reasonable expectation that UNM would provide a particular response to Gerald's grievance.  See Hartbarger v. Frank Paxton Co., 115 N.M. at 672, 857 P.2d at 783 ("The reasonableness of expectations is measured by just how definite, specific, or explicit has been the representation or conduct relied upon.").  The Court thus dismisses Count V, Gerald's breach-of-contract claim.

## VIII.   THE COURT WILL DISMISS GERALD'S PUNITIVE-DAMAGES CLAIM.

Because the Court has decided to dismiss all of the substantive counts, the Court will also dismiss the claim for punitive damages.  Moreover, punitive damages are not a stand-alone claim.  "[R]equesting punitive damages is not a separate cause of action that should be set out separately in the Complaint."  Guidance Endodontics, LLC v. Dentsply Int'l, Inc., 708 F. Supp. 2d 1209, 1271 (D.N.M. 2010)(Browning, J.).  Consequently, the Court dismisses Count VI of Gerald's TAC.

Moreover, the Court agrees that punitive damages are not available under section 28-1-13D of the NMHRA.  Section 28-1-13D provides the procedures by which "[a] person aggrieved by an order of the commission may obtain a trial de novo in the district court of the county where the discriminatory practice occurred or where the respondent does business."  N.M.S.A. § 28-1-13A. It states that, "if the complainant prevails, the court in its discretion may allow actual damages and reasonable attorney fees and the state shall be liable the same as a private person."  N.M.S.A. § 28-1-13D.  Based on this language, the Supreme Court of New Mexico stated that "[p]unitive damages . . . are not recoverable under the Human Rights Act."  Gandy v. Wal-Mart Stores, Inc., 117 N.M. at 443, 872 P.2d at 861 (citing N.M.S.A. §§ 28-1-11(E), 28-1-13(D); Behrmann v. Phototron Corp., 110 N.M. 323, 328, 795 P.2d 1015, 1020 (1990)).  While interpreting "actual damages" under § 28-1-13, the Supreme Court of New Mexico noted that "actual damages is synonymous with compensatory damages and . . . compensatory damages are exclusive of punitive damages."  Behrmann v. Phototron Corp., 110 N.M. at 328, 795 P.2d at 1020.  Consequently, the Court dismisses Gerald' claims for punitive damages under the NMHRA.

Gerald is also unable to obtain punitive damages for his Title VII claims.  Only UNM may be a proper Defendant in these claims, and punitive damages are not permitted in suits against a government, government agency, or political subdivision under 42 U.S.C. § 1981a.  The Court agrees that it should dismiss Gerald' claims under Title VII for punitive damages.

**IT IS ORDERED** that the Defendants' Motion to Dismiss Plaintiff's First Amended Complaint, filed December 6, 2010 (Doc. 23), is granted.  The Court grants Plaintiff Johnathan

Gerald leave to file, subject to rule 11 of the Federal Rules of Civil Procedure, a second amended

complaint bringing a hostile-work-environment claim within ten days of the Court's filing this order.


_____
UNITED STATES DISTRICT JUDGE


*Counsel:*

Jill M. Collins
Beall & Biehler
Albuquerque, New Mexico

-- and --

Dennis W. Montoya
Montoya Law, Inc.
Rio Rancho, New Mexico

-- and --

Santiago E. Juarez
Albuquerque, New Mexico

     *Attorneys for the Plaintiff*

John B. Pound
Mark T. Baker
Jennifer L. Attrep
Long, Pound & Komer, P.A.
Santa Fe, New Mexico

     *Attorneys for the Defendants*