IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JOHNATHAN B. GERALD,

       Plaintiff,

vs.                                                                  No. CIV 10-0721 JB/LFG

MIKE LOCKSLEY, BOARD OF REGENTS OF
THE UNIVERSITY OF NEW MEXICO, and
PAUL KREBS,

       Defendants.

**<u>MEMORANDUM OPINION AND ORDER</u>**

**THIS MATTER** comes before the Court on the Defendants' Motion to Dismiss Plaintiff's

Amended Complaint for Hostile Work Environment, filed June 9, 2011 (Doc. 53)("Motion"). The

primary issues are: (i) whether Plaintiff Johnathan Gerald has adequately set forth allegations to

support his hostile work environment claim in his Amended Complaint for Hostile Work

Environment Pursuant to the Court's Authorization to File Amended Complaint Set Forth in its

Memorandum Opinion and Order of May 6th, 2011, filed May 15, 2011 (Doc. 50)("SAC"); and

(ii) whether the Court should grant Gerald leave to file an amended complaint. The Court held a

hearing on July 19, 2011. Because Gerald has not cured the defects the Court identified in his First

Amended Complaint for Personal Injury, Race Discrimination and Deprivation of First Amendment

Rights under Color of State Law, filed November 2, 2011 (Doc. 19)("FAC"), the Court dismisses

Gerald's SAC. Because the allegations in the Affidavit of Jonathon B. Gerald (executed June 23,

2011), filed June 24, 2011 (Doc. 55-1), which was attached to the Gerald's Response to Defendants'

Motion to Dismiss Plaintiff's Amended Complaint for Hostile Work Environment, filed June 23,

2011 (Doc. 54)("Response"),[1] are, in combination with the allegations in the SAC, sufficient to plausibly state a hostile work environment claim, the Court grants Gerald leave to file an amended complaint.

## FACTUAL BACKGROUND

For the purposes of a motion to dismiss, the Court takes the allegations in the complaint as true. See Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994)("The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." (citation omitted)). Locksley is the head football coach at the University of New Mexico ("UNM"). SAC ¶ 4, at 2. Defendant Paul Krebs is the Athletic Director at UNM. See SAC ¶ 6, at 2. At all times relevant to SAC, UNM employed Gerald as an assistant coach responsible for working the team's wide receivers. See SAC ¶ 2, at 1. Gerald's claims arise from an alleged alteration with Locksley, and UNM's and Krebs' subsequent response to this incident.

Gerald alleges that, after a team practice session in August of 2009, before the physical altercation between Gerald and Locksley on which Gerald bases his claims, "Locksley physically threatened [Gerald] with bodily harm because of alleged errors or mistakes by [Gerald's] receivers during the practice and [Gerald's] coaching." SAC ¶ 14, at 2. Gerald further alleges that, on or about September 20, 2009,[2] during a coach's meeting at the UNM athletic facility, "during a coach's

---

[1] On June 24, 2011, Gerald attached an affidavit to the Response. See Affidavit of Jonathon B. Gerald (executed June 23, 2011), filed June 24, 2011 (Doc. 55-1). He filed errata the next day, which corrected a number of typographical errors and included an omitted page. See Gerald Aff.; Plaintiff's Errata, filed June 24, 2011 (Doc. 55).

[2] There is some confusion in the SAC whether the alleged altercation occurred on "September 20, 2009," SAC ¶ 15, at 3, or "September 19, 2010," SAC ¶¶ 20, 21, 22, 27, at 3, 4. See SAC ¶ 14, at 2 (alleging Locksley threaten Gerald "[a]fter a team practice session in August of 2010"). Because Gerald complained of the incident to the EEOC on January 5, 2010, see EEOC Charge (dated January 5, 2010), filed December 6, 2010 (Doc. 23-1), and filed his Complaint for

-2-

meeting at the UNM athletic facility after a loss the day before, Defendant Locksley became verbally abusive with the coaching staff because of the performance of the offensive team in a game the day before." SAC ¶ 15, at 3.

> Locksley then directed questions toward [Gerald], asking him about a particular play, to which [Gerald] indicated that he would run the play in whatever manner [Locksley] wanted. Locksley again asked the [Gerald] about the play and [Gerald] again said he would run the play as the [Locksley] wished. Locksley became furious at [Gerald] and swore at him, and suddenly approached [Gerald] in an aggressive manner. Plaintiff Gerald was physically attacked by . . . Locksley, who choked him and punched him in the face, injuring him, and continued to attack him until other coaches pulled . . . Locksley off [Gerald].

SAC ¶¶ 16-19, at 3. Gerald alleges that. "[a]lthough Defendant Locksley is a Black man, he directed his anger and abuse to the Black coaches, and rarely, if ever, became abusive toward Anglo coaches." SAC ¶ 31, at 5.

On September 20, 2009, Gerald reported the incident to UNM management and the police, including Krebs. Gerald asserts that "Krebs and other UNM officials did not take appropriate measures to handle the situation." SAC ¶¶ 20-21, at 3. Krebs encouraged Gerald "to minimize and trivialize what had occurred," and suggested to Gerald "his career would not benefit if he persisted in complaining of Locksely's behavior and that he should desist from any further action in the matter and from making any statements in regard to the assault." SAC ¶¶ 22-23, at 3-4. Gerald alleges that Krebs' statement "were motivated by retaliation and the Plaintiff=s [sic] race, and; [sic] to protect himself and the University athletic program from criticism because of the incident." SAC ¶ 24, at 4. Gerald alleges that Krebs publically denied and minimized the altercation between Locksley and Gerald, initially issuing a letter of reprimand to Locksley, without imposing further discipline. _See_

---

Personal Injury, Race Discrimination and Deprivation of First Amendment Rights under Color of State Law on July 30, 2010, _see_ Doc. 1, the Court takes September 20, 2009 to be the correct date.

SAC ¶¶ 27-28, at 4.  Gerald further alleges that, after a public outcry over the light response, the UNM administration suspended Locksley for ten days.  See SAC ¶ 24, at 4.  Gerald alleges that he and Locksley "are both African-American and . . . Krebs and the UNM administration believed that no serious discipline should be imposed because the incident involved a fight between two Black men."  SAC ¶ 30, at 4.

Gerald was placed on administrative leave for the remainder of the football season.[3] Although UNM invited Gerald to return to his employment with the UNM football team the following year, he refused to do.  See SAC ¶ 33, at 5.  Gerald alleges that UNM and Krebs' discipline of Locksley was insufficient to deter further acts of violence.  See SAC ¶ 33, at 5.  Gerald alleges:

> The violent acts of Defendant Locksley were done out of malice and animosity against the Plaintiff, and; the failure of UNM to adequately discipline the Defendant was motivated by racial discrimination where UNM management believed that the Plaintiff's race made him an easy target for retaliation, intimidation and manipulation in order to cover up the incident and avoid bad publicity, thereby ratifying Defendant Locksley's intentional and malicious conduct.

SAC ¶ 35, at 5.  Gerald contends that the incident has made him unmarketable in the college football coaching market.  See SAC ¶¶ 38-41, at 6.

On January 5, 2010, Gerald filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").  His EEOC Charge named only UNM as the respondent.  See EEOC Charge at 2.  Moreover, in his EEOC Charge, Gerald did not check the box for retaliation; he checked only "race" as the basis for his claims of discrimination.  EEOC Charge at 2.  The narrative portion of the charge lists a number of grievances and states:

---

[3] Gerald states in the SAC that he "was placed on administrative leave with pay for the remainder of the 2010, football season," SAC ¶ 31, at 5; however, the Court suspects that he has mistaken the date and that he was suspended for the 2009 season.

Statement of Discrimination: I was hired by the Respondent on December 19, 2008, as a Full time Football Coach.  During the time of my employment my supervisor (Head Coach) has subjected me to different working term and conditions than the other White coaches, including, but not limited to, threats and intimidation of physical abuse, demeaning my decisions, and cursing me in front of my peers and students.  On September 20, 2009, my supervisor physically assaulted me by choking and punching me about the face.  I reported this to management and nothing was done.  These conditions have made my working atmosphere hostile to which it has affected my performance of duties.

I believe that I have been discriminated against because of my Race (Black) in violation of Title VII of the Civil Rights Act of 1964 as amended.

EEOC Charge at 2.

## PROCEDURAL BACKGROUND

On July 30, 2010, Gerald filed suit against Locksley and UNM, raising claims for assault and battery, race discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17, and the New Mexico Human Rights Act, NMSA 1978, §§ 28-1-1 to -15 ("NMHRA"), and First-Amendment retaliation.  See Complaint for Personal Injury, Race Discrimination and Deprivation of First Amendment Rights under Color of State Law, filed July 30, 2010 (Doc. 1) ("Complaint").  Locksley and UNM filed a motion to dismiss Locksley's original Complaint, see Defendants' Motion to Dismiss, filed August 25, 2010 (Doc. 6), and in response, Locksley filed his FAC, which added Krebs as a Defendant and raised several additional claims -- i.e., retaliation under Title VII and the NMHRA, a denial of equal protection, and breach of contract.  Locksley also added a claim for punitive damages in Count VI of his FAC.

The Defendants withdrew their original motion to dismiss, based on Gerald's decision to amend.  See Notice of Withdrawal of Defendants' Motion to Dismiss, filed October 28, 2010 (Doc. 17).  The Defendants filed their Motion to Dismiss Plaintiff's First Amended Complaint, filed December 6, 2010 (Doc. 23)("First Motion to Dismiss"), in which they moved the Court, pursuant

to rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss Gerald's FAC in its entirety.  The Defendants asserted that the allegations in Gerald's FAC fail to establish his claims.

On April 21, 2011, Gerald substituted attorney Santiago E. Juarez for his former counsel Dennis W. Montoya.  See Notice, filed April 21, 2011 (Doc. 46).  The Supreme Court of New Mexico indefinitely suspended Mr. Montoya's license to practice law, and forbade him from "provid[ing] any legal services in connection with cases in which any of his present or former clients are or were involved."  In Re Dennis W. Montoya, No. 32,397, Order at 2 (N.M. Apr. 25, 2011)(Doc. 56).  Mr. Juarez took over a number of cases from Mr. Montoya.

On, May 6, 2011, the Court filed its Memorandum Opinion and Order, granting the First Motion to Dismiss.  See Doc. 47 ("MOO").  The Court held that, because Gerald failed to exhaust his administrative remedies, it lacked subject-matter jurisdiction over Gerald's retaliation claim and his claims against Locksley and Krebs, and the Court accordingly dismissed Gerald's retaliation claim, and his claims against Locksley and Krebs under Title VII and the NMHRA, without prejudice.[4]  The Court dismissed the remaining claims with prejudice.  In particular, the Court noted that Gerald did not suffer an adverse employment action, which renders any attempts to amend the complaint bring a discrimination claim futile.  See Orr v. City of Albuquerque, 417 F.3d 1144, 1149

---

[4] Because the Court lacked subject-matter jurisdiction, it could not dismiss the claims with prejudice.  A dismissal for lack of subject-matter jurisdiction must be without prejudice because "the court, having determined that it lacks jurisdiction over the action, is *incapable* of reaching a disposition on the merits of the underlying claims."  Brereton v. Bountiful City Corp., 434 F.3d 1213, 1216 (10th Cir. 2006)(emphasis in original).  See also Martinez v. Richardson, 472 F.2d 1121, 1126 (10th Cir. 1973)("It is fundamental . . . that a dismissal for lack of jurisdiction is not an adjudication of the merits and therefore dismissal of the . . . claim must be without prejudice.").  Accordingly, when the Court dismissed Gerald's claims for lack of subject-matter jurisdiction, it dismissed them without prejudice.

(10th Cir. 2005)(stating that a prima-facie case of discrimination requires a plaintiff to demonstrate that: (i) he or she is a member of a protected class; (ii) he or she suffered an adverse employment action, and (iii) similarly situated employees were treated differently).  In dismissing Gerald's constructive discharge claim, the Court stated: "Gerald has not set forth allegations that would rise to the level of a hostile work environment or the more demanding standard for establishing constructive discharge."  MOO at 74.  After noting that the allegations in the FAC failed to state a hostile work environment claim, the Court stated that "[i]f, subject to rule 11, Gerald amends his Complaint to advance the facts alleged in his EEOC Charge in support of his hostile work environment claim, then he may be able to survive a motion to dismiss."  MOO at 43.  The Court explained:

> The Court grants Gerald leave to file a second amended complaint for a hostile work environment claim.  While the allegations in his FAC do not raise to the level of a hostile work environment, the allegations in Gerald's EEOC Charge, combined with his allegations that Locksley threatened, hit, and choked him, may, under the totality of the circumstances, amount to a hostile work environment.  For some reason, Gerald did not include allegation in his FAC that he set forth in his EEOC Charge. In the EEOC Charge, Gerald alleges that he was "subjected . . . to different working term and conditions than the other White coaches, including, but not limited to, threats and intimidation of physical abuse, demeaning [his] decisions, and cursing [him] in front of [his] peers and students."  EEOC Charge at 2.  The physical attack combined with other threats and abuse and public humiliation in front of his peers and students may push his hostile work environment claim across the line from possible to plausible.  If he can, under rule 11, put what is in his EEOC Charge into an amended complaint, he may be able to establish a hostile work environment claim that can survive a rule 12(b)(6) challenge.

MOO at 74-75.  Accordingly, the Court granted "Gerald leave to file, subject to rule 11 of the Federal Rules of Civil Procedure, a second amended complaint bringing a hostile-work-environment claim within ten days of the Court's filing this order."  MOO at 103.

Also on May 6, 2011, the same day that the Court issued its MOO, the Court issued a Scheduling Order.  See Doc. 48.  The Scheduling Order set a June 6, 2011 deadline for Gerald to file

an amended complaint.  See Scheduling Order at 1 ("The Plaintiff shall be allowed until June 6, 2011 to amend the pleadings and to join additional parties in compliance with Fed. R. Civ. P. 15(a).").[5]

On May 15, 2011, Gerald filed his SAC.  Gerald did not "advance the facts alleged in his EEOC Charge in support of his hostile work environment claim."  MOO at 43.  Instead, Gerald filed his SAC with substantively identical factual allegations.  He brings one count for "harassment, intimidation, retaliation and hostile work environment."  SAC at 6.

On June 9, 2011, the Defendants filed their Motion, moving the Court to dismiss the SAC "in its entirety with prejudice."  Motion at 1.  The Defendants assert that, contrary to the Court's MOO, Gerald failed to add any new allegations to the SAC.  Instead, Gerald reasserts "substantially identical allegations" as the Court found inadequate to state a hostile work environment claim when it dismissed the FAC.  Motion at 3.  The Defendants assert that the only new allegations in the SAC of any relevance to Gerald's claims or the Court's analysis are that: (i) "Defendant Krebs is an Anglo-American and the Plaintiff is Black"; (ii) "Defendant Locksley and the Plaintiff are both African-American and Defendant Krebs and the UNM administration believed that no serious discipline should be imposed because the incident involved a fight between two Black men"; (iii) "[a]lthough Defendant Locksley is a Black man, he directed his anger and abuse to the Black coaches, and rarely, if ever, became abusive toward Anglo coaches"; and (iv) "the failure of UNM to adequately discipline the Defendant was motivated by racial discrimination where UNM management believed that the Plaintiff's race made him an easy target for retaliation, intimidation and manipulation."  Response at 3 (quoting SAC ¶¶ 25, 30, 31, 35, at 4, 5)(internal quotation marks

_____

[5] In effect, the Court gave Gerald two more attempts to amend: once within ten days of the Court's MOO, and, if he desired, once again by June 6, 2011 -- a full month away.

omitted).  The Defendants contend that "[t]hese new allegations . . . do nothing to alter the Court's previous holding that Plaintiff fails to state a claim for hostile work environment."  Response at 3.

The Defendants also asset that, "[e]ven though the Court gave Plaintiff leave to amend his complaint only to add a hostile work environment claim, Plaintiff raises two claims for relief under Title VII in the SAC," both a hostile work environment and a retaliation claim.  Response at 5.  The Defendants contend that, because the Court previously dismissed Gerald's retaliation claim for lack of subject-matter jurisdiction, Gerald's retaliation claim "cannot be re-alleged in the SAC."  Response at 5.  The Defendants further assert that, because the Court held that it lacked subject-matter jurisdiction over Gerald's claims against Locksley and Krebs, Gerald should have brought his SAC against only UNM, and not against Locksley and Krebs.  Finally, the Defendants note that Gerald seeks punitive damages, despite the Court's holding that he cannot seek punitive damages under Title VII.

On June 23, 2011, Gerald filed his Response to Defendants' Motion to Dismiss Plaintiff's Amended Complaint for Hostile Work Environment.  See Doc. 54 ("Response").  Rather than contest that the allegations in the SAC are sufficient to survive the Defendants' Motion or that he amended his complaint in accord with the Court's MOO, Gerald attached his affidavit to his Response, in which he set forth additional allegations.  Gerald states that he "has made an affidavit attesting to a hostile environment in his employment at UNM that included acts of racial discrimination, physical violence by his immediate supervisor and unfavorable treatment by UNM."  Response at 1-2.  In the affidavit, Gerald states:

> My name is Jonathon B. Gerald and I am the Plaintiff in this matter.  On December 19, 2008, I was hired by the University of New Mexico as a full-time assistant football coach for the varsity football team, and was assigned to coach the wide receivers.  My immediate supervisor at UNM was Head Football Coach Mike Locksley.

In addition to coaching duties, a part of the job of an assistant coach is to locate, evaluate and recruit prospective players for the football team from various high schools.  In early 2010, I began to work closely with Coach Locksley in identifying, evaluating and recruiting new players for the 2010 football team.  I am African American and Coach Locksley is also African American.  I discovered that Coach Locksley was very hard to work with because of his overly aggressive and dominant nature, his habit of demeaning his subordinates, his use of profanity and racial epithets.  As I grew to know Coach Locksley, I saw that his profane and demeaning conduct was directed toward the Black coaches, and that he rarely used profanity or derision against the White coaches.  He had a habit of addressing other Black coaches and me as "nigger," both in public and in private, which I found offensive.

He also had a habit of using intimidation and threats when a Black was being disciplined or when there was a disagreement, but rarely if ever used such conduct against White coaches.

In May of 2009, Coach Locksley and I were in his office discussing several high school prospects we were considering, and I favored a player who had a higher grade point average because I felt that he would be more likely to stay academically eligible for our program.  Coach Locksley favored another recruit and became enraged when I continued to disagree with him, and at one point appeared to be ready to attack me and threatened to "slap the shit" out of me.  The situation was defused when I finally backed down to avoid a fight.

The Coach continued to use profanity and a threatening manner throughout the Spring and Summer of 2009, and continued to call other Black assistants and me "nigger," when he addressed us.  During several coaches meetings the Coach told us that when we became head coaches we should be careful not to hire too many "niggers" as coaches, which was very offensive to me and the other Black assistants. In these meetings and on the field his favoritism toward the White members of the coaching staff was very obvious, he rarely berated them or swore at them like he did the Black coaches.

In August of 2009, during a practice session where there were players, other coaching assistants and members of the press nearby, Coach Locksley became enraged at me because of the performance of some of the players I was coaching, and again threatened to "slap the shit" out of me.  At this point I stood up to him and told him in so many words that he would regret it if he tried.  After the incident on the practice field Coach Locksley began to single me out for abuse, berating me and using profanity when he was displeased with me.

On Sunday, September 20, 2009, after we had lost a football game to Air Force, we had a coaches [sic] meeting where we were watching film of the game and Coach Locksley was very angry and upset about the loss, and began to berate and

curse at the coaches.  He focused on me and kept asking me about the execution of a particular play and how it should be run, and I told him that we would run it anyway he wanted.  Coach Locksley turned his chair around to face us and said, "you motherfuckers . . ." and then said some words that were incoherent, and got up from his chair and advanced on me in a threatening manner.  The Coach then attacked me while I was still sitting, and began to choke me with his hands until other coaches were able to push me away from him; as we separated, Coach Locksley swung at me with his fist and connected with my mouth, which bloodied my lip and caused bruises and abrasions.  Coaches Blackshear and Tee Martin were able to get me out of the building before the situation escalated further.

I was very upset with Coach Locksley and decided to file a police report of the incident in order to protect myself from a further assault and to make sure that the incident was recorded.  That evening I went to the Albuquerque Police Department and filed a police report alleging battery by Coach Locksley.

The incident between Coach Locksley and myself became an item of local and national news, and articles appeared in the local newspaper and the incident was reported on local and national television.  Initially Coach Locksley and the University denied the incident, but since there had been witnesses, the University eventually acknowledged that it had occurred.  Coach Locksley was initially given a letter of reprimand by the Athletic Department because of the attack on me, but after a public outcry, he was suspended for one game and told to apologize to the persons involved and the public.

During the events mentioned above, I was called into Athletic Director Paul Krebs' office for several discussions on the matter.  Mr. Krebs tried to enlist me into covering up or minimizing the incident, and told me that I should assist the University in "damage control" over the incident, and that I should not talk to the media, he offered me an extended contract to coach at UNM.  At this point I had been contacted by ESPN and other sports news media for an interview about my charges against Coach Locksley.  During our conversations, Mr. Krebs told me that talking to the media and making an issue of the incident would be detrimental to my career in coaching, and that going after the Coach or discussing the matter with the media would be "career suicide," which I interpreted as a threat to harm my career in coaching if I did not play along with the University.  I refused to drop the issue and engaged in interviews and discussions with reporters about what happened and about the inadequate discipline given to Coach Locksley.

I had requested that Coach Locksley be fired for his attack on me, but instead of terminating the Coach, the University placed me on administrative leave so I would not have to work with him.  I was opposed to being placed on administrative leave because I had done nothing wrong.  When I was placed on administrative leave I was required to turn in the cell phone and to relinquish the automobile provided to me by the University as a part of my employment.  Eventually, I was offered a

-11-

contract to coach the 2011, season, but I declined it because I would be under the supervision of Coach Locksley and did not believe it would be safe to work under him, and that the racially and personally demeaning behavior by him would continue.

Gerald Aff. ¶¶ 1-38, at 1-5 (paragraph numbers omitted).  Gerald does not explain why he submitted an affidavit with his Response.  He does not state why the Court, on a motion to dismiss, would be permitted to consider the affidavit.  See Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1261 (D.N.M. 2010)(Browning, J.)("In considering a motion to dismiss pursuant to rule 12(b)(6), it is improper for the Court to consider materials from outside of the pleadings.").  Gerald does not explain why he did not set forth the allegations in the affidavit in his SAC.  Nor does Gerald ask for leave to file an amended complaint.

Relying on the allegations in his affidavit, Gerald contends that he has adequately alleged a hostile work environment claim.  See Response at 7 ("The Plaintiff's Amended Complaint for Hostile Work Environment . . . and the Plaintiff's Affidavit attached as Exhibit 1, provide ample evidence that he has a valid claim for a Title VII hostile work environment action.").  Gerald argues that "[a] fair inference from the circumstances is that an assault by a Black man on another Black man is not worthy of severe punishment."  Response at 9.

Gerald states that he does not seek relief from Locksley and Krebs.  See Response at 11 ("The references to 'Defendant' should not be read to imply that the Plaintiff is seeking relief from these individuals.").  Gerald also states that the request for punitive damages in the SAC's prayer for relief is an inadvertent mistake.  See Response at 11-12 ("[T]he Plaintiff inadvertently requested punitive damages in the Second Amended Complaint, which are not recoverable from UNM.  This was a mistake and a carry-over from the previous complaints. No claim for punitive damages against any public entity is intended.").  Gerald does not respond to the Defendants' challenge to his retaliation claim.

On July 11, 2011, the Defendants filed their Reply in Support of Defendants' Motion to Dismiss Plaintiff's Amended Complaint for Hostile Work Environment.  <u>See</u> Doc. 57 ("Reply"). The Defendants contend that Gerald's affidavit is not properly before the Court.  The Defendants further assert that the allegations in the affidavit are insufficient to allege a hostile work environment claim, but that, if the Court considers the affidavit in assessing the SAC, the Court must treat the Motion as a motion for summary judgment and allow the Defendants to present evidence.  <u>See</u> <u>Lowe v. Town of Fairland</u>, 143 F.3d 1378, 1381 (10th Cir. 1998)("[C]ourts have broad discretion in determining whether or not to accept materials beyond the pleadings.  Reversible error may occur, however, if the district court considers matters outside the pleadings but fails to convert the motion to dismiss into a motion for summary judgment."  (citations omitted)).  The Defendants further argued that Gerald improperly attempted to untimely amend his SAC by attaching his affidavit to his Response.  The Defendants assert that the facts in Gerald's affidavit were known to him at the time that he filed his original complaint, his FAC, and his SAC.  The Defendants thus argue that Gerald has had three opportunities to set forth the allegations in his affidavit in a pleading, but has failed to do so.  They contend that "Plaintiff's backdoor attempt to amend his complaint a fourth time should be rejected by the Court."  Reply at 4.  The Defendants also assert that Gerald's failure to bring forth allegations of Locksley's use of racial epithets until the Defendants challenged his SAC make the allegations suspect in light of the age of this case and that Gerald has made no mention of them in his three pleadings.

At the July 19, 2011 hearing, the parties argued in support of the positions in their briefs. Jennifer L. Attrep, the Defendants' Counsel, argued that a reasonable inference from Gerald's failure to comply with the Court's MOO and add his allegations from the EEOC Charge into the SAC is

-13-

that, subject to rule 11, he could not do so.  <u>See</u> Transcript of Hearing at 6:9-12 (Attrep)("Tr.").[6]

Ms. Attrep also argued that Gerald is trying to amend his pleading "through the backdoor," in

violation of the Court's scheduling order and rule 15.  Tr. at 6:13-23 (Attrep).  She argued that the

Court should not allow Gerald to file another amended complaint, because amendment is untimely

under rule 15(a).

Ms. Attrep further contended that amendment is futile, because, were the Court to consider

Gerald's affidavit, the allegations in the affidavit are not enough to survive a motion to dismiss.  <u>See</u>

Tr. at 16:5-6 (Attrep).  She asserted that Gerald's allegations in his affidavit that Locksley threatened

him do not suggest racial animus and argued that "Title VII is not a general civility code."  Tr. at

10:4-20 (Attrep).  Ms. Attrep contended that the allegations are similar to those the United States

Court of Appeals for the Tenth Circuit found did not establish a hostile work environment in <u>Bolden</u>

<u>v. PRC, Inc.</u>, 43 F.3d 545, 551 (10th Cir. 1994).

Ms. Attrep stated that the Defendants have not conducted any discovery in this case.  <u>See</u> Tr.

at 14:23-25 (Court Attrep).  Mr. Juarez similarly stated that "there's been hardly any movement at

all on discovery in this case."  Tr. at 15:1-3 (Court, Juarez).  The deadline for discovery is November

2, 2011.  <u>See</u> Scheduling Order at 1.

Mr. Juarez stated that he did not feel that he could, subject to rule 11 and his ethical

obligation, transfer the allegations in the EEOC Charge to the SAC.  <u>See</u> Tr. at 17:1-4 ("THE

COURT: . . . I assume that you didn't feel under Rule 11 or your ethical obligations that you could

just transfer what was in the EEOC complaint to your Complaint.  Is that correct?  MR. JUAREZ:

That is correct Your Honor.").  Mr. Juarez stated:

---

[6] The Court's citations of the transcript are to the Court Reporter's original, unedited version.
Any final version may contain different line or page numbers.

> In a rush . . . to try to file the Amended Complaint I d[id] not feel that . . . it was appropriate under the rules to just sort of take those allegations and do an Amended Complaint that says we reallege as follows and then just sort of like cut and paste those allegations.  I think in the sense of trying to be a little bit more adequate, we became actually rather than trying to be more articulate we became less articulate by trying to allege those in the Complaint, getting the affidavit from Mr. Gerald and then attaching that to the response again to dismiss.

Tr. at 17:24-18:8 (Juarez).  Mr. Juarez first stated that he should have requested a new scheduling order when he first appeared in this case after Mr. Montoya was suspended, see Tr. at 17:9-18, (Juarez), but, after the Court noted that he was in the case when it issued its May 6, 2011 Scheduling Order, Mr. Juarez clarified that he meant that he should have requested more time when the Court issued its MOO, see Tr. at 18:25-19:24 (Court, Juarez).  Mr. Juarez also stated that Gerald has moved to Maryland, complicating attorney-client communications.  See Tr. at 19:18-20 (Juarez).

Mr. Juarez argued that, despite the "inartful articulation" in the SAC, Tr. at 25:21, the SAC contains sufficient allegations that, if the Court draws reasonable inferences from the allegations, Gerald is "close enough to be in the ball game."  Tr. at 22:6-10 (Juarez).  Mr. Juarez requested, in the alternative, that the Court give Gerald one last chance to amend his pleadings within ten days.  See Tr. at 22:10-25 (Juarez)("[S]ay you've got ten days to fix it or it's gone.").  Mr. Juarez stated he thought he could transfer the allegations in Gerald's affidavit to an amended complaint.  See Tr. at 23:3-8 (Court, Juarez).

## LEGAL STANDARD FOR MOTIONS TO DISMISS UNDER RULE 12(b)(1)

"Federal courts are courts of limited jurisdiction; they are empowered to hear only those cases authorized and defined in the Constitution which have been entrusted to them under a jurisdictional grant by Congress."  Henry v. Office of Thrift Supervision, 43 F.3d 507, 511 (10th Cir. 1994)(citations omitted).  A plaintiff generally bears the burden of demonstrating the court's jurisdiction to hear his or her claims.  See Steel Co. v. Citizens for a Better Env't, 523 U.S.

83, 104 (1998)("[T]he party invoking federal jurisdiction bears the burden of establishing its existence."). Rule 12(b)(1) allows a party to raise the defense of the court's "lack of jurisdiction over the subject matter" by motion. Fed. R. Civ. P. 12(b)(1). The Tenth Circuit has held that motions to dismiss for lack of subject-matter jurisdiction "generally take one of two forms: (1) a facial attack on the sufficiency of the complaint's allegations as to subject-matter jurisdiction; or (2) a challenge to the actual facts upon which subject-matter jurisdiction is based." Ruiz v. McDonnell, 299 F.3d 1173, 1180 (10th Cir. 2002).

> On a facial attack, a plaintiff is afforded safeguards similar to those provided in opposing a rule 12(b)(6) motion: the court must consider the complaint's allegations to be true. See Ruiz v. McDonnell, 299 F.3d at 1180; Williamson v. Tucker, 645 F.2d 404, 412 (5th Cir. 1981). But when the attack is aimed at the jurisdictional facts themselves, a district court may not presume the truthfulness of those allegations. A court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1). In such instances, a court's reference to evidence outside the pleadings does not convert the motion to a Rule 56 [summary-judgment] motion.

Alto Eldorado Partners v. City of Santa Fe, No. CIV 08-0175 JB/ACT, 2009 WL 1312856, at *8-9 (D.N.M. Mar.11, 2009)(Browning, J.)(citations omitted). As the United States Court of Appeals for the Fifth Circuit has stated:

> [T]he trial court may proceed as it never could under 12(b)(6) or Fed. R. Civ. P. 56. Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction -- its very power to hear the case -- there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims.

Williamson v. Tucker, 645 F.2d 404, 412-13 (5th Cir. 1981)(quoting Mortenson v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977)).

When making a rule 12(b)(1) motion, a party may go beyond the allegations in the complaint to challenge the facts upon which jurisdiction depends, and may do so by relying on affidavits or

other evidence properly before the court.  See New Mexicans for Bill Richardson v. Gonzales, 64

F.3d 1495, 1499 (10th Cir. 1995); Holt v. United States, 46 F.3d 1000, 1003 (10th Cir. 1995).  In

those instances, a court's reference to evidence outside the pleadings does not necessarily convert

the motion to a rule 56 motion for summary judgment.  See Holt v. United States, 46 F.3d at 1003

(citing Wheeler v. Hurdman, 825 F.2d 257, 259 n.5 (10th Cir. 1987)).  Where, however, the court

determines that jurisdictional issues raised in rule 12(b)(1) motion are intertwined with the case's

merits, the court should resolve the motion under either rule 12(b)(6) or rule 56.  See Franklin Sav.

Corp. v. United States, 180 F.3d 1124, 1129 (10th Cir. 1999); Tippet v. United States, 108 F.3d

1194, 1196 (10th Cir. 1997).  "When deciding whether jurisdiction is intertwined with the merits

of a particular dispute, 'the underlying issue is whether resolution of the jurisdictional question

requires resolution of an aspect of the substantive claim.'"  Davis ex rel. Davis v. United States, 343

F.3d 1282, 1296 (10th Cir. 2003)(quoting Sizova v. Nat'l Inst. of Standards & Tech., 282 F.3d 1320,

1324 (10th Cir. 2002)).

## LAW REGARDING RULE 12(b)(6)

Under rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which

relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "The nature of a Rule 12(b)(6) motion tests the

sufficiency of the allegations within the four corners of the complaint after taking those allegations

as true."  Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994)(citation omitted).  The

sufficiency of a complaint is a question of law, and when considering and addressing a rule 12(b)(6)

motion, a court must accept as true all well-pleaded factual allegations in the complaint, view those

allegations in the light most favorable to the non-moving party, and draw all reasonable inferences

in the plaintiff's favor.  See Smith v. United States, 561 F.3d 1090, 1097 (10th Cir. 2009); Moore

v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006); Hous. Auth. of Kaw Tribe v. City of Ponca City,

952 F.2d 1183, 1187 (10th Cir. 1991).  A complaint challenged by a rule 12(b)(6) motion to dismiss does not need to set forth detailed factual allegations, but a plaintiff's burden to set forth the grounds of his or her entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  See Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009)(stating that a plaintiff's complaint must set forth more than a threadbare recital "of the elements of a cause of action, supported by mere conclusory statements").  To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face.[7]  See Bell Atl. Corp v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995 (10th Cir. 2010).  "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S. Ct. at 1940.

## RELEVANT LAW REGARDING MOTIONS TO AMEND

"While Rule 15 governs amendments to pleadings generally, Rule 16 governs amendments to scheduling orders." Bylin v. Billings, 568 F.3d 1224, 1231 (10th Cir. 2009)(citing Fed. R. Civ. P. 16(b)).  When a court has not entered a scheduling order in a particular case, rule 15 governs amendments to a plaintiff's complaint.  See Fed. R. Civ. P. 15.  When a scheduling order governs the pace of the case, however, amending the complaint after the deadline for such amendments implicitly requires an amendment to the scheduling order, and rule 16(b)(4) governs changes to the

---

[7] In his Response, Gerald cites H.J. Inc. v. Northwestern Bell Tel. Co., 492 U. S. 229, 249-50 (1989), for the proposition that "[o]nly where it appears beyond doubt that the plaintiff cannot prove any set of facts supporting his claim that would entitle him to relief, is the court permitted to dismiss a cause of action for failure to state a claim."  Response at 6.  The Supreme Court of the United States "retired" the "no set of facts" pleading standard in 2007.  Bell Atlantic Corp. v. Twombly, 550 U.S. at 562-63 (citing Conley v. Gibson, 355 U.S. 41 (1957)).

scheduling order.  See Bylin v. Billings, 568 F.3d at 1231.

### 1.   Amendments Under Rule 15(a).

Rule 15(a) of the Federal Rules of Civil Procedure provides:

> **(1)** *Amending as a Matter of Course*.  A party may amend its pleading once as a matter of course within:
>
>> **(A)** 21 days after serving it, or
>>
>> **(B)** if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier.
>
> **(2)** *Other Amendments*.  In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires.

Fed. R. Civ. P. 15(a)(bold and italics in original).

> Refusing leave to amend is generally only justified upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment. Castleglen, Inc. v. Resolution Trust Corp., 984 F.2d 1571, 1585 (10th Cir. 1993) (citing Foman v. Davis, 371 U.S. 178, 182 . . . (1962)).  It is well settled in this circuit that untimeliness alone is a sufficient reason to deny leave to amend, see Woolsey v. Marion Laboratories, Inc., 934 F.2d 1452, 1462 (10th Cir. 1991); Las Vegas Ice & Cold Storage Co. v. Far West Bank, 893 F.2d 1182, 1185 (10th Cir. 1990); First City Bank v. Air Capitol Aircraft Sales, 820 F.2d 1127, 1133 (10th Cir. 1987), especially when the party filing the motion has no adequate explanation for the delay, Woolsey, 934 F.2d at 1462.  Furthermore, "[w]here the party seeking amendment knows or should have known of the facts upon which the proposed amendment is based but fails to include them in the original complaint, the motion to amend is subject to denial."  Las Vegas Ice, 893 F.2d at 1185.

Frank v. U.S. West, Inc., 3 F.3d 1357, 1365-66 (10th Cir. 1993).  See Duncan v. Manager, Dep't of

Safety, City & Cnty. of Denver, 397 F.3d 1300, 1315 (10th Cir. 2005)(quoting Frank v. U.S. West,

Inc. and stating that resolving the issue whether to allow a plaintiff to file a supplement to his

complaint is "well within the discretion of the district court").  "The . . . Tenth Circuit has

emphasized that '[t]he purpose of [rule 15(a)] is to provide litigants the maximum opportunity for

each claim to be decided on its merits rather than on procedural niceties.'" B.T. ex rel. G.T. v. Santa

Fe Pub. Schs., No. CIV 05-1165 JB/RLP, 2007 WL 1306814, at *2 (D.N.M. Mar. 12,

2007)(Browning, J.)(quoting Minter v. Prime Equip. Co., 451 F.3d 1196, 1204 (10th Cir. 2006)).

"Specifically, the . . . Tenth Circuit has determined that district courts should grant leave to amend

when doing so would yield a meritorious claim." Burleson v. ENMR-Plateau Tel. Co-op., No. CIV

05-0073 JB/KBM, 2005 WL 3664299, at *2 (D.N.M. Sept. 23, 2005)(Browning, J.)(citing Curley

v. Perry, 246 F.3d 1278, 1284 (10th Cir. 2001)).

　　　Although rule 15(a) provides that leave to amend shall be freely given, "the district court

may deny leave to amend where amendment would be futile." Jefferson Cnty. Sch. Dist. No. R-1

v. Moody's Investor's Servs., Inc., 175 F.3d 848, 859 (10th Cir. 1999).  "A proposed amendment

is futile if the complaint, as amended, would be subject to dismissal." Bradley v. Val-Mejias, 379

F.3d 892, 901 (10th Cir. 2004)(citing Jefferson Cnty. Sch. Dist. v. Moody's Investor's Servs., 175

F.3d 848, 859 (10th Cir.1999).

　　　It is "well settled" in the Tenth Circuit "that untimeliness alone is a sufficient reason to deny

leave to amend, especially when the party filing the motion has no adequate explanation for the

delay." Frank v. U.S. West, Inc., 3 F.3d at 1365-66 (internal citations omitted).[8]  The longer the

delay, "the more likely the motion to amend will be denied, as protracted delay, with its attendant

burdens on the opponent and the court, is itself a sufficient reason for the court to withhold

permission to amend." Minter v. Prime Equip. Co., 451 F.3d at 1205 (citing Steir v. Girl Scouts of

---

　　　　　[8] The Court notes that there is authority in the Tenth Circuit that seems to be to the contrary.
See R.E.B., Inc. v. Ralston Purina Co., 525 F.2d 749, 751 (10th Cir.1975)("Lateness does not of
itself justify the denial of the amendment.").  Minter v. Prime Equipment Co. seems to clarify that
the distinction is between "delay" and "undue delay." Minter v. Prime Equipment Co., 451 F.3d
1196, 1205-06 (10th Cir. 2006).  Delay is undue "when the party filing the motion has no adequate
explanation for the delay." Id. at 1206.

the USA, 383 F.3d 7, 12 (1st Cir. 2004)).  Undue delay occurs where the plaintiff's amendments "make the complaint 'a moving target.'"  Minter v. Prime Equip. Co., 451 F.3d at 1206 (10th Cir. 2006)(quoting Viernow v. Euripides Dev. Corp., 157 F.3d 785, 799-800 (10th Cir. 1998)). "[P]rejudice to the opposing party need not also be shown."  Las Vegas Ice & Cold Storage Co. v. Far W. Bank, 893 F.2d 1182, 1185 (10th Cir. 1990).  "Where the party seeking amendment knows or should have known of the facts upon which the proposed amendment is based but fails to include them in the original complaint, the motion to amend is subject to denial."  Las Vegas Ice & Cold Storage Co. v. Far W. Bank, 893 F.2d at 1185 (quoting State Distribs., Inc. v. Glenmore Distilleries Co., 738 F.2d 405 (10th Cir. 1984)).  Along the same vein, the court will deny amendment if the party learned of the facts upon which its proposed amendment is based and nevertheless unreasonably delayed in moving to amended its complaint.  See Pallottino v. City of Rio Rancho, 31 F.3d 1023, 1027 (10th Cir. 1994)(noting motion to amend filed "was not based on new evidence unavailable at the time of the original filing").

### 2.    Amending a Scheduling Order Under Rule 16(b)(4).

"Rule 16 only allows such amendments for 'good cause,' an arguably more stringent standard than the standards for amending a pleading under Rule 15."  Bylin v. Billings, 568 F.3d at 1230 (quoting Fed. R. Civ. P. 16(b)(4)).  Rule 16(b)(4) states: "A schedule may be modified only for good cause and with the judge's consent."  Fed. R. Civ. P. 16(b)(4).  The rule "focuses on the diligence of the party seeking leave to modify the scheduling order to permit the proposed amendment."  Advanced Optics Elecs., Inc. v. Robins, 769 F.Supp.2d 1285, 1313 (D.N.M. 2010)(Browning, J.).  "Properly construed, 'good cause' means that scheduling deadlines cannot be met despite a party's diligent efforts."  Advanced Optics Elecs., Inc. v. Robins, 769 F.Supp.2d at 1313.

The Tenth Circuit has interpreted rule 16 as imposing a "good cause" standard to untimely motions to amend when a scheduling order governs the case.  See Minter v. Prime Equip. Co., 451 F.3d 1196, 1205 n.4 (10th Cir. 2006).  "This requires the moving party to show that it has been diligent in attempting to meet the deadlines, which means it must provide an adequate explanation for any delay."  Minter v. Prime Equip. Co., 451 F.3d at 1205 n.4.  In Minter v. Prime Equipment Co., the Tenth Circuit recognized a "rough similarity between the 'good cause' standard of Rule 16(b) and our 'undue delay' analysis under Rule 15."  Minter v. Prime Equipment Co.  See 451 F.3d at 1205 n.4.

### LAW REGARDING EXHAUSTION OF ADMINISTRATIVE REMEDIES

Both Title VII and NMHRA claims must be administratively exhausted before being brought in federal court.  Title VII creates a work-sharing deferral system between the EEOC and the states that have their own employment discrimination legislation.  See 42 U.S.C. § 2000e-5(c), (d).  In the states that possess their own employment discrimination legislation, the EEOC must generally "defer" to state or local remedies.  EEOC v. Superior Temp. Servs., Inc., 56 F.3d 441, 447 (2d Cir. 1995)(quoting 42 U.S.C. § 2000e-5(c), (d)).  The NMHRA places New Mexico among those states that have their own employment discrimination legislation and contact agencies.  See 29 C.F.R. § 1601.74 (2005).  In New Mexico, a complainant can, upon meeting filing requirements, proceed with his or her grievance either through the EEOC or through the New Mexico Human Rights Division ("NMHRD").  Mitchell-Carr v. McLendon, 127 N.M. 282, 286-87, 980 P.2d 65, 69-70 (1999).  "In a State that has an entity with the authority to grant or seek relief with respect to the alleged unlawful practice, an employee who initially files a grievance with that agency must file the charge with the EEOC within 300 days of the employment practice."  Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 109 (2002).  Once a person elects to proceed with his or her complaint

-22-

under state law, the NMHRA controls the grievance procedures for resolving the complaint.  See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. at 109.

Whether complainants decide to pursue their grievances with the EEOC or with the NMHRD, they must exhaust their respective regimes' administrative remedies before seeking judicial review.  See Jones v. Runyon, 91 F.3d 1398, 1399 (10th Cir. 1996)("Exhaustion of administrative remedies is a jurisdictional prerequisite to suit under Title VII."); Mitchell-Carr v. McLendon, 127 N.M. at 288, 980 P.2d at 71 ("[E]xhaustion of administrative remedies is a prerequisite to suit under the NMHRA, and a failure to exhaust administrative remedies may mean that the court lacks subject-matter jurisdiction.")(citing Luboyeski v. Hill, 117 N.M. 380, 382, 872 P.2d 353, 355 (1994)).  Exhaustion of administrative remedies is central to Title VII's statutory scheme, because it provides the EEOC and state deferral agencies with the first opportunity to investigate discriminatory practices, and enables them to perform their roles of obtaining voluntary compliance and of promoting conciliatory efforts.  See Patterson v. McLean Credit Union, 491 U.S. 164, 180-81 (1989); Williams v. Little Rock Mun. Water Works, 21 F.3d 218, 222 (8th Cir. 1994).

1.      **The Exhaustion of Administrative Remedies Under the NMHRA.**

The NMHRA makes it an unlawful discriminatory practice for

an employer, unless based on a bona fide occupational qualification or other statutory prohibition, to refuse to hire, to discharge, to promote or demote or to discriminate in matters of compensation, terms, conditions or privileges of employment against any person otherwise qualified because of race, age, religion, color, national origin, ancestry, sex, physical or mental handicap or serious medical condition, or, if the employer has fifty or more employees, spousal affiliation; provided, however, that 29 U.S.C. Section 631(c)(1) and (2) shall apply to discrimination based on age; or, if the employer has fifteen or more employees, to discriminate against an employee based upon the employee's sexual orientation or gender identity. . . .

NMSA 1978, § 28-1-7. The NMHRA also allows individuals to bring a lawsuit in the appropriate

district court after exhausting their administrative remedies.  See Luboyeski v. Hill, 117 N.M. at 382, 872 P.2d at 355. The NMHRA provides:

> A person aggrieved by an order of the commission may obtain a trial de novo in the district court of the county where the discriminatory practice occurred or where the respondent does business by filing a notice of appeal within ninety days from the date of service of the commission's order.

NMSA 1978, § 28-1-13A.

To bring an NMHRA suit in district court, a plaintiff is required to exhaust the administrative grievance process with respect to all defendants named in the district-court lawsuit.  See Luboyeski v. Hill, 117 N.M. at 383, 872 P.2d at 356 ("Since [the plaintiff] has not gone through the administrative process that is prerequisite to suing Locksley and Krebs under the Human Rights Act, we affirm the trial court's order dismissing those defendants.").  Accordingly, in Luboyeski v. Hill, the Supreme Court of New Mexico affirmed a trial court's dismissal of respondents who were not named in the administrative proceeding, but who were added to the appeal to the district court.  See 117 N.M. at 383, 872 P.2d at 356.

As this Court has previously acknowledged, the Supreme Court of New Mexico allows for personal liability under the NMHRA.  See Duprey v. Twelfth Judicial Dist. Court, No. CIV 08-0756 JB, 2009 WL 2482170, at *7 (D.N.M. July 28, 2009)(Browning, J.).  The NMHRA defines "employer" as "any person employing four or more persons and any person acting for an employer." NMSA 1978, § 28-1-2B.  While acknowledging that there is generally no personal liability under Title VII, the Supreme Court of New Mexico has "reject[ed] the proposition that there can exist no individual liability under the NMHRA."  Sonntag v. Shaw, 130 N.M. 238, 243, 22 P.3d 1188, 1193 (2001).  In Sonntag v. Shaw, a defendant relied on Title VII case law to argue that the owner of a corporation could not be sued as an individual under the NMHRA.  See Sonntag v. Shaw, 130 N.M.

at 243, 22 P.3d at 1193.  Although it held that the defendant could not be held personally liable,

given that the plaintiff had failed to exhaust administrative remedies, the Supreme Court of New

Mexico declined to close the door on individual liability under the NMHRA.  See Sonntag v. Shaw,

130 N.M. at 243, 22 P.3d at 1193.  The Supreme Court of New Mexico noted:

> [T]his Court has acknowledged the possibility of individual liability for
> discrimination claims. Cf. Luboyeski v. Hill, 117 N.M. 380, 382, 872 P.2d 353, 355
> (1994) (affirming the dismissal of individual defendants because the plaintiff failed
> to exhaust administrative remedies against them); Mitchell-Carr v. McLendon,
> 1999-NMSC-025, ¶ 10, 127 N.M. 282, 980 P.2d 65 (citing Luboyeski). As Plaintiff
> suggests, the potential for individual liability for discrimination claims is rooted in
> the language of the NMHRA itself, which forbids "any person" from supporting a
> discriminatory practice.  Section 28-1-7(I); see NMSA 1978, § 28-1-2(A) (1993)
> (including within its definition of "person" for purposes of the NMHRA, "one or
> more individuals").

Sonntag v. Shaw, 130 N.M. at 243, 22 P.3d at 1193.

## 2.    The Exhaustion of Administrative Remedies under Title VII.

Title VII prohibits an employer from "fail[ing] or refus[ing] to hire or . . . discharg[ing] any

individual, or otherwise . . . discriminat[ing] against any individual with respect to his compensation,

terms, conditions, or privileges of employment, because of such individual's race, color, religion,

sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  "Under long-standing [Tenth] [C]ircuit

precedent, supervisors and other employees may not be held personally liable under Title VII."

Williams v. W.D. Sports, N.M., Inc., 497 F.3d 1079, 1083 n.9 (10th Cir. 2007).  See Haynes v.

Williams, 88 F.3d 898, 899 (10th Cir. 1996)("The relief granted under Title VII is against the

employer, not individual employees whose actions would constitute a violation of the Act.").  Before

commencing a Title VII action in federal court in a state with an agency empowered to investigate

employment discrimination, like the New Mexico Department of Labor, Human Rights Division,

"a plaintiff first must exhaust administrative remedies by filing a charge of discrimination with the

EEOC within 300 days of the allegedly unlawful employment practice." Castaldo v. Denver Public Sch., 276 F. App'x 839, 841 (10th Cir. 2008)(citing 42 U.S.C. § 2000e-5(e)(1); 42 U.S.C. § 12117(a); Proctor v. United Parcel Serv., 502 F.3d 1200, 1206 & n.3 (10th Cir. 2007)(explaining filing times in deferral states, which are those states that have "an agency empowered to investigate employment discrimination")).  To exhaust administrative remedies, an individual claimant must: (i) timely file a charge of discrimination with the EEOC setting forth the facts and nature of the charge; and (ii) receive notice of the right to sue.  See 42 U.S.C. §§ 2000e-5(b), (c), (e), (f)(1); Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1326 (10th Cir. 1999).  "[A] plaintiff normally may not bring a[n] . . . action based upon claims that were not part of a timely-filed EEOC charge for which the plaintiff has received a right-to-sue letter." Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs., 165 F.3d at 1321.

To be timely, a plaintiff must file the charge with the EEOC within 180 days or with a state agency within 300 days of the complained-of conduct.  See 42 U.S.C. § 2000e-5(e)(1); 29 C.F.R. § 1601.13 (1998); Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs., 165 F.3d at 1327; Gunnell v. Utah Valley St. Coll., 152 F.3d 1253, 1260 n.3 (10th Cir. 1998).  Once an individual receives notice of the right to sue, he or she has ninety days in which to file suit.  See 42 U.S.C. § 2000e-5(f)(1).

**3.     The Exhaustion of Administrative Remedies Is a Jurisdictional Requirement.**

In the Tenth Circuit, exhaustion of administrative remedies is a jurisdictional prerequisite to filing a Title VII action.  See Jones v. United Parcel Serv., Inc., 502 F.3d at 1183; Alcivar v. Wynne, 268 F. App'x at 753 ("The Tenth Circuit has consistently held that 'exhaustion . . . is a jurisdictional prerequisite to suit under Title VII -- not merely a condition precedent to suit.'")(quoting Shikles v. Sprint/United Mgmt. Co., 426 F.3d 1304, 1317 (10th Cir. 2005)); Ransom

v. U.S. Postal Service, 170 F. App'x 525, 527 & n.2 (10th Cir. 2006)("[A] claimant under the Rehabilitation Act . . . is required to present her claims to the appropriate EEO agency before filing suit.")(citing 5 U.S.C. § 7702(a)(2)); Wells v. Shalala, 228 F.3d 1137, 1142-43 (10th Cir. 2000)); Jones v. Runyon, 91 F.3d 1398, 1399 (10th Cir. 1996)("Exhaustion of administrative remedies is a jurisdictional prerequisite to suit under Title VII."); Romero v. Union Pac. R.R., 615 F.2d 1303, 1303 (10th Cir. 1980).

Without such a filing, federal courts lack subject-matter jurisdiction to entertain discrimination claims under that statutes, and a rule 12(b)(1) motion to dismiss is procedurally proper. See Seymore v. Shawyer & Sons, Inc., 111 F.3d 794, 799 (10th Cir. 1997); Carmody v. SCI Colo. Funeral Servs., Inc., 76 F. Supp. 2d 1101, 1103-04 (D. Colo. 1999).[9] When a defendant brings a motion to dismiss for lack of subject-matter jurisdiction under rule 12(b)(1) based on a plaintiff's failure to exhaust administrative remedies in a timely manner, a court "analyze[s] th[e] case under 12(b)(6) of the Federal Rules of Civil Procedure," unless a court considers materials outside the complaint, in which case "it should . . . treat[] [the] motion as a motion for summary judgment under

---

[9] The Tenth Circuit has mentioned some concern whether failure to exhaust administrative remedies is still a jurisdictional prerequisite to suit after the Supreme Court of the United States' decision in Jones v. Bock, 549 U.S. 199 (2007). See, e.g., Alcivar v. Wynne, 268 F. App'x at 753 (noting that "Jones v. Bock held that under the PLRA [Prison Litigation Reform Act] exhaustion is an affirmative defense to be raised by the defendant and not a jurisdictional pleading requirement," but finding it was "not . . . necessary to decide whether exhaustion is jurisdictional under Title VII after Jones."); McQueen v. Colo. Springs Sch. Dist. No. 11, 488 F.3d 868, 874 (10th Cir. 2007)("Although courts have repeatedly referred to the exhaustion requirement as jurisdictional, . . . recent Supreme Court jurisprudence in other contexts casts doubt on that characterization . . . .")(citations omitted, emphasis in original). A recent unpublished Tenth Circuit decision indicates that Jones v. Bock did not demote the exhaustion requirement from a jurisdictional prerequisite to an affirmative defense, at least in the Title VII context. See Martinez v. Target Corp., No. 09-2112, 2010 WL 2616651, at *3 n.2 (10th Cir. July 1, 2010)(Kelly, Porfilio, O'Brien, JJ.)("Martinez is not proceeding under the PLRA; Bock is inapposite. She does not point us to a single decision -- of this or any other court -- applying Bock in the context of a Title VII or ADEA case.").

Rule 56 of the Federal Rules of Civil Procedure." <u>Douglas v. Norton</u>, 167 F. App'x 698, 704-05 (10th Cir. 2006).

a.      **The Scope of the EEOC Charge.**

"A plaintiff's claim in federal court is generally limited by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination submitted to the EEOC." <u>MacKenzie v. City & County of Denver</u>, 414 F.3d 1266, 1274 (10th Cir. 2005). "We liberally construe charges filed with the EEOC in determining whether administrative remedies have been exhausted as to a particular claim." <u>Jones v. United Parcel Serv., Inc.</u>, 502 F.3d at 1186. "This more lenient pleading standard contemplates the fact that administrative charges of unlawful employment practices are regularly filled out by employees who do not have the benefit of counsel." <u>Mitchell v. City of Wichita</u>, 112 F. App'x 662, 667 (10th Cir. 2005). "[T]he charge must contain facts concerning the discriminatory and retaliatory actions underlying each claim." <u>Jones v. United Parcel Serv., Inc.</u>, 502 F.3d at 1186. "The failure to mark a particular box creates a presumption that the charging party is not asserting claims represented by that box." <u>Jones v. United Parcel Serv., Inc.</u>, 502 F.3d at 1186 (citing <u>Gunnell v. Utah Valley State College</u>, 152 F.3d 1253, 1260 (10th Cir. 1998)). "The presumption may be rebutted, however, if the text of the charge clearly sets forth the basis of the claim." <u>Jones v. United Parcel Service, Inc.</u>, 502 F.3d at 1186.

Liberally construing EEOC complaints requires courts to look beyond the formalities of the complaint form. The Tenth Circuit held in <u>Jones v. United Parcel Service, Inc.</u> that, while Jones checked "no" to the questions, "[d]o you believe that the employer regarded you as disabled?" and "did you advise you employer that you required an accommodation?", Jones' allegations that UPS interfered with a medical evaluation to ensure Jones was not released to return to work, that UPS did not permit Jones to return to work despite releases from two doctors, and that Jones checked a

box for retaliation, should have triggered an administrative investigation into whether UPS discriminated against Jones, because he was disabled and whether UPS retaliated against him. 502 F.3d at 1182, 1186-87. Because Jones checked "no" in response to the question whether he advised his employer he needed accommodation and because the text of the charge did not contain facts that would prompt an investigation of such a claim, the Tenth Circuit held that Jones did not exhaust his administrative remedies with respect to his failure-to-accommodate claim. 502 F.3d at 1187.

In Duncan v. Manager Department of Safety, 397 F.3d 1300 (10th Cir. 2005), a former police officer filed an EEOC charge against the city on April 14, 1998, and checked the box for retaliation. See 397 F.3d at 1314. The officer alleged a series of acts before the date that the EEOC charge was filed, which were supposedly in retaliation for her use of the complaint process. See 397 F.3d at 1314. The Tenth Circuit held that none of the actions that the officer alleged in her EEOC charge were sufficient to support a retaliation claim. See 397 F.3d at 1314. The Tenth Circuit noted that her allegation in her complaint that in August of 1998 -- months after filing her EEOC complaint -- she was transferred to the police academy in retaliation for filing her original EEOC charge was severe enough to support a retaliation claim. See 397 F.3d at 1314. The Tenth Circuit noted, however, that, because the officer did not file an additional EEOC charge alleging that specific retaliatory act, she did not exhaust her administrative remedies and thus the district court correctly dismissed her claim for retaliation. See 397 F.3d at 1314.

In Annett v. University of Kansas, 371 F.3d 1233 (10th Cir. 2003), the Tenth Circuit declined to consider Annett's contention that receiving the position of adjunct lecturer versus adjunct professor constituted a retaliation action, because she failed to exhaust her administrative remedies. See 371 F.3d at 1238. The Tenth Circuit considered Annett's charge of discrimination filed September 6, 2000, and her "complaint narrative" submitted on May 31, 2000, and found no

-29-

reference to a distinction between "lecturer" and "professor" as probative of discrimination or

retaliation. 371 F.3d at 1238. Annett's complaint stated: "I was given an Adjunct faculty position,

but no Principal Investigator status, which prevents me from obtaining grants." 371 F.3d at 1238.

Annett's complaint narrative stated: "My own position as an Adjunct Faculty member at KU was

downgraded to prevent me from submitting grants that could act as an alternative source of income."

371 F.3d at 1238. The Tenth Circuit held that it could not conclude "that this sentence represents

the distinction between being appointed an adjunct lecturer versus an adjunct professor in 1999 or

2000." 371 F.3d at 1238. Furthermore, the Tenth Circuit noted that it "lack[ed] jurisdiction to

review Title VII claims that are not part of a timely-filed EEOC charge," including actions that

occurred after the charge was filed. 371 F.3d at 1238 (citing Seymore v. Shawver & Sons, Inc., 111

F.3d at 799).

> Previously, we would proceed to examine whether the alleged employment action,
> provided it occurred after the filing of the EEOC charge, was "like or reasonably
> related to the allegations of the EEOC charge." However, our recent holding in
> Martinez v. Potter, [347 F.3d 1208 (2003),] has foreclosed this line of inquiry. In
> Martinez, we abrogated the continuing violation exception to our jurisdictional
> requirements to allege a claim of retaliation and held that "unexhausted claims
> involving discrete employment actions are no longer viable." In so doing, we relied
> on National R.R. Passenger Corp. v. Morgan, which concluded that each discrete
> retaliatory action constitutes its own unlawful employment practice for which
> administrative remedies must be exhausted, and we applied Morgan to incidents
> occurring after an employee's filing of an EEO complaint, and we applied Morgan
> to incidents occurring after an employee's filing of an EEO complaint..

Annett v. Univ. of Kansas, 371 F.3d at 1238 (internal quotations and citations omitted). Thus, the

Tenth Circuit dismissed Annett's claim for failure to exhaust administrative remedies.

###    b.    Each Discrete Incident Must be Exhausted.

Before 2002, under the "continuing violation" theory, the Tenth Circuit recognized a limited

exception to the exhaustion requirement "when the unexhausted claim is for discrimination like or

reasonably related to the allegations of the EEOC charge." Simms v. Okla. ex. rel. Dep't of Mental Health and Substance Abuse Servs., 165 F.3d at 1327 (internal citations and quotations omitted). The Tenth Circuit "construed the 'reasonably related' exception to include most retaliatory acts subsequent to an EEOC filing." 165 F.3d at 1327 (citing Seymore v. Shawyer & Sons, Inc., 111 F.3d at 799). In Martinez v. Potter, however, the Tenth Circuit noted that the "Supreme Court's recent pronouncement in National Railroad Passenger Corp. v. Morgan, 536 U.S. 101 (2002), has effected fundamental changes to the doctrine allowing administratively unexhausted claims in Title VII actions." 347 F.3d at 1210. The Tenth Circuit's "decisions have unambiguously recognized Morgan as rejecting application of the 'continuing violation' theory." Martinez v. Potter, 347 F.3d at 1211 (citing Davidson v. America Online, Inc., 337 F.3d 1179 (10th Cir. 2003)). The Tenth Circuit in Martinez v. Potter stated:

> We agree with the government that such unexhausted claims involving discrete employment actions are no longer viable. Morgan abrogates the continuing violation doctrine as previously applied to claims of discriminatory or retaliatory actions by employers, and replaces it with the teaching that each discrete incident of such treatment constitutes its own unlawful employment practice for which administrative remedies must be exhausted.

347 F.3d at 1210 (internal citations and quotations omitted).

Thus, under National Railroad Passenger Corp. v. Morgan, each discrete act of discrimination must be administratively exhausted. "Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable unlawful employment practice." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. at 114 (internal citations and quotations omitted). In National Railroad Passenger Corp. v. Morgan, this rule applied to bar a plaintiff from suing on claims for which no administrative remedy had been sought when those

incidents of which the plaintiff complained occurred more than 300 days before the filing of the plaintiff's EEO complaint.  See Martinez v. Potter, 347 F.3d at 1210.  "The rule is equally applicable, however, to discrete claims based on incidents occurring after the filing of Plaintiff's EEO complaint."  Martinez v. Potter, 347 F.3d at 1210-11.  The Tenth Circuit has stated: "Our decisions have unambiguously recognized Morgan as rejecting application of the continuing violation theory."  Martinez v. Potter, 347 F.3d at 1211 (internal quotations omitted).

In Jones v. United Parcel Service, the Tenth Circuit explained how the requirement that plaintiffs must exhaust each discrete claims works in conjunction with courts liberally construing EEOC charges.  See 502 F.3d at 1186.

> The next step in determining whether a plaintiff has exhausted her administrative remedies is to determine the scope of the allegations raised in the EEOC charge because "[a] plaintiff's claim in federal court is generally limited by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination submitted to the EEOC. . . . We emphasize, however, that our inquiry is limited to the scope of the administrative investigation that can reasonably be expected to follow from the discriminatory acts alleged in the administrative charge. In other words, the charge must contain facts concerning the discriminatory and retaliatory actions underlying each claim; this follows from the rule that "each discrete incident" of alleged discrimination of retaliation "constitutes its own 'unlawful employment practice' for which administrative remedies must be exhausted."

Jones v. United Parcel Service, 502 F.3d at 1186 (citations omitted).

This Court has previously held that these principles demand that an act which occurs subsequent to the filing of the formal EEOC charge would not be included in the scope of the administrative investigation and would constitute its own "unlawful employment practice for which administrative remedies must be exhausted."  Farley v. Leavitt, No. CIV 05-1219 JB/LFC, 2007 WL 6364329, at *14 (D.N.M. Dec. 31, 2007)(Browning, J.)(quoting Jones v. United Parcel Serv., Inc., 502 F.3d at 1186)(internal quotation marks omitted).  Tenth Circuit holdings support this conclusion.

See Duncan v. Manager Department of Safety, 397 F.3d at 1314 (affirming dismissal of retaliation claim postdating plaintiff's EEO complaint and stating that "Ms. Duncan did not file an additional EEOC charge alleging the retaliatory act, however, and this failure to exhaust her administrative remedies is fatal to her claim"); Annett v. Univ. of Kan., 371 F.3d at 1238 ("Previously, we would proceed to examine whether the alleged employment action, provided it occurred after the filing of the EEOC charge, was 'like or reasonably related to the allegations of the EEOC charge'[;] [h]owever, our recent holding in Martinez v. Potter, has foreclosed this line of inquiry.").

> **c.      A Plaintiff Must Exhaust at Least One Related Act that Is the Basis of a Hostile Work Environment Claim.**

A different rule applies to hostile work environment claims, for which "the continuing violation doctrine remains viable." Semsroth v. City of Wichita, 304 F. App'x 707, 722 (10th Cir. 2008). An employer creates a hostile work environment when "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Davis v. U.S. Postal Serv., 142 F.3d 1334, 1341 (10th Cir. 1998)(quotations omitted). Under National Railroad Passenger Corp. v. Morgan, a series of events that constitute a hostile work environment claim are considered one unlawful action. See West v. Norton, 376 F. Supp. 2d 1105, 1129 (D.N.M. 2004)(Browning, J.). "Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. at 115 (internal citations and quotations omitted). An "unlawful employment practice" that constitutes a hostile work environment thus cannot be said to occur on any particular day, but rather occurs over a series of days or years. Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. at 115 (citing Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993)). Accordingly, so long as one of the incidents

-33-

included within the claim of hostile environment occurred within the prescribed time limit, other conduct that occurred outside of the proscribed time period, but contributing to the hostile work environment, is not time barred.  See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. at 105 (holding "that consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as any act contributing to that hostile environment takes place within the statutory time period"); West v. Norton, 376 F. Supp. 2d at 1129.

In National Railroad Passenger Corp. v. Morgan, the Supreme Court of the United States provided three factors courts may consider to determine if "a series of separate acts . . . collectively constitute one 'unlawful employment practice.'"   536 U.S. at 117 (quoting 42 U.S.C. § 2000e-5(e)(1)).  "[A] series of alleged events comprises the same hostile environment where 'the pre- and post-limitations period incidents involved the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers.'" Duncan v. Manager, Dep't of Safety, City & Co. of Denver, 397 F.3d at 1309 (quoting Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. at 120)("Morgan advises looking at the type of these acts, the frequency of the acts, and the perpetrator of the acts.").

In National Railroad Passenger Corp. v. Morgan, the Supreme Court addressed whether an EEOC charge alleging the plaintiff was "consistently harassed and disciplined more harshly than other employees on account of his race" was part of the same hostile work environment claim as "evidence from a number of other employees that managers made racial jokes, performed racially derogatory acts, made negative comments regarding the capacity of blacks to be supervisors, and used various racial epithets." 536 U.S. at 105, 120.  While expressly declining to make a judgment on the merits of the plaintiff's claims, the Supreme Court found it could not say that these were "not

part of the same actionable hostile environment claim."  536 U.S. at 121.

In Duncan v. Manager, Dep't of Safety, City & Co. of Denver, the Tenth Circuit addressed a plaintiff's hostile environment claim alleging "three groups of acts that plausibly took place during the filing period: (1) the harassing statements by Sgt. Andrews; (2) the spreading of rumors by Lt. Leone; and (3) the anonymous magazine article placed in her box and the theft of a notebook by an unknown perpetrator."  397 F.3d at 1309.  The Tenth Circuit "examin[ed] the acts in the filing period and determin[ed] what acts outside of the filing period [we]re related by type, frequency, and perpetrator.  The entire range of related acts constitute[d] the hostile work environment underlying Ms. Duncan's claim."  397 F.3d at 1309.  The Tenth Circuit found:

> The alleged actions of Sgt. Andrews and Lt. Leone began after Ms. Duncan returned to District Four in late 1996 and continued into the filing period.  These acts are related by type, frequency, and perpetrator, thus all these acts, including those before the beginning of the filing period, are within the scope of Ms. Duncan's hostile work environment claim.  The alleged hostile actions that occurred before Ms. Duncan returned to District Four, however, are not part of the same hostile work environment as those alleged during the filing period. The acts she alleges immediately prior to her return are an anonymous letter threatening physical violence and Chief Michaud's adjustment of her score on the sergeant's exam. While these acts may have a temporal relation to the behavior of Sgt. Andrews and Lt. Leone, they are of a different character, they took place while Ms. Duncan was on a different assignment, and they were not perpetrated by the same people. Even if we draw all inferences in Ms. Duncan's favor, we do not think a rational jury could conclude that any of the allegations before her return to District Four are part of the same hostile work environment as those acts alleged during the filing period.

Duncan v. Manager, Dep't of Safety, City & Co. of Denver,  397 F.3d at 1309.

### 4.    Time Requirements for Exhausting Administrative Remedies Are Not Jurisdictional.

While failure to exhaust administrative remedies is a jurisdictional bar to suit, in Zipes v. Trans World Airlines, Inc., 455 U.S. 385 (1982), the Supreme Court held that "filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a

requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling." 455 U.S. at 393.  See DeWalt v. Meredith Corp., 288 F. App'x 484, 490 (10th Cir. 2008)(citing Zipes v. Trans World Airlines, Inc., 455 U.S. at 393; Beaird v. Seagate Tech., Inc., 145 F.3d 1159, 1174-75 (10th Cir. 1998)).  The Tenth Circuit treats a plaintiff's failure to timely exhaust administrative remedies not "as a jurisdictional issue, [but] rather . . . as an affirmative defense to be raised by [defendants]."  DeWalt v. Meredith Corp., 288 F. App'x at 490.

Though not jurisdictional, the time limit is not an arbitrary barrier.  It is designed to give an agency timely notice of potentially illegal conduct, to discover and correct its own errors, and possibly to conciliate the claim.  See Sampson v. Civiletti, 632 F.2d at 863.  An employee who fails to comply with the limitation period is barred from seeking judicial relief in federal court, absent a defense of equitable tolling.  See Davis v. United States Postal Serv., 142 F.3d at 1339; Wilson v. West, 962 F. Supp. 939, 944 (S.D. Miss. 1997).

### a.      Exceptions of Equitable Tolling Are Narrowly Construed.

"Equitable exceptions, however, have been narrowly construed."  Harms v. I.R.S., 321 F.3d 1001, 1006 (10th Cir. 2003).  See Montoya v. Chao, 296 F.3d 952, 957 (10th Cir. 2002)(stating that "federal courts have typically extended equitable relief only sparingly").  The Tenth Circuit "has generally recognized equitable tolling of Title VII periods of limitation only if circumstances rise to the level of active deception which might invoke the powers of equity to toll the limitations period."  Montoya v. Chao, 296 F.3d at 957.  See Godwin v. Sw. Research Inst., 237 F. App'x 306, 307 (10th Cir. 2007)("Our precedent requires that an ADEA plaintiff demonstrate 'active deception' on the part of an employer, the EEOC, or the court."); Biester v. Midwest Health Servs., Inc., 77 F.3d 1264, 1269 n.2 (10th Cir. 1996)(noting, in a Title VII case, that "extraordinary circumstances" are "necessary to justify equitable tolling under established Tenth Circuit precedent.").  "Equitable

tolling may be appropriate where a plaintiff has been lulled into inaction by an employer's 'deliberate design . . . or actions that the employer should unmistakably have understood would cause the employee to delay filing his charge.'" Al-Ali v. Salt Lake Cmty. Coll., 269 F. App'x 842, 847 (10th Cir. 2008)(quoting Hulsey v. Kmart, Inc., 43 F.3d 555, 557 (10th Cir. 1994)).  Equitable tolling "is not warranted where an employee is aware of all of the facts constituting discriminatory treatment but lacks direct knowledge of the employer's subjective discriminatory purpose." Bennett v. Coors Brewing Co., 189 F.3d 1221, 1235 (10th Cir. 1999)(citation omitted).

### b. **Equitable Tolling Is Within the District Court's Discretion.**

The decision whether to equitably toll the limitations period rests within the district court's sound discretion.  See Purrington v. Univ. of Utah, 996 F.2d 1025, 1030 (10th Cir. 1993).  In Castaldo v. Denver Public Schools, 276 F. App'x 839 (10th Cir. 2008), the Tenth Circuit found that the district court did not abuse its discretion when it chose not to apply equitable tolling to the plaintiff's EEOC charge when the plaintiff alleged: (i) that his employer did not post notices regarding the filing of EEOC charges; (ii) that he was too incapacitated by his shoulder injuries to file an EEOC charge; and (iii) that he was proceeding pro se.  See 276 F. App'x at 841.  The Tenth Circuit found no error in the district court's conclusion that the failure to post EEOC notices was not a sufficient justification for equitable tolling.  See 276 F. App'x at 841.  See also Wilkerson v. Siegfried Ins. Agency, Inc., 683 F.2d 344, 347 (10th Cir. 1982)(holding that "the simple failure to post . . . notices, without intent to actively mislead the plaintiff respecting the cause of action, does not extend the time within which a claimant must file his or her discrimination charge").  The district court noted that the plaintiff did not allege that his employer intended to actively deceive him by failing to post notices about filing EEOC charges.  See Castaldo v. Denver Pub. Schs., 276 F. App'x at 841.  The Tenth Circuit also concluded that the statements in the plaintiff's EEOC charge

-37-

revealed that it was not his alleged incapacity that prevented him from filing a timely charge, but rather the fact that he was unaware of his obligation to do so until he consulted an attorney.  See 276 F. App'x at 841.  The Tenth Circuit found that "his ignorance of the filing requirement does not entitle him to equitable tolling."  276 F. App'x at 842.  Finally, the Tenth Circuit upheld the district court's finding that the plaintiff's pro-se status did not justify equitable tolling, because the plaintiff had the ability to contact an attorney but elected not to do so until well after the expiration of the filing period.  See 276 F. App'x at 842.

In Godwin v. Southwest Research Institute, the Tenth Circuit held that the district court did not abuse its discretion in refusing to employ equitable tolling when the plaintiff misaddressed his EEOC submission, which arrived forty-four days after the time limit had expired.  See 237 F. App'x. at 307-08.  In Baker v. Perfection Hy-Test, No. 95-6091, 1996 WL 1162 (10th Cir. Jan. 2, 1996), the Tenth Circuit held that there was no active deception sufficient to toll the 300-day deadline where the plant manager of the plaintiff's employer told the plaintiff, after his demotion, that "restructuring was happening 'all over the country,' that plaintiff 'couldn't sue,' [and] that he might try but he 'wouldn't get to first base.'" 1996 WL 1162, at * 2.  The Tenth Circuit found that the statements "at most expressed an opinion concerning plaintiff's likelihood of success."  1996 WL 1162, at *7.

## LAW REGARDING TITLE VII HOSTILE WORK ENVIRONMENT CLAIMS

"Title VII of the Civil Rights Act of 1964 forbids employment discrimination based on race, color, religion, sex, or national origin."  Brown v. Gen. Servs. Admin., 425 U.S. 820, 825 (1976)(citing 42 U.S.C. §§ 2000e-2, 2000e-3).  "Title VII of the Civil Rights Act of 1964 prohibits an employer from failing or refusing to hire or discharging any individual, or otherwise discriminating against any individual with respect to his compensation, terms, conditions, or

privileges of employment, because of such individual's race, color, religion, sex, or national origin."

Farley v. Leavitt, No. CIV 05-1219 JB/LFC, 2007 WL 6364329, at *6 (D.N.M. Dec. 31,

2007)(Browning, J.)(quoting 42 U.S.C. § 2000e-2(a)(1))(internal quotes and alterations omitted).

With the 1972 amendments to the statute, Title VII's protections apply to federal employees as well

as to employees of private concerns.  See Brown v. Gen. Servs. Admin., 425 U.S. at 825-26 (citing

42 U.S.C. § 2000e(b)).

> [A]lthough the plaintiff need not plead facts that constitute a prima facie case under
> the framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 . . . (1973), in
> order to survive a motion to dismiss, Swierkiewicz v. Sorema N.A., 534 U.S. 506,
> 510-15 . . . (2002), a civil rights plaintiff retains the burden of alleging facts
> sufficient to state a claim entitling her to relief.

Harman v. Unisys Corp., 356 F. App'x 638, 640 (D.C. Cir. 2009)(citing Jordan v. Alternative Res.

Corp., 458 F.3d 332, 346-47 (4th Cir. 2006).  See Prince-Garrison v. Maryland Dep't of Health and

Mental Hygiene, 317 F. App'x 351, 353 (4th Cir. 2009)("A civil rights plaintiff need not plead facts

that constitute a prima facie case under the framework of McDonnell Douglas Corp. v. Green . . . in

order to survive a motion to dismiss.  Nevertheless, the plaintiff retains the burden to allege facts

sufficient to state all the elements of her claim."  (citations omitted)).  "McDonnell Douglas

inferences provide assistance to a judge as he addresses motions to dismiss, for summary judgment,

and for directed verdict."  Messina v. Kroblin Transp. Sys., Inc., 903 F.2d 1306, 1308 (10th Cir.

1990).

"To establish a prima facie case of hostile work environment harassment, a plaintiff must

show that 'under the totality of circumstances [(i)] the harassment was pervasive or severe enough

to alter the terms, conditions, or privilege of employment, and [(ii)] the harassment was racial or

stemmed from racial animus.'"  Bloomer v. United Parcel Serv., Inc., 94 F. App'x 820, 825 (10th

Cir. 2004)(quoting Witt v. Roadway Express, 136 F.3d 1424, 1432 (10th Cir. 1998)).  See Carter

v. Mineta, 125 F. App'x 231, 238 (10th Cir. 2005); Mitchell v. City and County of Denver, 112 F. App'x 662, 671 (10th Cir. 2004).  To establish a hostile-work environment claim, "a plaintiff must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Davis v. U.S. Postal Serv., 142 F.3d at 1341 (internal citations and quotations omitted).  "A discriminatory and abusive environment must affect the employee's work environment so substantially as to make it intolerable for her to continue." Creamer v. Laidlaw Transit, Inc., 86 F.3d 167, 170 (10th Cir. 1996)(holding that a work environment did not contain "pervasive" harassment when the plaintiff made general allegations of frequent "sexual slurs" and the only specific incident cited involved a co-worker grabbing the plaintiff).

"The mere utterance of a statement which 'engenders offensive feelings in an employee' would not affect the conditions of employment to a sufficient[ly] significant degree to violate Title VII.'" Gross v. Burggraf Construction Co., 53 F.3d 1531, 1537 (10th Cir.1995)(quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986)(alteration in the original)).  A plaintiff must allege more than "'a few isolated incidents of racial enmity' or 'sporadic racial slurs.'" Chavez v. New Mexico, 397 F.3d 826, 832 (10th Cir. 2005)(quoting Bolden v. PRC, Inc., 43 F.3d at 551). "Instead, 'there must be a steady barrage of opprobrious racial comments.'" Chavez v. Mexico, 397 F.3d at 832 (quoting Bolden v. PRC, Inc., 43 F.3d at 551).

The Tenth Circuit has stated  that "[p]ervasiveness and severity are independent and equal grounds" upon which a plaintiff may establish this element of a hostile environment claim. Witt v. Roadway Express, 136 F.3d at 1432 (addressing a hostile environment claim under 42 U.S.C. § 1981).  See Aramburu v. Boeing Co., 112 F.3d 1398, 1410 (10th Cir. 1997)(citing Durham v.

Xerox Corp., 18 F.3d 836, 838-39 (10th Cir. 1994), for the proposition that "standards and burdens under § 1981 are the same as those under Title VII"). Moreover, the plaintiff must demonstrate that the work environment was objectively and subjectively offensive, but need "not demonstrate psychological harm, nor is she required to show that her work suffered as a result of the harassment." Walker v. United Parcel Service of Am., 76 F. App'x 881, 885 (10th Cir. 2003). In addition to all the circumstances, relevant considerations to determine if an environment is objectively hostile include: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998)(quoting Harris v. Forklift Systems, Inc., 510 U.S. at 21)(internal citations and quotations omitted).

## ANALYSIS

The Court dismisses the SAC. The Court lacks subject-matter jurisdiction over Gerald's retaliation claim. Gerald has not cured the defects that the Court identified in its MOO with a hostile work environment claim. The Court grants Gerald leave to amend his complaint to attempt to plead a hostile work environment claim, because Gerald's allegations in his affidavit, in conjunction with the allegations in his SAC, plausibly allege a hostile work environment claim.

**I.     THE COURT DISMISSES GERALD'S RETALIATION CLAIM AND HIS CLAIMS AGAINST KREBS AND LOCKSLEY WITHOUT PREJUDICE, BECAUSE THE COURT LACKS SUBJECT-MATTER JURISDICTION OVER GERALD'S UNEXHAUSTED CLAIMS.**

In its MOO, the Court dismissed without prejudice Gerald's retaliation claim and his claims against Krebs and Locksley for lack of subject-matter jurisdiction. Gerald did not name Krebs or Locksley or complain of retaliation in his EEOC Charge. See EEOC Charge at 2. The exhaustion

of administrative remedies is a "jurisdictional prerequisite." Jones v. Runyon, 91 F.3d at 1399

("Exhaustion of administrative remedies is a jurisdictional prerequisite to suit under Title VII.").

Because Gerald failed to exhaust his administrative remedies for his retaliation claim, and for his

claims against Krebs and Locksley, the Court lacks subject-matter jurisdiction over these

unexhausted claims.  Nonetheless, Gerald improperly brings these claims again in his SAC.  Gerald

concedes that he cannot seek relief against Locksley and Krebs.  See Response at 11.  The Court

therefore, again, dismisses these claims without prejudice for lack of subject-matter jurisdiction.

See Brereton v. Bountiful City Corp., 434 F.3d at 1216 (holding that dismissal for lack of subject-

matter jurisdiction must be without prejudice, because "the court, having determined that it lacks

jurisdiction over the action, is incapable of reaching a disposition on the merits of the underlying

claims."   (emphasis in original)); Martinez v. Richardson, 472 F.2d at 1126 ("It is

fundamental . . . that a dismissal for lack of jurisdiction is not an adjudication of the merits and

therefore dismissal of the . . . claim must be without prejudice.").

### A.   GERALD DID NOT EXHAUST HIS ADMINISTRATIVE REMEDIES FOR HIS CLAIMS AGAINST KREBS AND LOCKSLEY.

Gerald refers to Krebs as "Defendant Krebs" and Locksley as "Defendant Locksley" and

throughout the SAC.  SAC ¶¶ 4, 6, 8, 13, 15, 19-31, 33-37, 39, 42-43, at 2-6.  The Defendants assert

that the Court held it lacked subject-matter jurisdiction over Gerald's Title VII claims against

Locksley and Krebs, and that Gerald therefore may not assert claims against them in the SAC.  The

Court agrees that Gerald may not assert a hostile work environment against Locksley and Krebs.

Gerald has not exhausted his administrative remedies against Locksley or Krebs.  See MOO at 43-

47.  Moreover, while the Court lacks jurisdiction over Gerald's Title VII claims against Locksley

and Krebs because Gerald did not exhaust his administrative remedies against them, and the Court

should not, and will not, make any other rulings as to them on these claims, the Court notes that, even if he had exhausted his administrative remedies against Locksley and Krebs, Gerald would have to explain how he can maintain a suit under Title VII against Locksley and Krebs in their individual capacities. The Tenth Circuit has held: "Under Title VII, suits against individuals must proceed in their official capacity; individual capacity suits are inappropriate. The relief granted under Title VII is against the employer, not individual employees whose actions would constitute a violation of the Act." Haynes v. Williams, 88 F.3d 898, 899 (10th Cir. 1996)(quoting Sauers v. Salt Lake County, 1 F.3d 1122, 1125 (10th Cir. 1993)). See Busby v. City of Orlando, 931 F.2d 764, 772 (11th Cir. 1991)("The relief granted under Title VII is against the employer, not individual employees whose actions would constitute a violation of the Act."). Accordingly, the Court will dismiss Gerald's claims against Locksley and Krebs without prejudice for lack of subject-matter jurisdiction. See Luboyeski v. Hill, 117 N.M. at 382, 872 P.2d at 355.

Gerald acknowledges that, because the Court has dismissed his claims against Locksley and Krebs, he cannot seek relief against them. He asserts:

> Although the Defendant objects to the use of the word "Defendant" used in connection with Mr. Locksley and Mr. Krebs, the caption of this case still refers to them as such and has not been amended. The references to "Defendant" should not be read to imply that the Plaintiff is seeking relief from these individuals.

Response at 11. Because Gerald did not exhaust his administrative remedies with respect to Locksley and Krebs, the Court will dismiss the claims against them without prejudice.

### B. GERALD DID NOT EXHAUST HIS ADMINISTRATIVE REMEDIES FOR HIS RETALIATION CLAIM.

Despite the Court dismissing Gerald's retaliation claim in his FAC for lack of subject-matter jurisdiction, Gerald appears to assert a retaliation claim in the SAC. Gerald titles the sole count in his SAC "harassment, intimidation, retaliation and hostile work environment." SAC at 6 (emphasis

added).  He alleges that "the retaliation, harassment and intimidation by UNM and Athletic Director Krebs were not desired or welcomed by the Plaintiff," and that the "retaliation, harassment and intimidation by UNM and Defendant Krebs was based in part or in entirety on the Plaintiff's status as an African-American, and were done because Defendant UNM and Defendant Krebs believed that he could be intimidated because of his race."  SAC ¶¶ 42-43, at 6 (emphasis added).

The Defendants argue that, because the Court held it lacks subject-matter jurisdiction over Gerald's retaliation claims, Gerald cannot reassert that claim.[10]  Gerald did not respond to the Defendants' argument in his response.  The Court agrees that Gerald may not reassert his retaliation claim, and the Court dismisses his retaliation claim without prejudice for lack of subject-matter jurisdiction.  As the Court held in its MOO, Gerald failed to exhaust his administrative remedies for his retaliation claim, and the Court therefore lacks subject-matter jurisdiction over that claim.  See Jones v. United Parcel Serv., Inc., 502 F.3d at 1183; Alcivar v. Wynne, 268 F. App'x at 753.

To bring a retaliation claim before this Court, Gerald must have first presented the claim to the EEOC.  "A failure to file an administrative . . . claim before bringing suit is jurisdictionally fatal."  Mitchell v. City and County of Denver, 112 F. App'x at 666.  The Court must determine if a retaliation claim "can reasonably be expected to follow the charge of discrimination submitted to the EEOC."  MacKenzie v. City & County of Denver, 414 F.3d at 1274.  "We liberally construe charges filed with the EEOC in determining whether administrative remedies have been exhausted

---

[10] The Defendants assert that the Court dismissed Gerald's retaliation claim with prejudice. A dismissal for lack of subject-matter jurisdiction, however, must be without prejudice, because "the court, having determined that it lacks jurisdiction over the action, is *incapable* of reaching a disposition on the merits of the underlying claims."  Brereton v. Bountiful City Corp., 434 F.3d at 1216 (emphasis in original).  See Martinez v. Richardson, 472 F.2d at 1126 ("It is fundamental . . . that a dismissal for lack of jurisdiction is not an adjudication of the merits and therefore dismissal of the . . . claim must be without prejudice.").

as to a particular claim." <u>Jones v. United Parcel Serv., Inc.</u>, 502 F.3d at 1186.  "This more lenient pleading standard contemplates the fact that administrative charges of unlawful employment practices are regularly filled out by employees who do not have the benefit of counsel." <u>Mitchell v. City and County of Denver</u>, 112 F. App'x at 667.  "[T]he charge must contain facts concerning the discriminatory and retaliatory actions underlying each claim." <u>Jones v. United Parcel Serv., Inc.</u>, 502 F.3d at 1186.

First, Gerald did not check the box for "retaliation" on his EEOC Charge, nor did he set forth allegations in the narrative section that would lead the EEOC to investigate retaliation.  <u>See</u> EEOC Charge at 2.  "The failure to mark a particular box creates a presumption that the charging party is not asserting claims represented by that box." <u>Jones v. United Parcel Serv., Inc.</u>, 502 F.3d at 1186 (citing <u>Gunnell v. Utah Valley State College</u>, 152 F.3d at 1260).  "The presumption may be rebutted, however, if the text of the charge clearly sets forth the basis of the claim." <u>Jones v. United Parcel Service, Inc.</u>, 502 F.3d at 1186.

In <u>Annett v. University of Kansas</u>, 371 F.3d 1233 (10th Cir. 2003), the Tenth Circuit declined to consider Annett's contention that receiving the position of adjunct lecturer versus adjunct professor constituted a retaliation action, because she failed to exhaust her administrative remedies.  <u>See</u> 371 F.3d at 1238.  The Tenth Circuit considered Annett's charge of discrimination filed September 6, 2000, and her "complaint narrative" submitted on May 31, 2000, and found that the absence of a distinction between "lecturer" and "professor" was probative of her failure to exhaust a discrimination or retaliation claim.  371 F.3d at 1238.  Annett's complaint stated: "I was given an Adjunct faculty position, but no Principal Investigator status, which prevents me from obtaining grants." 371 F.3d at 1238.  Annett's complaint narrative stated: "My own position as an Adjunct Faculty member at KU was downgraded to prevent me from submitting grants that could

act as an alternative source of income." 371 F.3d at 1238.  The Tenth Circuit held that it could not

conclude "that this sentence represents the distinction between being appointed an adjunct lecturer

versus an adjunct professor in 1999 or 2000." 371 F.3d at 1238.  Furthermore, the Tenth Circuit

noted that it "lack[ed] jurisdiction to review Title VII claims that are not part of a timely-filed EEOC

charge," including actions that occurred after the charge was filed.  371 F.3d at 1238 (citing

Seymore v. Shawver & Sons, Inc., 111 F.3d at 799).

> Previously, we would proceed to examine whether the alleged employment action, provided it occurred after the filing of the EEOC charge, was "like or reasonably related to the allegations of the EEOC charge."  However, our recent holding in Martinez v. Potter, has foreclosed this line of inquiry.  In Martinez, we abrogated the continuing violation exception to our jurisdictional requirements to allege a claim of retaliation and held that "unexhausted claims involving discrete employment actions are no longer viable."  In so doing, we relied on National R.R. Passenger Corp. v. Morgan, which concluded that each discrete retaliatory action constitutes its own unlawful employment practice for which administrative remedies must be exhausted, and we applied Morgan to incidents occurring after an employee's filing of an EEO complaint, and we applied Morgan to incidents occurring after an employee's filing of an EEO complaint.

Annett v. Univ. of Kansas, 371 F.3d at 1238 (internal quotations and citations omitted).  The Tenth

Circuit therefore dismissed Annett's claim for failure to exhaust administrative remedies.

In Zinke v. Slater, 34 F. App'x 667 (10th Cir. 2002), the Tenth Circuit affirmed a district

court's dismissal of a plaintiffs' hostile work environment and discrimination claims, because she

failed to exhaust her administrative remedies.  The Tenth Circuit held that she did not overcome the

presumption her failure to check boxes in her EEO complaint created:

> In 1998, Zinke clearly indicated "reprisal" as the exclusive basis for her EEO complaint.  In Block 6, "Check Below Why You Believe You Were Discriminated Against," Zinke marked only "Reprisal," followed by the statement "Non-selection due to reprisal for reporting sexual harassment."  Although her failure to mark the box for sex discrimination is not dispositive, it "creates a presumption that she was not asserting claims represented by boxes not checked."  Gunnell v. Utah Valley State College, 152 F.3d 1253, 1260 (10th Cir. 1998); see also Williams v. Little Rock Mun. Water Works, 21 F.3d 218, 223 (8th Cir. 1994) (providing employee's

EEOC charge, which mentioned filing previous racial discrimination charge, reasonably read as alleging only retaliation claim, particularly in light of employee's failure to check box for racial discrimination).  Zinke fails to rebut the presumption that she was not asserting additional claims because her factual description of the reprisal claim completely omits any reference to hostile work environment or gender discrimination issues.  In Block 7, "Explain How You Believe You Were Discriminated Against," Zinke described in detail what she believed was the FAA's failure to hire her in retaliation for filing the 1991 complaint of quid pro quo sexual harassment.  See Gunnell, 152 F.3d at 1260 (concluding that plaintiff failed to rebut the presumption that she was not asserting sex discrimination claim, caused by her failure to mark appropriate box, because "reasonable reader would understand that her mention of sex discrimination" was merely an "explanation leading up to the gist of her complaint of retaliation").  There is nothing in the 1998 EEO complaint to put the Secretary on notice of any hostile work environment or gender discrimination claims.  In fact, the only reference to any kind of harassment in the 1998 complaint was to the 1991 charge of quid pro quo harassment as the "protected activity" element of Zinke's reprisal claim.  Thus, we conclude Zinke's hostile work environment and gender discrimination claims are not the same type of discrimination . . . .

34 F. App'x at 672-73.

Like the Plaintiffs in Zinke v. Slater, Gerald does not overcome the presumption his failure to check the box.  In the section titled "DISCRIMINATION BASED ON (Check appropriate box(es))," Gerald checked only the box for "race," and he did not check the box for "retaliation."  In the section titled "DATE(S) DISCRIMINATION TOOK PLACE," Gerald indicated that the earliest date was August 13, 2009 and the latest date was September 20, 2009, the date of the altercation.  In the narrative portion of the EEOC Charge, Gerald wrote:

Statement of Discrimination: I was hired by the Respondent on December 19, 2008, as a Full time Football Coach.  During the time of my employment my supervisor (Head Coach) has subjected me to different working term and conditions than the other White coaches, including, but not limited to, threats and intimidation of physical abuse, demeaning my decisions, and cursing me in front of my peers and students.  On September 20, 2009, my supervisor physically assaulted me by choking and punching me about the face.  I reported this to management and nothing was done.  These conditions have made my working atmosphere hostile to which it has affected my performance of duties.

I believe that I have been discriminated against because of my Race (Black)

in violation of Title VII of the Civil Rights Act of 1964 as amended.

EEOC Charge at 2.  Gerald's factual description of the discrimination claim omits any reference to retaliation against him for protected activity.  At the January 27, 2011 hearing, Gerald asserted that his statement that he "reported this to management and nothing was done" would reasonably lead the EEOC to investigate a retaliation claim.  His assertion that "nothing was done" does not sound in retaliation, because it does not suggest that Gerald suffered an adverse employment action in response to his protected activity.  A "reasonable reader would understand that [Gerald's] mention of" management's inaction as merely an "explanation leading up to the gist of h[is] complaint of" discrimination.  Gunnell v. Utah Valley State Coll., 152 F.3d at 1260.

The Court thus concludes that Gerald failed to exhaust his administrative remedies, because the Court's review of Gerald's EEOC Charge reveals that Gerald neither checked the retaliation box nor presented any information that could reasonably be expected to lead the EEOC to investigate a retaliation claim.  Because Gerald did not exhaust his administrative remedies for his retaliation claim, the Court has no subject-matter jurisdiction over it.  The Court therefore dismisses Gerald's retaliation claim without prejudice.  See Echols v. Today's Staffing, 35 F. App'x 776, 777 (10th Cir. 2002)(affirming dismissal of race discrimination claim where EEOC charge provided no suggestion of a racial discrimination theory).[11]

## II.   GERALD FAILS TO ADEQUATELY PLEAD A HOSTILE WORK ENVIRONMENT CLAIM.

Gerald fails to allege facts that, taken as true, plausibly allege a hostile work environment.

---

[11] While the Court should not and will not decide issues where it lacks subject-matter jurisdiction, the Court notes that, even if Gerald had exhausted his administrative remedies as to his retaliation claim, his retaliation claim would have to overcome the deficiencies the Court identified in his First Amendment retaliation claim in its MOO.  See MOO at 52-75.

See Robbins v. Oklahoma, 519 F.3d at 1247-48 (holding that allegations in a complaint "must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief").  See also Messina v. Kroblin Transp. Sys., Inc., 903 F.2d at 1308 ("McDonnell Douglas inferences provide assistance to a judge as he addresses motions to dismiss, for summary judgment, and for directed verdict.").  The Court stated in it MOO that "the allegations in [Gerald's] FAC do not raise to the level of a hostile work environment."  MOO at 74.  Despite the Court giving Gerald leave to file an amended complaint that set forth the allegations from the EEOC charge that he was "subjected . . . to different working term and conditions than the other White coaches, including, but not limited to, threats and intimidation of physical abuse, demeaning [his] decisions, and cursing [him] in front of [his] peers and students,"  EEOC Charge at 2, Gerald added information only about the race of the parties and states that Locksley directed his abuse at black coaches and rarely at white coaches.  These additions are insufficient to push his hostile work environment claim past the threshold of plausibly.  Moreover, Gerald's affidavit, which he attached to his Response, is not properly before the Court.  "The Court is not permitted to consider factual allegations outside the complaint when ruling on a motion to dismiss under Rule 12(b)(6), and plaintiff may not use h[is] affidavit to avoid dismissal of h[is] amended complaint."  Sallis v. Oil Capital Elec., LLC, No. 10-CV-0111-CVE-TLW, 2010 WL 3789534, at *4 (N.D. Okla. Sept. 23, 2010)(citing Tal v. Hogan, 453 F.3d 1244, 1252 (10th Cir. 2006)).  See Kearney v. Dimanna, 195 F. App'x 717, 721 n.2 (10th Cir. 2006)("It is well-established . . . that in determining whether to grant a motion to dismiss, the district court . . . [is] limited to assessing the legal sufficiency of the allegations contained within the four corners of the complaint.").  The Court therefore dismisses the SAC.

     To prevail on a discrimination claim based on a hostile work environment,

     a plaintiff must show "that a rational jury could find that the workplace is permeated

with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." <u>Sandoval v. City of Boulder</u>, 388 F.3d 1312, 1327 (10th Cir. 2004) (quotation omitted).

> In making this determination, we consider the work atmosphere both objectively and subjectively, looking at all the circumstances from the perspective of a reasonable person in the plaintiff's position. We may consider the conduct's frequency and severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the plaintiff employee's work performance.

<u>Tademy v. Union Pac. Corp.</u>, 614 F.3d 1132, 1144 (10th Cir. 2008) (citation and quotations omitted). Additionally, the harassment must be based on the plaintiff's protected class or stem from discriminatory animus toward her protected class. <u>See id.</u> at 1139 (addressing claim of racially hostile work environment and stating "harassment must be racial or stem from racial animus" (quotation and brackets omitted)); <u>see also</u> <u>Bolden v. PRC Inc.</u>, 43 F.3d 545, 551 (10th Cir. 1994) ("General harassment if not racial or sexual is not actionable.").

<u>Faragalla v. Douglas County Sch. Dist. RE 1</u>, 411 F. App'x. 140, 151-52 (10th Cir. 2011). Taken as true, Gerald's allegations in his SAC, however, fall short of plausibly alleging a hostile work environment.

Gerald alleges that Locksley threatened him with physical violence in August of 2009, and physically attacked him on or about September 20, 2009:

> After a team practice session in August of 20[09], Locksley physically threatened the Plaintiff with bodily harm because of alleged errors or mistakes by the Plaintiff=s [sic] receivers during the practice and the Plaintiff=s [sic] coaching. On or about September 20, 2009, during a coach's meeting at the UNM athletic facility after a loss the day before, Defendant Locksley became verbally abusive with the coaching staff because of the performance of the offensive team in a game the day before. Locksley then directed questions toward the Plaintiff, asking him about a particular play, to which the Plaintiff indicated that he would run the play in whatever manner the Defendant wanted. Locksley again asked the Plaintiff about the play and the Plaintiff again said he would run the play as the Defendant wished. Locksley became furious at the Plaintiff and swore at him, and suddenly approached the Plaintiff in an aggressive manner. Plaintiff Gerald was physically attacked by Defendant Locksley, who choked him and punched him in the face, injuring him, and continued to attack him until other coaches pulled Defendant Locksley off the

Plaintiff.

After the assault of September 20, 20[09], by Defendant Locksley, the Plaintiff filed a police report on the incident, accusing the Defendant of assaulting him.  The Plaintiff also reported the incident of September 20, 20[09], to UNM management, including Athletic Director Krebs.  Instead of responding to the incident of violence in a proper manner, the Plaintiff was encouraged by Defendant Krebs to minimize and trivialize what had occurred on September 20, 20[09].  During a conversation on the matter, Defendant Krebs harassed the Plaintiff and threatened the Plaintiff's career as a coach in retaliation for reporting the incident by suggesting that his career would not benefit if he persisted in complaining of Locksely's behavior and that he should desist from any further action in the matter and from making any statements in regard to the assault.  Defendant Krebs' statements to the Plaintiff were motivated by retaliation and the Plaintiff=s [sic] race, and; to protect himself and the University athletic program from criticism because of the incident.

Defendant Krebs is an Anglo-American and the Plaintiff is Black.  Defendant Krebs believed that the Plaintiff could be intimidated because of his race, and because of the Plaintiff's fear of loss of his employment in the coaching field.

Although there were reports by other individuals who were present at the incident of September 20, 20[09], that Defendant Plaintiff Locksley choked the Plaintiff and hit him in the face, Defendant Krebs publically denied any such action by the Defendant, and minimized the incident.  Defendant Krebs refused to impose any meaningful discipline on Defendant Locksley and merely issued a letter of reprimand to him without imposing further discipline.  After a public outcry as to the lack of effective discipline in the matter, the UNM administration imposed a ten (10) day suspension on Defendant Locksley.

Defendant Locksley and the Plaintiff are both African-American and Defendant Krebs and the UNM administration believed that no serious discipline should be imposed because the incident involved a fight between two Black men.  Although Defendant Locksley is a Black man, he directed his anger and abuse to the Black coaches, and rarely, if ever, became abusive toward Anglo coaches.  The Plaintiff was placed on administrative leave with pay for the remainder of the 2010, football season.

SAC ¶¶ 13-32, at 2-5 (paragraph numbers omitted).  Count I, the sole count in the SAC, states in its

entirety:

The Plaintiff re-alleges the allegations and statements in the previous paragraphs herein and further states: The assault by Defendant Locksley and the retaliation, harassment and intimidation by UNM and Athletic Director Krebs were not desired

or welcomed by the Plaintiff.  The retaliation, harassment and intimidation by UNM and Defendant Krebs was based in part or in entirety on the Plaintiff's status as an African-American, and were done because Defendant UNM and Defendant Krebs believed that he could be intimidated because of his race.  The hostile environment and intimidating atmosphere created by Defendant UNM and its officers and employees was severe, pervasive and unreasonable, and caused the Plaintiff to refuse to work under the conditions present.  The Plaintiff suffered loss of employment and future employment, and extreme emotional distress because of the environment created by the Defendant; and further suffered loss of employment and future loss of employment and employment opportunities.

FAC ¶¶ 42-45, at 6-7 (paragraph numbers omitted).  Thus, beyond conclusory allegations of discrimination, Gerald alleges that: (i) Locksley threatened him in August 2009; (ii) Locksley physically attacked him in September 2009; (iii) when he reported the attack, Krebs encouraged him to minimize the incident; and (iv) Locksley directs his anger and abuse at black coaches over white coaches.  These additional allegations are not sufficient to support a hostile work environment claim.

The only material addition Gerald made to the SAC is that he notes the race of the parties, and he alleges that Locksley "directed his anger and abuse to the Black coaches, and rarely, if ever, became abusive toward Anglo coaches."  SAC ¶ 31, at 5.  The Court granted Gerald leave to amend his pleading because "the allegations in Gerald's EEOC Charge, combined with his allegations that Locksley threatened, hit, and choked him, may, under the totality of the circumstances, amount to a hostile work environment."  MOO at 74.  In the EEOC Charge, Gerald alleges that he was "subjected . . . to different working term and conditions than the other White coaches, including, but not limited to, threats and intimidation of physical abuse, demeaning [his] decisions, and cursing [him] in front of [his] peers and students."  EEOC Charge at 2.  The Court stated in its MOO that

> [t]he physical attack combined with other threats and abuse and public humiliation in front of [Gerald's] peers and students may push his hostile work environment claim across the line from possible to plausible.  If [Gerald] can, under rule 11, put what is in his EEOC Charge into an amended complaint, he may be able to establish a hostile work environment claim that can survive a rule 12(b)(6) challenge.

-52-

MOO at 74.  Instead of adding allegations about of other threats and abuse and public humiliation in front of his peers and students, Gerald added a conclusory assertion of disparate treatment.  This sole addition is insufficient to overcome the deficiencies the Court identified in its MOO.

Gerald's new allegations repair one of the issues the Court identified with his FAC.  In its MOO, the "Court notes that Gerald's allegations against Locksley nowhere mention race or suggest racial animus."  MOO at 62.  The Court concluded that "Gerald's FAC . . . reveals no suggestion that the altercation was 'racially motivated'; rather, Gerald alleges that Locksley's dissatisfaction with Gerald's performance motivated his actions."  MOO at 62.  Gerald's allegations that Locksley threatened and beat him do not, on their face, suggest these incidents were the result of racial animus.  See Tademy v. Union Pac. Corp., 614 F.3d at 1139 ("The harassment must be "racial or stem[ ] from racial animus."  (quoting Witt v. Roadway Express, 136 F.3d 1424, 1432 (10th Cir. 1998))).  Rather, Gerald alleges that Locksley's dissatisfaction with Gerald's performance motivated his actions.  Gerald alleges that Locksley threatened him "with bodily harm because of alleged errors or mistakes by the Plaintiff=s [sic] receivers during the practice and the Plaintiff=s [sic] coaching."  SAC ¶ 14, at 2-3.  Similarly, Gerald alleges that Locksley physically attacked him in the course of being "verbally abusive with the coaching staff because of the performance of the offensive team in a game the day before."  SAC ¶ 15, at 3.  Gerald's new allegation -- that Locksley "directed his anger and abuse to the Black coaches, and rarely, if ever, became abusive toward Anglo coaches," SAC ¶ 31, at 5, plausibly -- if weakly, suggests a link between Locksley's actions and racial animus.

Gerald's disparate treatment allegation does not, however, remedy the other shortcomings the Court identified in Gerald's pleadings: a threat combined with a single incident of physical violence in the realm of football, which Gerald was encouraged to minimize, does not amount to a hostile work environment.  To plead a hostile work environment claim, Gerald must set forth

allegations making plausible harassment that "was pervasive or severe enough to alter the terms, conditions, or privilege of employment." Bloomer v. United Parcel Serv., Inc., 94 F. App'x at 825 (quoting Witt v. Roadway Express, 136 F.3d at 1432).   The Tenth Circuit has stated that "[p]ervasiveness and severity are independent and equal grounds" upon which a plaintiff may establish this element of a hostile environment claim. Witt v. Roadway Express, 136 F.3d at 1432. Relevant considerations to determine if an environment is objectively hostile include: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Faragher v. City of Boca Raton, 524 U.S. at 787-88 (quoting Harris v. Forklift Systems, Inc., 510 U.S. at 21)(internal citations and quotations omitted).

Again, Gerald alleges essentially four incidents in support of his hostile work environment claim: he contends that Locksley threatened him, that Locksley attacked him, that Locksley treated black coaches worse than white coaches, and that the Krebs discouraged Gerald from pursuing his grievance against Locksley.   Gerald thus complains of only a few, discrete incidents.   The small number of incidents on which Gerald bases his claims is not fatal if the incidents are adequately severe. "[T]he required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct." Ellison v. Brady, 924 F.2d 872, 878 (7th Cir. 1991)(citing King v. Bd. of Regents, 898 F.2d 533, 537 (7th Cir. 1990)).   There is no minimum number of incidents or pattern of behavior that Gerald must allege.   In Rocha Vigil v. City of Las Cruces, 119 F.3d 871 (10th Cir. 1997), the Tenth Circuit stated:

> In line with Harris, other circuits have recognized that Title VII hostile work environment plaintiffs need not prove a pattern, "steady barrage," or other minimum quantum of discriminatory conduct in order to establish actionable harassment.   See Torres v. Pisano, 116 F.3d 625, 631 (2d Cir. 1997) ("Of course, even a single episode of harassment, if severe enough, can establish a hostile work environment."); Davis

v. Monsanto Chem. Co., 858 F.2d 345, 349 (6th Cir. 1988) ("[P]laintiff need not prove that the instances of alleged harassment were related in either time or type. Rather all that the victim of racial harassment need show is that the alleged conduct constituted an unreasonably abusive or offensive work-related environment or adversely affected the reasonable employee's ability to do his or her job."); Rodgers v. Western-Southern Life Ins. Co., 12 F.3d 668, 674 (7th Cir. 1993) ("Within the totality of circumstances, there is neither a threshold 'magic number' of harassing incidents that gives rise, without more, to liability as a matter of law *nor a number of incidents below which a plaintiff fails as a matter of law to state a claim*.") (emphasis added); Daniels v. Essex Group, Inc., 937 F.2d 1264, 1274 n.4 (7th Cir. 1991) (recognizing that single, isolated incident of harassment can give rise to employer liability for racial harassment under Title VII).

119 F.3d at 873.  While there is no minimum number of incidents, where a plaintiff alleges few incidents, they must be severe to establish a hostile work environment.  See, e.g., Lowe v. Angelo's Italian Foods, Inc., 87 F.3d 1170, 1175 (10th Cir.1996)(holding that one isolated comment and the use of the term "girlie," "although regrettable, do not demonstrate that the work environment . . . was 'permeated with discriminatory intimidation, ridicule, and insult'"); Creamer v. Laidlaw Transit, Inc., 86 F.3d 167, 170 (10th Cir.)(holding single incident of sexual harassment was neither sufficiently pervasive nor severe to constitute a hostile work environment), cert. denied, 519 U.S. 983 (1996); Gross v. Burggraf Construction Co., 53 F.3d 1531, 1547 (10th Cir. 1995)(holding one single statement that could be construed as gender-based and hostile was insufficient to demonstrate hostile work environment under Meritor Sav. Bank, FSB v. Vinson); Bolden v. PRC Inc., 43 F.3d 545, 551 (10th Cir. 1994)(holding that only two overtly racial comments and one arguably racial remark over the course of the plaintiff's eight years of employment did not constitute pervasive conduct), cert. denied, 516 U.S. 826 (1995).

In Brooks v. City of San Mateo, 229 F.3d 917 (9th Cir. 2000), in an opinion authored by Chief Judge Alex Kozinski, the United States Court of Appeals for the Ninth Circuit held that a single incident in which a fellow employee touched the plaintiff's stomach and then her breast under

her sweater, while very offensive, did not create a hostile work environment, particularly given that

the city took prompt steps to remove the fellow employee from the workplace.  The Ninth Circuit

stated:

> If a single incident can ever suffice to support a hostile work environment claim, the incident must be extremely severe.  See [EEOC, Policy Guidance on Sexual Harassment, 8 BNA FEP Manual, page 6 at 405:6690-91 (Mar. 19, 1990)] ("[A] single unusually severe incident of harassment may be sufficient to constitute a Title VII violation; the more severe the harassment, the less need to show a repetitive series of incidents.  This is particularly true when the harassment is physical.").  In Al-Dabbagh [v. Greenpeace, Inc., 873 F. Supp. 1105, 1111 (N.D. Ill. 1994)], a single incident was held to be sufficient where the assailant "slapped [plaintiff], tore off her shirt, beat her, hit her on the head with a radio, choked her with a phone cord and ultimately forced her to have sex with him."  Al- Dabbagh, 873 F.Supp. at 1108.  The perpetrator held the victim captive overnight; when she finally managed to escape, she had to be hospitalized for her injuries.  See id.

229 F.3d at 926.  Rape and other forms of severe sexual assault are the archetypical examples of

single incidents which can establish a hostile work environment.  See, e.g., Little v. Windermere

Relocation, Inc., 301 F.3d 958, 967 (9th Cir. 2001)("A single 'incident' of harassment -- and we

assume arguendo that three rapes in the course of one evening constitutes a 'single' incident -- can

support a claim of hostile work environment because the 'frequency of the discriminatory conduct'

is only one factor in the analysis."  (citations omitted)); Ferris v. Delta Air Lines, Inc., 277 F.3d 128,

136 (2d Cir. 2001)("Although a continuing pattern of hostile or abusive behavior is ordinarily

required to establish a hostile environment, a single instance can suffice when it is sufficiently

egregious.  We have no doubt a single incident of rape can satisfy the first prong of employer

liability under a hostile work environment theory." (citing Tomka v. Seiler Corp., 66 F.3d 1295,

1305 (2d Cir. 1995)("[E]ven a single incident of sexual assault sufficiently alters the conditions of

the victim's employment and clearly creates an abusive work environment for purposes of Title VII

liability."), abrogated on other grounds by Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998)));

Turnbull v. Topeka State Hosp., 255 F.3d 1238, 1243-44 (10th Cir. 2001)(finding a hostile work environment in a single incident where an inmate "knocked [the plaintiff] to the ground, undressed her and digitally penetrated her, bit and choked her, and repeatedly threatened to kill her."); Lockard v. Pizza Hut, Inc., 162 F.3d 1062, 1072 (10th Cir.1998)(finding a "single incident of physically threatening conduct," in which a customer pulled his waitress by the hair, grabbed and placed his mouth on her breast, severe enough to create an actionable hostile work environment).

In Lockard v. Pizza Hut, Inc., the Tenth Circuit held that a single sexual assault could establish a hostile work environment. Customers sexually assaulted the plaintiff after her supervisor insisted she wait on them:

> Ms. Lockard's duties included closing the store after the restaurant stopped serving customers at 10 p.m. on weekdays and 11 p.m. on weekends. Upon occasion, she and Mr. Jack[, her supervisor,] were the only Pizza Hut employees at closing time and Mr. Jack would often play one of his favorite songs "Freak Me" on the jukebox. The song contains sexually explicit lyrics. Ms. Lockard testified that she informed both Mr. Jack and Ms. Selby that she found this song offensive and asked Mr. Jack to stop playing it, to no avail. Other than playing offensive music, Mr. Jack never directly acted improperly toward her.
>
> Ms. Lockard's more serious allegation of sexual harassment involved the failure of Mr. Jack to respond properly to the inappropriate conduct of two crude and rowdy male customers on November 6, 1993. Ms. Lockard testified that these two men had eaten at the restaurant several times previous to November 6 and had made sexually offensive comments to her, such as "I would like to get into your pants." After the two men made these remarks, Ms. Lockard informed Mr. Jack that she did not like waiting on them; however, the record contains no evidence that she told Mr. Jack why she did not like waiting on the men or that she ever relayed to him the substance of their remarks. On the evening of November 6, these customers again entered the restaurant. The wait staff, including younger male waiters, argued over who would seat them because no one on the staff wanted to serve them. Mr. Jack then instructed Ms. Lockard to wait on them. After being seated by Ms. Lockard, one of the customers commented that she smelled good and asked what kind of cologne she was wearing. Ms. Lockard responded that it was none of his business, and the customer grabbed her by the hair. She informed Mr. Jack that one of the customers had pulled her hair and that she did not want to continue waiting on them, and asked Mr. Jack if he could find someone else to serve them. Ms. Lockard testified that Mr. Jack denied her request, stating "You wait on them. You were

-57-

hired to be a waitress.  You waitress."  Ms. Lockard returned to their table with a
pitcher of beer.  As she reached to put the beer on the table, the customer pulled her
to him by the hair, grabbed her breast, and put his mouth on her breast.  At that point,
Ms. Lockard told Mr. Jack that she was quitting and wanted to go home.  She called
her husband who picked her up.

162 F.3d at 1067 (citations to the record omitted).  At trial, the district court denied the defendants'

motion for judgment as a matter of law, and the defendants appealed, arguing in part that the

plaintiff has not demonstrated "that she suffered harassment sufficiently severe or pervasive to

create an actionable hostile work environment."  162 F.3d at 1068.  The Tenth Circuit affirmed,

stating:

> The conduct of these customers on November 6 was more than a mere offensive
> utterance.  Grabbing Ms. Lockard's hair and breast while she attempted to take their
> orders and serve their beer is physically threatening and humiliating behavior which
> unreasonably interfered with Ms. Lockard's ability to perform her duties as a
> waitress.  Defendants essentially argue that the physically threatening conduct of
> these two customers was simply a one-time incident and was therefore not pervasive
> enough to create an abusive environment, comparing the single incident here with
> the repeated incidents of sexual abuse suffered by the plaintiff in Meritor.  However,
> in  Harris  the  Court  made  clear  that  the  "appalling  conduct  alleged  in
> Meritor . . . merely present[s] some especially egregious examples of harassment.
> They  do  not  mark  the  boundary  of  what  is  actionable."   Harris,  510 U.S. at
> 22 . . . .  The "frequency of the discriminatory conduct," id. at 23 . . . is simply one
> factor in the analysis, and "no single factor is required," id.  Conduct is actionable
> if it is "sufficiently severe or pervasive."  Meritor, 477 U.S. at 67 . . . (emphasis
> added); see also Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 . . . (1998); Harris,
> 510 U.S. at 21-22 . . . .  We therefore disagree with defendants' assertions that a
> single incident of physically threatening conduct can never be sufficient to create an
> abusive environment.  "[L]ooking at all the circumstances," as we must, Harris, 510
> U.S. at 23 . . . , we are persuaded that the record contains sufficient evidence to
> support the jury's conclusion that the harassing conduct of the customers was severe
> enough to create an actionable hostile work environment.

162 F.3d at 1072.

The Tenth Circuit returned to the question whether a single incident can establish a hostile

work environment in Turnbull v. Topeka State Hospital.  In that case, the Tenth Circuit reversed a

district court's judgment as a matter of law that the plaintiff had not presented evidence establishing

a hostile work environment.  A psychologist employed at a state mental hospital sued the hospital

and state under Title VII for sexual harassment after a patient sexually assaulted her.  The hospital

had a history of patients "sexual[ly] acting out" and "staff were aware this posed potential dangers,

dangers that were tragically highlighted when a female employee was murdered by a patient in

1992."  255 F.3d at 1241.  "Although psychologists could request extra staff to attend a group

therapy session or other treatment, the shortage of staff meant those requests were rarely met."  255

F.3d at 1242.  The plaintiff and others had complained of safety concerns.  The plaintiff was on a

walk with the patient on the grounds of the hospital.  "When they reached a slightly secluded area,

[the patient] suddenly attacked.  He knocked her to the ground, undressed her and digitally

penetrated her, bit and choked her, and repeatedly threatened to kill her."  255 F.3d at 1242-43.

      After a jury found a hostile work environment, the trial court entered judgment as a matter

of law for the defendant.  The Tenth Circuit reversed, holding the verdict was reasonable.  The Tenth

Circuit stated that, "[w]hile there was only one incident, it was objectively abusive, dangerous, and

humiliating, and Dr. Turnbull was so traumatized she was unable to return to work thereafter."  255

F.3d at 1243-44.

      Courts rarely find limited incidents of physical violence without a sexual element to establish

a hostile work environment.  In Cooper v. American Airlines, Inc., 213 F. App'x 714 (10th Cir.

2007), the Tenth Circuit held that a single union-related physical assault was insufficient to make

out a prima facie case of hostile work environment under Title VII.  The case involved a physical

attack on the plaintiff that included hitting him, and "pressing and bumping and humping" his leg:

> While Mr. Cooper was handing out the [Aircraft Mechanics Fraternal Association]
> flyers, Robert Jackson, who at the time was American's Managing Director of Base
> Maintenance, informed Mr. Cooper that the TWU was not happy about the
> distribution of the literature.  Shortly thereafter, another American employee, Randy
> McDonald, who is a white male and at the time was the president of TWU,

> physically confronted Mr. Cooper and tried to wrestle away the flyers, shouting that Mr. Cooper was destroying TWU membership.  He also began "pressing and bumping and humping" Mr. Cooper's leg.  Mr. Jackson intervened in an effort to get Mr. McDonald to stop his conduct.  A scuffle then ensued during which Mr. McDonald swung at and hit Mr. Jackson.  Mr. Jackson backed away and Mr. McDonald resumed his confrontation of Mr. Cooper, which included making "African gibberish" noises along with another American employee.  According to Mr. Cooper, other American employees chanted derogatory racial slurs.

213 F. App'x at 715-16 (citations to the record omitted).  The Tenth Circuit "agree[d] and affirm[ed] the district court's disposition," which "first stated that whether the harassment was based on or motivated by race was 'thin at best,'" and held that "the harassment did not affect a term or condition of Mr. Cooper's employment and did not constitute the '"steady barrage of opprobrious racial comment" as would offend Title VII.'"  213 F. App'x at 716 (quoting Johnson v. Bunny Bread Co., 646 F.2d 1250, 1257 (8th Cir. 1981)).  The Tenth Circuit also agreed that, "considering whether American "'knew or should have known about the conduct and failed to stop it,' the court determined that American had not been negligent but had acted reasonably in responding to the incident."  213 F. App'x at 716 (quoting Hollins v. Delta Airlines, 238 F.3d 1255, 1258 (10th Cir. 2001)).

Similarly, in Mathirampuzha v. Potter, 548 F.3d 70 (2d Cir. 2008), the United States Court of Appeals for the Second Circuit affirmed the district court's grant of summary judgment, holding that a physical assault that produced injuries requiring eye surgery was insufficient to establish an adverse employment action, or support a race, color, and national-origin hostile work environment claim, for Title VII purposes:

> On September 29, 2003, the plaintiff was physically assaulted by Ron Sacco, a supervisor at the Wallingford plant. . . .  Sacco grabbed the plaintiff's arm, punched him in the shoulder and the chest, spit in his face, and poked him in the eye.  Sacco also shouted, "Joe, I['ll] never let you go to [the] Hartford plant."
>
> The plaintiff's direct supervisor, Claudio Scirocco, quickly intervened -- or,

as the plaintiff phrased it, "came to save my life." A union representative promptly arrived on the scene and brought the plaintiff to the office of a higher-ranking Postal Service supervisor. But the supervisor laughed when the plaintiff told her what had happened. The plaintiff's union continued to advocate on his behalf, however, and Sacco was ultimately issued a "Letter of Warning" for "Conduct Unbecoming a Postal Supervisor" and was transferred to another work assignment for at least a year.

The plaintiff asserts that his confrontation with Sacco caused him physical injury and severe emotional distress. He suffered chest pains and contusions to his shoulder blade, required eye surgery, and fell into a depression.

548 F.3d at 73. The plaintiff also alleged other incidents in his complaint that he did not administratively exhaust, including "that Sacco has 'verbally harassed' him since 1999, ha[d] 'subjected him to disparate treatment by denying him approved lunch breaks and assistance in performing work duties,' and ha[d] retaliated against him for complaining about his treatment." 548 F.3d at 73. The Second Circuit held that this incident was insufficient to establish an adverse employment action in support of a discrimination claim:

We agree with the district court that the plaintiff's "asserted treatment at the hands of Ron Sacco on September 29 -- while unprofessional and boorish -- and the initially dismissive attitude of other supervisors when Sacco's behavior was brought to their attention, does not amount to an 'adverse employment action' . . . ." [Mathirampuzha v. U.S. Postal Serv., No. 3:04cv841, 2006 WL 2458669, at *7 (D. Conn. Aug.21, 2006)].

An adverse employment action is "a materially adverse change in the terms and conditions of employment." Sanders v. N.Y. City Human Res. Admin., 361 F.3d 749, 755 (2d Cir. 2004) (emphasis added; citation and internal quotation marks omitted).

To be materially adverse, a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities. Examples of such a change include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation.

Id. (citation, internal quotation marks, and ellipsis omitted). Only in limited

circumstances does a single, acute incident of abuse qualify as an adverse employment action. In the context of hostile work environment claims, we have stated that a single event, if "extraordinarily severe," could alter the conditions of a working environment. Howley v. Town of Stratford, 217 F.3d 141, 153 (2d Cir. 2000) (citation and internal quotation marks omitted). A "single incident of rape," for example, "'sufficiently alters the conditions of the victim's employment and clearly creates an abusive work environment for purposes of Title VII liability'" for sex-based discrimination. Ferris v. Delta Air Lines, Inc., 277 F.3d 128, 136 (2d Cir. 2001) (quoting Tomka v. Seiler Corp., 66 F.3d 1295, 1305 (2d Cir. 1995), abrogated on other grounds by Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 . . . (1998)), cert. denied, 537 U.S. 824 . . . (2002). But we require that the incident constitute an "intolerable alteration" of the plaintiff's working conditions, Howley, 217 F.3d at 154, so as to substantially interfere with or impair his ability to do his job, see Mormol v. Costco Wholesale Corp., 364 F.3d 54, 59 (2d Cir. 2004).

We conclude, in light of that authority, that Sacco's aggressive conduct toward the plaintiff on September 29, 2003, was not an adverse employment action. After the incident took place, the plaintiff continued to work at the Wallingford plant in the same position, at the same pay, and with the same responsibilities. Indeed, there is no evidence that the assault brought lasting harm to the plaintiff's ability to do his job. The physical encounter itself, while understandably upsetting, was not so severe as to alter materially the plaintiff's working conditions -- unlike, for example, a rape, see Ferris, 277 F.3d at 136, or an obscene and humiliating verbal tirade that undermines the victim's authority in the workplace, see Howley, 217 F.3d at 154. The Postal Service's response to the incident, moreover, while not immediate, ultimately ameliorated the plaintiff's working conditions, as Sacco was eventually disciplined and transferred to another work assignment for at least one year. Although a more severe incident of harassment or abuse could constitute an adverse employment action, the brief incident in this case, however regrettable, does not meet the "extraordinarily severe" standard. The plaintiff has therefore failed to establish a prima facie case of employment discrimination based on that event.

548 F.3d at 78-79.

Like the physical attack in Cooper v. American Airlines, Inc., in which the plaintiff alleged that he was punched and his leg was "press[ed] and bump[ed] and hump[ed]," Gerald's allegations of a threat, being hit and choked, and the Defendants' response does not rise to the level of a hostile work environment, because "the harassment did not affect a term or condition of [Gerald's] employment." 213 F. App'x at 716. Moreover, the Tenth Circuit agreed that, despite the plaintiff's allegations that the attacker and other employees made "African gibberish" noises and chanted

derogatory racial slurs, "whether the harassment was based on or motivated by race was 'thin at best.'" 213 F. App'x at 716 (citations omitted).  While Gerald adds the allegation that Locksley directed abuse at black coaches, Gerald also alleges that Locksley's disatisfaction with Gerald's and the team's performance motivated his threats and attack, undermining the cogency of his contention that racism motivated Locksley's actions.

Moreover, the Defendants' discipline of Locksley ameliorated whatever affect Locksley's alleged actions had on Gerald's working conditions.  While Gerald alleges that Krebs initially publically denied and minimized the altercation between Locksley and Gerald, and issued a letter of reprimand to Locksley, he further alleges that, after a public outcry over the light response, the UNM administration suspended Locksley for ten days.  Gerald provides no basis for his assertion that Locksley's punishment was insufficient to deter further acts of violence.  The Defendants' "response to the incident, moreover, while not immediate, ultimately ameliorated the plaintiff's working conditions, as [Locksley] was eventually disciplined." Mathirampuzha v. Potter, 548 F.3d at 79.

Consequently, the allegations in the SAC, "however regrettable," Mathirampuzha v. Potter, 548 F.3d at 78-79, do not plausibly suggest a "workplace . . . permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of [Gerald's] employment and create an abusive working environment." Faragalla v. Douglas County Sch. Dist. RE 1, 411 F. App'x. at 152 (quoting Sandoval v. City of Boulder, 388 F.3d at 1327).  Like the assaults in Samuels v. Potter and Mathirampuzha v. Potter, "[t]he physical encounter itself, while understandably upsetting, was not so severe as to alter materially the plaintiff's working conditions," Mathirampuzha v. Potter, 548 F.3d at 79, or "constitute the 'steady barrage of opprobrious racial comment' as would offend Title VII," Samuels v. Potter, 213 F. App'x at 716 (quoting Johnson v.

Bunny Bread Co., 646 F.2d at 1257.  Additionally, while it does not excuse punching and choking, the realm of football admits greater physical interaction.  See Gross v. Burggraf Construction Co., 53 F.3d at 1538 (noting the rough-and-tumble surroundings of the construction industry can make vulgarity and sexual epithets common and reasonable conduct); Sauers v. Salt Lake County, 1 F.3d 1122, 1126 (10th Cir. 1993)(affirming district court finding that plaintiff "accepted" the "unusually rough, sexually explicit and raw atmosphere" of the Salt Lake County Attorney's Office).  Gerald, therefore, has not alleged a hostile work environment.  The Court thus dismisses the SAC.

### III.   THE COURT GRANTS GERALD LEAVE TO FILE A THIRD AMENDED COMPLAINT FOR A HOSTILE WORK ENVIRONMENT CLAIM.

The Court grants Gerald leave to file a second amended complaint for a hostile work environment claim.  "The court should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).  "The . . . Tenth Circuit has emphasized that '[t]he purpose of [rule 15(a)] is to provide litigants the maximum opportunity for each claim to be decided on its merits rather than on procedural niceties.'"  B.T. ex rel. G.T. v. Santa Fe Pub. Schs., No. CIV 05-1165 JB/RLP, 2007 WL 1306814, at *2 (D.N.M. Mar. 12, 2007)(Browning, J.)(quoting Minter v. Prime Equip. Co., 451 F.3d 1196, 1204 (10th Cir. 2006)).  The Tenth Circuit has interpreted rule 16 as imposing a "good cause" standard to untimely motions to amend when a scheduling order governs the case.  See Minter v. Prime Equip. Co., 451 F.3d at 1205 n. 4.  "This requires the moving party to show that it has been diligent in attempting to meet the deadlines, which means it must provide an adequate explanation for any delay."  Minter v. Prime Equip. Co., 451 F.3d at 1205 n. 4.

The Defendants assert that, even considering the allegations in Gerald's affidavit, he has not plead an hostile work environment claim, and therefore giving him leave to amend would be futile.  The Court may refuse to allow a plaintiff to amend his or her complaint when amendment would

be futile.  See Brereton v. Bountiful City Corp., 434 F.3d at 1219 ("A dismissal with prejudice is appropriate where a complaint fails to state a claim under Rule 12(b)(6) and granting leave to amend would be futile.").  While the Court does not consider whether the allegations in Gerald's affidavit establish a hostile work environment claim for the purposes of deciding the Defendants' motion to dismiss.  See Kearney v. Dimanna, 195 F. App'x at 721 n.2 ("It is well-established . . . that in determining whether to grant a motion to dismiss, the district court, and consequently this court, are limited to assessing the legal sufficiency of the allegations contained within the four corners of the complaint."), the Court will consider, however, whether the affidavit's allegations, in combination with the SAC's allegations, would plausibly establish a hostile work environment claim to determine whether amendment would be futile.  While the Court is reluctant to consider evidence that a defendant puts forth in response to a motion to dismiss, it is somewhat different when a plaintiff puts forth evidence.  A plaintiff may have some legitimate reasons why its material is not in the complaint.  For example, the plaintiff may have recently uncovered the facts in discovery and has not been able to amend when the Court hears the motion to dismiss.  While Gerald's situation does not fit the usual pattern, his circumstances -- his original attorney being suspended from the practice of law -- is also an uncommon occurrence.  The Court concludes that the allegations in Gerald's affidavit in conjunction with the allegations in the SAC are sufficient to set forth a plausible hostile work environment claim.

The Defendants assert that Gerald's allegations in his affidavit are insufficient to set forth a plausible hostile work environment claim.  The Defendants contend that Gerald's allegations in his affidavit are not materially different from the facts the Tenth Circuit held were insufficient to survive summary judgment in Bolden v. PRC Inc.  In that case, the Tenth Circuit affirmed summary judgment on, among other things, a plaintiff's hostile work environment claim.  The plaintiff, "Mr.

Bolden, an African American, had worked as an electrician at PRC for eight years" and he was "a

sensitive and serious person working in a shop filled with boorish churls. Eventually, the torment

from his coworkers became unbearable for Mr. Bolden, so he resigned his employment with PRC."

43 F.3d at 548. "Although the record on appeal show[ed] Mr. Bolden was badgered frequently by

several of his coworkers, Mr. Bolden allege[d] only two of his coworkers made overtly racial

remarks.":

> Barry Fiordimondo, a coworker, at least three years before Mr. Bolden's resignation, warned Mr. Bolden "you better be careful because we know people in [the] Ku Klux Klan." Mr. Fiordimondo also used terms such as "honky" and "nigger" in Mr. Bolden's presence. Mr. Fiordimondo drew a sad face cartoon and titled it "Junior makes the same pay as I do." Mr. Bolden interpreted this cartoon to be a racial attack directed at him as the only black person working in the shop at the time the picture was drawn. In his deposition, Mr. Bolden notes Mr. Fiordimondo was considered a joking type of person who often used the terms "honky" and "nigger" in the shop with respect to persons other than Mr. Bolden.

> Another coworker, Michael Weinsaft, also allegedly made racial remarks directed at Mr. Bolden. Mr. Bolden cannot recall any of Mr. Weinsaft's racial slurs or jokes.

> During the last year and a half of Mr. Bolden's employment with PRC, several of his coworkers began deriding him. Mr. Bolden kept a log of most of these incidents. Mr. Bolden lists twenty incidents occurring over the eighteen-month period. On one occasion, Mr. Weinsaft walked over to Mr. Bolden's work area and expelled flatus directly at Mr. Bolden. Two other coworkers made flatulence jokes involving Mr. Bolden: One coworker expelled flatus and said, "[a] kiss for you Jim." Although such jokes were a common occurrence in the shop, Mr. Bolden was the sole recipient of such direct gas from Mr. Weinsaft.

> Other coworkers called Mr. Bolden names. He was referred to as "dickhead," "dumbshit," "asshole," "faggot," and "fool." During a lunch break, an unidentified coworker rigged Mr. Bolden's chair so the back would fall off when Mr. Bolden leaned against it. One coworker told Mr. Bolden "to go to hell [and he] hopes [his] family goes there with [him], along with [his] dog." One morning on his way into work, Mr. Bolden encountered a coworker leaving the building. Mr. Bolden jokingly said, "[G]oing the wrong way aren't you?" In response, the coworker called Mr. Bolden a fool and kept on walking. The final provocation, resulting in Mr. Bolden's resignation, was when a coworker violently pushed Mr. Bolden after they accidentally bumped into each other.

Mr. Bolden describes the workshop as a "joking" environment where most of the workers made jokes and were the targets of joking behavior.  Mr. Bolden notes he does not like to joke at work.  He is a serious, literal-minded person.  Mr. Bolden also presents evidence about his religion and about how some of his coworkers may have been aggressive toward him in response to his strongly-held religious beliefs.

43 F.3d at 549.  The district court granted the defendants summary judgment on all Bolden's claims, including a hostile work environment claim.  The district court stated that "the badgering of the plaintiff was 'commonplace of the blue collar environment of the electronics shop,'" and held that the "evidence show[ed] only isolated and sporadic racial comments."  43 F.3d at 550 (citation to the record omitted).  Bolden appealed, "assert[ing] the reasonable inferences drawn from the facts he has shown support a claim of racially hostile work environment."  The Tenth Circuit affirmed:

For Mr. Bolden's harassment claim to survive summary judgment, his facts must support the inference of a racially hostile environment, [s]ee Meritor, 477 U.S. at 67 . . . , and support a basis for liability, Hicks v. Gates Rubber Co., 833 F.2d 1406, 1417-18 (10th Cir. 1987). Specifically, it must be shown that under the totality of the circumstances (1) the harassment was pervasive or severe enough to alter the terms, conditions, or privilege of employment, Meritor, 477 U.S. at 67 . . . , and (2) the harassment was racial or stemmed from racial animus. General harassment if not racial or sexual is not actionable. The plaintiff must show "'more than a few isolated incidents of racial enmity.'" Hicks, 833 F.2d at 1412 (quoting Snell v. Suffolk Co., 782 F.2d 1094, 1103 (2d Cir. 1986)). Instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments. Id. at 1412-13 (citing Johnson v. Bunny Bread Co., 646 F.2d 1250, 1257 (8th Cir. 1981)).

The blatant racial harassment of Mr. Bolden came from only two of his coworkers on a couple of occasions. The racial jokes and slurs were infrequent. In the eight years Mr. Bolden worked at PRC, he complains of only two overtly racial remarks (the Ku Klux Klan comment and the use of the term "nigger") and one arguably racial comment (the sad face cartoon). Because the racial comments were not pervasive, they are insufficient to be actionable. However, we must consider the totality of the circumstances and therefore consider the racial comments along with the general ridicule of Mr. Bolden by the other coworkers.

The general ridicule became prevalent two years after Mr. Fiordimondo made the overt racial invectives. None of the general ridicule was overtly racial. Mr. Bolden explained in his deposition the workshop had a "joking" atmosphere. Many of the workers harassed one another; many of the workers were the recipients of such jokes. The derisive environment in the workshop was universal; Mr. Bolden was not

-67-

singled out for abuse.  Mr. Bolden notes for the court, others in the shop were badgered as he was.  The only difference, revealed in the record, between Mr. Bolden and the rest of the shop was that Mr. Bolden could not tolerate the taunting. Mr. Bolden did not share the crude and rude sensibilities of his coworkers.

Mr. Bolden has not presented evidence of "'a steady barrage of opprobrious racial comment,'" as required to show a racially hostile work environment.  Hicks, 833 F.2d at 1412-13 (quoting Johnson, 646 F.2d at 1257).  It is clear from the record Mr. Bolden was unhappy at work; however, general torment and taunting if not racially discriminatory are not actionable.  There is no evidence in the record concerning the racial makeup of the workshop, whether Mr. Bolden was the only African American in the shop, or whether the other recipients of such general taunting were African American.  Mr. Bolden's workplace was permeated with "intimidation, ridicule, and insult"; however, the record reveals the intimidation, ridicule, and insult were directed indiscriminately, not targeted at Mr. Bolden due to his race.  Thus, we conclude Mr. Bolden's claim of racial harassment fails because he has not shown he was singled out for abuse and has not shown the ridicule he faced stemmed from racial animus.  We do not mean to suggest a plaintiff's claim will necessarily be defeated if the plaintiff works in a place where several of the workers are taunted.  Our holding in this case is narrow.  Mr. Bolden failed to survive the summary judgment motion, because he did not present evidence to support the inference of pervasive racial harassment.  See Meritor, 477 U.S. at 65. Accordingly, we affirm the grant of summary judgment on the claim of racial harassment.

Bolden v. PRC Inc., 43 F.3d at 551.

While some elements of the holding in Bolden v. PRC Inc. bolsters the Court's dismissal of

the SAC, because the SAC alleges only a "few isolated incidents" that were not "overtly racial" in

the realm of football, Bolden v. PRC Inc., 43 F.3d at 551 (citations omitted), the opinion is not

particularly instructive in assessing the viability of the allegations in the SAC combined with the

allegations in Gerald's affidavit.  Unlike the "general ridicule" in Bolden v. PRC Inc., which was

"directed indiscriminately," and Bolden was not "singled out for abuse," 43 F.3d at 551, Gerald

alleges that Locksley's ephithets, threats, and physical violence were racially charged, and directed

at him and the other black coaches, see Gerald Aff. ¶ 8, at 2 ("As I grew to know Coach Locksley,

I saw that his profane and demeaning conduct was directed toward the Black coaches, and that he

rarely used profanity or derision against the White coaches."); id. ¶ 9, at 2 ("[Gerald] had a habit of addressing other Black coaches and me as 'nigger,' both in public and in private, which I found offensive."); id. at ¶ 10, at 2 ("He also had a habit of using intimidation and threats when a Black was being disciplined or when there was a disagreement, but rarely if ever used such conduct against White coaches.").  Unlike the "two overtly racial remarks (the Ku Klux Klan comment and the use of the term 'nigger') and one arguably racial comment" in Bolden v. PRC Inc., which were made two years before "[t]he general ridicule became prevalent," 43 F.3d at 551, Gerald alleges that, "throughout the Spring and Summer of 2009," Locksley "continued to call other Black assistants and [Gerald] 'nigger,'" Gerald Aff. ¶ 14, at 2 (emphasis added), and that, "[d]uring several coaches meetings," Locksley told them to "be careful not to hire too many 'niggers' as coaches," Gerald Aff. ¶ 15, at 2 (emphasis added), which reasonably implies that the racial epithets were frequent and occurred contemporaneously with the alleged threats and physical violence.  Unlike the dispensation of flatus, violent push, and general ridicule in Bolden v. PRC Inc., which Bolden had not shown "stemmed from racial animus," Gerald alleges that Locksley's actions sprung from racial bias, see Gerald Aff. ¶ 8, at 2 ("As I grew to know Coach Locksley, I saw that his profane and demeaning conduct was directed toward the Black coaches, and that he rarely used profanity or derision against the White coaches.").

Nonetheless, the Court agrees that the allegations in the affidavit face difficulties going forward.  Many of the interactions with Locksley of which Gerald complains suggest that the bad blood between Locksley and Gerald resulted from their personal history and not from discriminatory intent on Locksley's behalf.  "[P]ersonality conflicts between employees are not the business of the federal courts."  Vore v. Ind. Bell Tel. Co., 32 F.3d 1161, 1162 (7th Cir. 1994).  Gerald states that, in May of 2009, he and Locksley disagreed on which high school prospect to recruit, and that

Locksley "became enraged when [Gerald] continued to disagree with him."  Gerald Aff. ¶¶ 11-12,

at 2.  Locksley threatened to "slap the shit" out of him, but that he defused the situation when he

"finally backed down to avoid a fight."  Gerald Aff. ¶¶ 12-13, at 2.  Similarly, Gerald alleges:

> In August of 2009, during a practice session where there were players, other coaching assistants and members of the press nearby, <u>Coach Locksley became enraged at me because of the performance of some of the players I was coaching</u>, and again threatened to "slap the shit" out of me.  At this point I stood up to him and told him in so many words that he would regret it if he tried.  After the incident on the practice field Coach Locksley began to single me out for abuse, berating me and using profanity when he was displeased with me.

Gerald Aff. ¶¶ 17-19, at 3 (emphasis added).

Gerald's account of the September 20, 2009 incident in the affidavit also lacks a racial

animus nexus, stating instead that Locksley was "angry and upset about [a] loss":

> On Sunday, September 20, 2009, after we had lost a football game to Air Force, we had a coaches meeting where we were watching film of the game and Coach Locksley was very angry and upset about the loss, and began to berate and curse at the coaches.  He focused on me and kept asking me about the execution of a particular play and how it should be run, and I told him that we would run it anyway he wanted.  Coach Locksley turned his chair around to face us and said, "you motherfuckers . . ." and then said some words that were incoherent, and got up from his chair and advanced on me in a threatening manner.  The Coach then attacked me while I was still sitting, and began to choke me with his hands until other coaches were able to push me away from him; as we separated, Coach Locksley swung at me with his fist and connected with my mouth, which bloodied my lip and caused bruises and abrasions.

Gerald Aff. ¶¶ 20-23, at 3-4.

Gerald's allegations in his affidavit against Krebs also suggest that a desire to protect the

football program and not racial animus motivated Krebs's actions of which Gerald complains.

Gerald alleges:

> I was called into Athletic Director Paul Krebs' office for several discussions on the matter.  Mr. Krebs tried to enlist me into covering up or minimizing the incident, and told me that I should assist the University in "damage control" over the incident, and that I should not talk to the media, he offered me an extended contract

> to coach at UNM.  At this point I had been contacted by ESPN and other sports news media for an interview about my charges against Coach Locksley.  During our conversations, Mr. Krebs told me that talking to the media and making an issue of the incident would be detrimental to my career in coaching, and that going after the Coach or discussing the matter with the media would be "career suicide," which I interpreted as a threat to harm my career in coaching if I did not play along with the University.  I refused to drop the issue and engaged in interviews and discussions with reporters about what happened and about the inadequate discipline given to Coach Locksley.

Gerald Aff. ¶¶ 30-34, at 4-5.

All boorish behavior does not amount to violations of Title VII.  See Bolden v. PRC Inc., 43 F.3d at 551 ("General harassment if not racial or sexual is not actionable.").

> Federal law provides that an employee is to be free from racial discrimination in the workplace, which includes freedom from a racially-hostile work environment. It does not guarantee a utopian workplace, or even a pleasant one.  If the workplace is unsavory for any reason other than hostility generated on the basis of race, gender, ethnicity, or religion, no federal claim is implicated.

Vore v. Ind. Bell Tel. Co., 32 F.3d at 1162.  The incidents Gerald alleges do not, on their face and alone, suggest that Locksley, an African American, mistreated Gerald, an African American, out of racial animus.  See Christian v. Runyan, NO. 94 CIV. 5907 (TPG), 1998 WL 47826, at *5 (S.D.N.Y. Feb. 4, 1998)("Although it is possible that there can be racial bias committed against a black employee by a black supervisor, the fact that much of the mistreatment alleged by plaintiff was, if it occurred, committed by a black supervisor is substantial evidence against the idea of racial bias.").  They suggest that Locksley had little patience for poor performance and having his decisions questioned, and that he responded to Gerald's perceived insubordination like a brute.  "[P]ersonality conflicts between employees are not the business of the federal courts."  Vore v. Ind. Bell Tel. Co., 32 F.3d at 1162.

On the other hand, Gerald provides allegations that Locksley used racial epithets, that his actions were racially motivated, and that racial animus drove his threats and physical violence.  He

alleges that Locksley possessed an "aggressive and dominant nature," that he had a "habit of demeaning his subordinates," and "us[ing] of profanity and racial epithets."  Gerald Aff. ¶ 7, at 2. Gerald further alleges that Locksley's "profane and demeaning conduct was directed toward the Black coaches, and that he rarely used profanity or derision against the White coaches." Gerald Aff. ¶ 8, at 2.  He also contends that Locksley used "intimidation and threats when a Black was being disciplined or when there was a disagreement, but rarely if ever used such conduct against White coaches."  Gerald Aff. ¶ 10, at 2.  Gerald further alleges that Locksley "had a habit of addressing other Black coaches and [Gerald] as 'nigger,' both in public and in private, which [Gerald] found offensive."  Gerald Aff. ¶ 9, at 2.  Gerald alleges that, throughout the Spring and Summer of 2009, Gerald "continued to use profanity and a threatening manner," and "continued to call other Black assistants and [Gerald] 'nigger.'"  Gerald Aff. ¶ 14, at 2.  Gerald states:

> During several coaches meetings [Locksley] told us that when we became head coaches we should be careful not to hire too many "niggers" as coaches, which was very offensive to me and the other Black assistants.  In these meetings and on the field his favoritism toward the White members of the coaching staff was very obvious, he rarely berated them or swore at them like he did the Black coaches.

Gerald Aff. ¶¶ 15-16, at 2-3.  Because Gerald plausibly alleges that Locksley's boorish behavior had a racial component, Locksley was Gerald's supervisor, and Locksley's activities occurred at meetings and work activities, Gerald sets forth allegations that his work environment was "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  Sandoval v. City of Boulder, 388 F.3d at 1327.

The Court granted Gerald leave to amend his pleading, because "the allegations in Gerald's EEOC Charge, combined with his allegations that Locksley threatened, hit, and choked him, may, under the totality of the circumstances, amount to a hostile work environment."  MOO at 74.  In the

EEOC Charge, Gerald alleges that he was "subjected . . . to different working term and conditions than the other White coaches, including, but not limited to, threats and intimidation of physical abuse, demeaning [his] decisions, and cursing [him] in front of [his] peers and students." EEOC Charge at 2. The Court stated in its MOO that "[t]he physical attack combined with other threats and abuse and public humiliation in front of [Gerald's] peers and students may push his hostile work environment claim across the line from possible to plausible." MOO at 74. The allegations in Gerald's affidavit achieve what the Court instructed Gerald to do in his SAC. Gerald alleges other incidents where Locksley threatened and abused him, namely Locksley threatened that he would "slap the shit" of Gerald in May 2009 after Gerald questioned Locksley recruitment pick, Gerald Aff. ¶¶ 11-12, at 2, and in August 2009 when Gerald's player performed badly, Gerald Aff. ¶ 17, at 2. The August 2009 was humiliating, because Gerald made the threat in front of "players, other coaching assistants and members of the press," Gerald Aff. ¶ 17, at 2, which "undermines the victim's authority in the workplace," Mathirampuzha v. Potter, 548 F.3d at 78-79 (citations omitted). Gerald's allegations that Locksley's threats and abuse were directed primarily towards black coaches plausibly links these allegations and the September 2009 incident to Locksley's alleged racial animus, because he alleges that Locksley's ephithets, threats, and physical violence were racially charged, and directed at him and the other black coaches. See Gerald Aff. ¶ 8, at 2 ("As I grew to know Coach Locksley, I saw that his profane and demeaning conduct was directed toward the Black coaches, and that he rarely used profanity or derision against the White coaches."); id. ¶ 9, at 2 ("[Gerald] had a habit of addressing other Black coaches and me as 'nigger,' both in public and in private, which I found offensive."); id. at ¶ 10, at 2 ("He also had a habit of using intimidation and threats when a Black was being disciplined or when there was a disagreement, but rarely if ever used such conduct against White coaches."). Gerald further alleges that Locksley used racial epithets,

asserting that "throughout the Spring and Summer of 2009," Locksley "continued to call other Black assistants and [Gerald] 'nigger,'" Gerald Aff. ¶ 14, at 2, and that, "[d]uring several coaches meetings," Locksley told them to "be careful not to hire too many 'niggers' as coaches," Gerald Aff. ¶ 15, at 2, which reasonably implies that the racial epithets were frequent and occurred contemporaneously with the alleged threats and physical violence. In sum, these allegations, in combination with the allegations in the SAC, plausibly allege a hostile work environment claim, because they "more than a few isolated incidents of racial enmity." Hicks v. Gates Rubber Co., 833 F.2d at 1412 (quoting Snell v. Suffolk Co., 782 F.2d at 1103). They allege Gerald's "workplace was permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Faragalla v. Douglas County Sch. Dist. RE 1, 411 F. App'x. at 152 (quoting Sandoval v. City of Boulder, 388 F.3d at 1327). The Court believes that these allegations, in combination with the allegations in the SAC, plausibly allege a hostile work environment. The threats and physical attacks, which Gerald alleges were racially motived, combined with use of racial epithets and public humiliation and mistreatment from his supervisor, make plausible that, "under the totality of circumstances [(i)] the harassment was pervasive or severe enough to alter the terms, conditions, or privilege of employment, and [(ii)] the harassment was racial or stemmed from racial animus." Bloomer v. United Parcel Serv., Inc., 94 F. App'x at 825 (quoting Witt v. Roadway Express, 136 F.3d at 1432).

The alternative, non-race-based explanations of Krebs and Locksley's conduct may ultimately condemn Gerald's claim on summary judgment, where he must overcome McDonnell

Douglas Corp. v. Green's burden shifting framework.[12]  Gerald may be unable to marshal evidence

that establishes a prima facie-case of discrimination, including showing that the "harassment was

racial or stemmed from racial animus.'" Bloomer v. United Parcel Serv., Inc., 94 F. App'x at 825.

If he is able to establish a prima-facie case, he may be unable to show that the Defendants'

---

[12] Under the burden-shifting analysis established in McDonnell Douglas Corp. v. Green, if the plaintiff establishes a prima-facie case for any of his discrimination claims, "the burden shifts to the defendant to come forward with a legitimate nondiscriminatory reason for its employment related decision." Mitchell v. City of Wichita, Kan., 140 F. App'x 767, 777 (10th Cir. 2005). "Upon the employer's articulation of legitimate, nondiscriminatory reasons . . . the presumption of discrimination established by the prima-facie case simply drops out of the picture." Kelly v. City of Albuquerque, 375 F. Supp. 2d 1183, 1210 (D.N.M. 2004)(Browning, J.)(internal quotations omitted), aff'd by 542 F.3d 802 (10th Cir. 2008).

> Once the defendant produces a legitimate, nondiscriminatory explanation for the defendant's action, to survive summary judgment, the plaintiff must establish a genuine question of material fact whether the defendant's explanation is pretextual. To establish a genuine issue of material fact as to pretext, a plaintiff must demonstrate that the Defendant's "proffered non-discriminatory reason is unworthy of belief." Pinkerton v. Colo. Dept. of Transp., 563 F.3d 1052, 1065 (10th Cir. 2009)(internal quotation marks and citations omitted). To meet this standard, a plaintiff must produce evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." Pinkerton v. Colo. Dept. of Transp., 563 F.3d at 1065 (internal quotation marks and citations omitted). "If a plaintiff advances evidence upon which a factfinder could conclude that the defendant's allegedly nondiscriminatory reasons for the employment decisions are pretextual, the court should deny summary judgment." Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ., 595 F.3d at 1134. "[A] plaintiff's prima facie case [of discrimination], combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. at 148. Consequently, "once a plaintiff presents evidence sufficient to create a genuine factual dispute regarding the veracity of a defendant's nondiscriminatory reason, we presume the jury could infer that the employer acted for a discriminatory reason and must deny summary judgment." Bryant v. Farmers Ins. Exchange, 432 F.3d at 1125.

West v. N.M. Taxation and Revenue Dep't, 757 F. Supp. 2d 1065, 1100 (D.N.M. 2010).

contention that Locksley's actions were the product of a personality conflict with Gerald and Locksley's dissatisfaction with Gerald's performance as a coach is pretextual.  He may also be unable to show that the Defendants' contention that Krebs encouraged Gerald to minimize the September 20, 2009 incident to protect the football team is pretextual.  Regardless, the difficulties Gerald's faces at future stages in the litigation are not a basis to grant a motion to dismiss, and do not render amendment futile.  See Bell Atlantic Corp. v. Twombly, 550 U.S. at 556 ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and "that a recovery is very remote and unlikely.").  Moreover, "McDonnell Douglas, . . . is an evidentiary standard, not a pleading requirement. . . .  [The Supreme Court] ha[s] rejected the argument that a Title VII complaint requires greater 'particularity,' because this would 'too narrowly constric[t] the role of the pleadings.'"  See Swierkiewicz v. Sorema N. A., 534 U.S. 506 (2002)(quoting McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 283 n.11 (1976)).  This remains true even after the Supreme Court's decisions in Bell Atlantic Corp. v. Twombly and Ashcroft v. Iqbal.  See Davis v. Coca-Cola Bottling Co. Consol., 516 F.3d 955, 974 (11th Cir. 2008)("[A] Title VII complaint need not allege facts sufficient to make a classic McDonnell Douglas prima facie case").  "[R]ead together, Swierkiewicz and Twombly require employment discrimination plaintiffs to allege sufficient material facts to state a plausible claim for relief, but do not mandate doing so on every element of the McDonnell Douglas prima facie case."  Kasten v. Ford Motor Co., No. 09-11754, 2009 WL 3628012, at *4 (E.D. Mich. Oct. 30, 2009).  "Asking for plausible grounds . . . does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" that supports Gerald's claim.  Bell Atlantic Corp. v. Twombly, 550 U.S. at 556.  While the Court concludes that the SAC and Gerald's affidavit manages to set forth allegations sufficient to plausibly suggest that

discovery may produce evidence of a hostile work environment, the allegations do not present a strong case.

While Gerald has been far from artful in setting forth his hostile work environment claim, the Court believes that, from the SAC and from Gerald's affidavit, the full picture emerges. Locksley is careful not to have too many black coaches on his staff, apparently concerned how they will perform or how the public may perceive a "too black" coaching staff. Locksley treats the black assistant coaches differently than the white coaches. He rides the black coaches harder and is more abrasive to the black coaches. He uses the word "nigger" to refer to and to criticize black coaches in front of coaches, staff, players, and the press. He also uses physical threats and has used physical force to intimidate Gerald. Locksley did not engage in this inappropriate physical conduct once or twice; it appears to have been unceasing.

The Defendants argue that "the notion that the situation at issue involved any racial component is implausible given that the person complaining and the subject of the complaint both are African American." Motion at 16 n.12 (citing Christian v. Runyan, 1998 WL 47826, at *5 ("Although it is possible that there can be racial bias committed against a black employee by a black supervisor, the fact that much of the mistreatment alleged by plaintiff was, if it occurred, committed by a black supervisor is substantial evidence against the idea of racial bias."). This argument suggests, in part, that a black man calling another black man "nigger" is not racist. Harvard Law School Professor Randall L. Kennedy states that, while the "American language is (and has long been) rife with terms of ethnic, racial, and national insult: kike, mick, wop, nip, gook, honkie, wetback, chink, et cetera . . . . ," nonetheless "[t]he editors of the Random House Webster's College Dictionary are correct in stating . . . that 'nigger is now probably the most offensive word in English." Randall L. Kennedy, The David C. Baum Lecture: "Nigger!" as a Problem in the Law,

2001 U. Ill. L. Rev. 935, 937 (footnotes omitted).

> The term "nigger," however, is remarkably protean.  It can mean many things.  It confirms Justice Oliver Wendell Holmes's celebrated remark that "[a] word is not a crystal, transparent and unchanged," but is instead "the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used."  A weapon of racist oppression, "nigger" can also be a weapon of antiracist resistance as in Dick Gregory's autobiography entitled Nigger, or H. Rap Brown's polemic Die Nigger Die!  An expression of deadening contempt, use of the N-word can also be an assertion of enlivened wit as in Richard Pryor's trenchant album of stand up comedy That Nigger's Crazy.  A term of belittlement, "nigger" can also be a term of respect as in "James Brown is a sho nuff nigger."  An insult, "nigger" can also be a compliment as in "he played like a nigger."  A term of hostility, nigger can also be a term of endearment as in "this is my main nigger" -- i.e., my best friend.  Noting appreciation for the linguistic and political complexity of "nigger," the journalist Jarvis Deberry maintains that the N-word is "beautiful in its multiplicity of functions . . . to convey so many contradictory emotions."  It might just be, he writes, "the most versatile and most widely applied intensifier in the English language."

Kennedy, supra, 2001 U. Ill. L. Rev. at 937 (footnotes omitted).  The import of the work "nigger"

is thus context bound.

> Regardless of how the N-word is used, there is a growing tension over its use.  Historically, there were times when the N-word was deemed acceptable among some Blacks when the word was used only amongst them.  Employing the N-word may have been an attempt to take the bite out of the word, to turn a negative into a positive, or to be defiant.  The N-word has become increasingly popular among hip-hop generation Black youth. . . .  Black comedians, rappers, and spoken-word artists have introduced the N-word into popular American culture by peppering their routines and lyrics with the word.

Gregory S. Parks & Shayne E. Jones, "Nigger": A Critical Race Realist Analysis of the N-Word

Within Hate Crimes Law, 98 J. Crim. L. & Criminology 1305, 1321-22 (2008)(footnotes omitted).

In certain circumstances, a black man's use of the word "nigger" to describe another black man may

be racist, particularly when it is used as a put-down, as a word of disrespect, or to explain why the

a person is acting in a particular manner.  The SAC and affidavit allow a reasonable inference that

Locksley was using the word in a racist sense, to paint black coaches in an negative light vis-a-vis

the white coaches.

The Defendants also contend that Gerald fails to allege that UNM is liable for Locksley's

or Krebs' actions.  They contend:

> [I]t is UNM -- not Locksley or Krebs -- that Plaintiff asserts his hostile work
> environment claim against.  There, however, is no allegation in the SAC or in
> Plaintiff's Affidavit that Plaintiff, at any time, made anyone at UNM aware of
> Locksley's conduct leading up to the September 2009 altercation or that Plaintiff
> took advantage of the resources UNM offers to resolve employment disputes.

Reply at 8.  Their argument is unavailing, because it asks the Court to require that Gerald overcome

an affirmative defense in his complaint.  The Tenth Circuit has "explained that an employer can be

vicariously liable for a hostile work environment created by a supervisor in two situations":

> First, the employer is vicariously liable when "the supervisor's harassment
> culminates in a tangible employment act, such as discharge, demotion, or undesirable
> reassignment." [Burlington Indus., Inc. v.] Ellerth, 524 U.S. [742,] 765 . . . [(1998)].
> In that situation, the employer has no affirmative defense available.  Id.  Second, an
> employer may be vicariously liable for a hostile work environment, even absent a
> tangible employment action.  However, in that circumstance, the employer will not
> be liable if it proves the following affirmative defense by a preponderance of the
> evidence: (1) it "exercised reasonable care to prevent and correct promptly any
> [racially] harassing behavior," and (2) the plaintiff "unreasonably failed to take
> advantage of any preventive or corrective opportunities provided by the employer
> or to avoid harm otherwise." Id.; see Faragher [v. City of Boca Raton], 524 U.S.
> [775,] 807 . . . [(1998)].

Shabestari v. Utah Non-Profit Housing, 377 F. App'x 770, 772-73 (10th Cir. 2010)(quoting

Pinkerton v. Colo. Dep't of Transp., 563 F.3d 1052, 1059 (10th Cir. 2009)).  Gerald does not allege

that he was subjected to a tangible employment action, which "constitutes a significant change in

employment status, such as hiring, firing, failing to promote, reassignment with significantly

different responsibilities, or a decision causing a significant change in benefits."  Burlington

Industries, Inc. v. Ellerth, 524 U.S. 742, 761 (1998).  See Couture v. Belle Bonfils Mem'l Blood

Ctr., 151 F. App'x 685, 690-91 (10th Cir. 2005)("[W]e reiterated our policy of 'liberally defin[ing]'

the phrase 'adverse employment action,' and indicated it is not necessarily limited to a 'tangible employment action' such as 'hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'"  (quoting Hillig v. Rumsfeld, 381 F.3d 1028, 1031 (10th Cir.2004))).[13]  Because whether UNM took adequate measures to prevent harassment and whether Gerald took adequately availed himself of corrective measures with regard to the new allegations of Locksley's alleged racially discriminatory behavior is at most an affirmative defense, he need not set forth allegations regarding these matters in his complaint.  See Atlantic Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d 1138, 1169 n.16

---

[13] The Court dismissed with prejudice Gerald's constructive discharge claim, because he did not allege circumstances that would force a reasonable person to resign.

> [C]onstructive discharge . . . can be regarded as an aggravated case of, sexual harassment or hostile work environment.  For an atmosphere of sexual harassment or hostility to be actionable, . . . the offending behavior "must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  Meritor, 477 U.S., at 67 . . . (internal quotation marks and brackets omitted).  A hostile-environment constructive discharge claim entails something more: A plaintiff who advances such a compound claim must show working conditions so intolerable that a reasonable person would have felt compelled to resign.  See, e.g., Breeding v. Arthur J. Gallagher & Co., 164 F.3d 1151, 1160 (C.A.8 1999) ("[A]lthough there may be evidence from which a jury could find sexual harassment, . . . the facts alleged [for constructive discharge must be] . . . so intolerable that a reasonable person would be forced to quit."); Perry v. Harris Chernin, Inc., 126 F.3d 1010, 1015 (C.A.7 1997) ("[U]nless conditions are beyond 'ordinary' discrimination, a complaining employee is expected to remain on the job while seeking redress.").

Pa. State Police v. Suders, 542 U.S. 129, 136-47 (1004).  If the Court had allowed his constructive discharge claims to go forward, his constructive discharge claims could serve as a tangible employment action.  See Pa. State Police v. Suders, 542 U.S. at 140-41 ("[A]n employer does not have recourse to the Ellerth/Faragher affirmative defense when a supervisor's official act precipitates the constructive discharge; absent such a 'tangible employment action,' however, the defense is available to the employer whose supervisors are charged with harassment.").  Regardless, Gerald would not be required to plead whether he availed himself of any preventive or corrective opportunities UNM provided.  The situation would be different, of course, on a motion for summary judgment.

-80-

(2000)("Federal Rule of Civil Procedure 8(c) requires a defendant to plead . . . any . . . affirmative defense in his answer to the complaint."  (quoting <u>Venters v. City of Delphi</u>, 123 F.3d 956, 967 (7th Cir. 1997))); <u>Zeligson v. Hartman-Blair, Inc.</u>, 135 F.2d 874, 874 (10th Cir. 1943)("[Affirmative defenses] may not be raised by a motion addressed to the sufficiency of the complaint."). <u>Compare</u> Fed. R. Civ. P. 8(a)(2)("A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief"), <u>with</u> Fed. R. Civ. P. 8(c)("In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense . . . .").

The Defendants further argue that Gerald is attempting to do an end run around the scheduling order.  They contend this amendment is untimely and that Gerald cannot show good cause to amend his pleading after the June 6, 2011 deadline for Gerald to file an amended complaint. <u>See</u> Scheduling Order at 1.  The Court believes, however, that Gerald's circumstances establish good cause to allow him to file an amended complaint.  Mr. Juarez picked up a number -- if not all -- of Mr. Montoya's cases when Mr. Montoya was suspended from the practice of law.  Mr. Montoya had an active practice and had sixty-six federal cases pending at the time of his suspension.  By way of comparison, each District Court of New Mexico judge currently carries a caseload of roughly one-hundred civil cases.  The Court may reasonably assume that Mr. Juarez also inherited a number of state court cases.  Mr. Montoya's cases were at various stages.  Mr. Juarez recently tried one of Mr. Montoya's former cases before the Court on June 29-30, 2011, in <u>Mata v. Rahn</u>, No. CIV. 10-0366. Gerald's move to Maryland complicated attorney-client communications.  Had Mr. Juarez requested a continuance to file his SAC when the Court issued its MOO, the Court would have granted it to him in light of the acute increase in his caseload that he was working under.  The sharp increase in his caseload provided good cause under rule 16, because Mr. Juarez could not meet the Court's

deadline despite his diligent efforts.  See Advanced Optics Elecs., Inc. v. Robins, 769 F.Supp.2d at 1313 ("Properly construed, 'good cause' means that scheduling deadlines cannot be met despite a party's diligent efforts.").  Mr. Montoya drafted Gerald's first two pleadings, and while the facts in Gerald's affidavit were known to Gerald, they were not know to Juarez.  While Mr. Juarez was remiss not to request the continuance in May 2011, before filing the SAC, the Court thus believes that there is good cause to allow give Gerald one final opportunity to file an amended complaint.

Gerald has tested the outer limits of rule 15(a) and rule 16(b)(4).  The Court might not abuse its discretion by denying Gerald's request to amend.  Bylin v. Billings, 568 F.3d at 1231-32 ("[T]he district court is given broad discretion in supervising the pretrial phase of litigation, and its decisions regarding the preclusive effect of a pretrial order . . . will not be disturbed unless they evidence a clear abuse of discretion."  (quoting United States v. Dang, 488 F.3d 1135, 1143 (9th Cir. 2007)); Morton Int'l, Inc. v. A.E. Staley Mfg. Co., 343 F.3d 669, 684 (3d Cir. 2003)("Rule 16 was not intended to function as an inflexible straightjacket on the conduct of litigation." (citations omitted)).  Nonetheless, the Court prefers to resolve Gerald's claim on the merits.  Burleson v. ENMR-Plateau Tel. Co-op., 2005 WL 3664299, at *2 (""[T]he . . . Tenth Circuit has determined that district courts should grant leave to amend when doing so would yield a meritorious claim."  (citing Curley v. Perry, 246 F.3d at 1284)).  Gerald has shown good cause for the Court to allow him to file a third amended complaint.  Mr. Juarez' explanation, while not compelling, is understandable, and given the volume of cases that Mr. Juarez assumed from Mr. Montoya, provides good cause to extend the deadline one more time, particularly given that discovery remains at an early stage.

The Court has treated Gerald liberally in its procedures and in considering material outside the complaint to decide whether to allow his to amend his pleadings.  The third amended complaint should be the last, and at the hearing, Gerald agreed.  See Tr. at 22:10-25 (Juarez)("[S]ay you've got

ten days to fix it or it's gone.").  If Gerald does not place his allegations, in full, in the third amended complaint the Court will not consider them.  Gerald's unorthodox procedures have caused the Court to expend considerable time and effort, and the case remains at the pleading stage.  Gerald's process has also been a burden on the Defendants.  Gerald and his counsel must put sound thought and careful effort into the next pleading.

　　　　**IT IS ORDERED** that the Defendants' Motion to Dismiss Plaintiff's Amended Complaint for Hostile Work Environment, filed June 9, 2011 (Doc. 53), is granted in part and denied in part. The Court dismisses Plaintiff's Amended Complaint for Hostile Work Environment Pursuant to the Court's Authorization to File Amended Complaint Set Forth in its Memorandum Opinion and Order of May 6th, 2011, filed May 15, 2011 (Doc. 50).  The Court dismisses Plaintiff Johnathan Gerald's retaliation claim without prejudice, because Gerald failed to exhaust his administrative remedies and the Court therefore lacks subject-matter jurisdiction.  The Court dismisses Gerald's hostile work environment claim, because Gerald fails to plausibly state his claim.  The Court grants Gerald leave to file an amended complaint for a hostile work environment claim within ten days of the date of this order.

　　　　　　　　　　　　　　　　　　　　　　　　　＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿
　　　　　　　　　　　　　　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE


*Counsel:*

Santiago E. Juarez
Albuquerque, New Mexico

　　　　*Attorneys for the Plaintiff*

-83-

John B. Pound
Mark T. Baker
Jennifer L. Attrep
Long, Pound & Komer, P.A.
Santa Fe, New Mexico

*Attorneys for the Defendants*